# Exhibit 5

CAUSE NO. 13-14212

FILED
13 DEC -4 AM 10: 31

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC. | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 191ST JUDICIAL DISTRICT |
| | § | |
| TURNKEY KIOSKS, LLC | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION, REQUEST FOR TEMPORARY INJUNCTION, REQUEST FOR PERMANENT INJUNCTION, AND REQUEST FOR DISCLOSURE

TO THE HONORABLE COURT:

COMES NOW, Plaintiff Ganart Technologies, Inc. ("Ganart"), and brings this action against Defendant TurnKey Kiosks, LLC ("TurnKey") for injunctive relief and damages, as follows:

### I. NATURE OF THE ACTION

1. Ganart seeks injunction relief and monetary damages against TurnKey based on its unauthorized use of Ganart's confidential and proprietary information and trade secrets in violation of the Texas Uniform Trade Secrets Act and a Non-Disclosure Agreement TurnKey entered into with Ganart.

### II. DAMAGES AND RELIEF

2. Ganart seeks monetary relief over $1,000,000.00.

3. Ganart also seeks non-monetary relief.

### III. DISCOVERY CONTROL PLAN

4. Ganart intends to conduct discovery under Level 3 of the Texas Rules of Civil Procedure.

## IV. PARTIES

5. Plaintiff Ganart Technologies, Inc. is a Delaware Corporation with its principal place of business located at 1700 Columbian Club Drive, Carrollton, Texas 75006.

6. Defendant TurnKey Kiosks, LLC ("TurnKey") is an Arizona limited liability company located at 8957 West Windsor Drive #118, Peoria, Arizona 85381. It may be served with process through the Texas Secretary of State. TurnKey's registered agent is: Margaret Strachan, 8573 W. Mohawk Lane, Peoria, Arizona 85382.

## V. JURISDICTION AND VENUE

7. The court has jurisdiction over the lawsuit because the amount in controversy exceeds this court's minimum jurisdictional requirements.

8. The Court has jurisdiction over TurnKey because it entered into the Non-Disclosure Agreement with Ganart which is the basis of this lawsuit. In entering into the contractual agreement at which forms the basis of this lawsuit, TurnKey purposefully established minimum contacts with Texas such that the exercise of jurisdiction comports with fair play and substantial justice. TurnKey purposely availed itself of the benefits and protections of Texas by conducting business with a company with its principal place of business in Texas and by entering into a contract which is governed by Texas law.

9. Venue is proper in this Court pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002.

## VI. FACTS GIVING RISE TO THIS ACTION

10. Ganart and TurnKey executed a Non-Disclosure and Confidentiality Agreement ("NDA") on December 6, 2011 to explore potential business opportunities. A true and correct copy of the NDA is attached hereto as Exhibit A. Pursuant to the NDA, Ganart subsequently

shared confidential information with TurnKey, including financial analysis and data, pricing, and device designs.

11. The confidential information and material provided to TurnKey was in connection with the development of a kiosk model for Ganart's Workplace Solution using Ganart's proprietary software platform (TaaS®) and proprietary hardware designs. Ganart provided TurnKey a list of approved devices and proprietary hardware designs needed for the kiosk. Ganart also provided TurnKey a palm secure cube by Fujitsu, along with Ganart's proprietary palm vein scanner assembly ("the Assembly"). The Assembly was a result of two years of research and development by Ganart to perfect the capture of biometric images in support of Ganart's Know-Your-Customer (KYC) and Anti-Money Laundering (AML) compliant Self-Service Registration at Kiosk ("Self-Service Registration at Kiosk") and biometric user authentication at kiosk which has been in commercial use since August 2011.

12. TurnKey sent their test kiosk to Ganart on November 3, 2012 to be put in Ganart lab for testing and device certification purposes. Ganart successfully tested the lab kiosk to run on Ganart software. The parties mutually agreed that TurnKey would send a production-ready kiosk to Ganart fitted with all devices, including the Assembly, for real production environment. Ganart shipped a unit of the Assembly to TurnKey in November 14, 2012 to be installed in the production-ready kiosk.

13. TurnKey executives (Gary Strachan, Kelly Strachan, Margaret Strachan, and Casey Strachan) visited the corporate office of Ganart on December 7, 2012 to discuss the parties' business relationship.

14. On January 7, 2013 Casey Strachan made a request for two units of the Assembly stating that TurnKey had two palm vein scanner devices with them available that they would like

to fit into two Assembly units. TurnKey requested a kiosk with Ganart-approved devices and the Assembly, running on Ganart software platform to be installed in their corporate office in Peoria, Arizona as a demo unit for prospective customers for Ganart's Workplace Solution. The parties agreed that Ganart would send two units of the Assembly to TurnKey with the mutual understanding that one unit of the Assembly would be installed in the demo unit to be deployed in TurnKey's corporate office, and the other one would be held by TurnKey pending request by Ganart for another kiosk. Ganart sent two units of the Assembly to TurnKey that day.

15. TurnKey completed the production ready kiosk fitted with the Assembly and shipped it to Ganart on January 24, 2013 which was deployed by Ganart in the Humanetics factory location in Carrollton, Texas.

16. Ganart sent a hard drive to TurnKey loaded with Ganart's proprietary software, which was received by TurnKey on March 8, 2013. TurnKey used the hard drive and one of the Assembly units for the demo kiosk that was placed in their corporate office. The demo kiosk was operational on April 1, 2013 TurnKey is currently in possession of one Assembly unit, the other was returned to Ganart in November in a disassembled state.

17. On August 20, 2013 Ganart received several alerts from TurnKey's demo unit. Upon inquiry, Ganart was informed that TurnKey removed several devices from the demo unit, which triggered the alerts.

18. On September 4, 2013 Casey Strachan requested to make some changes to the software module (from two cassette dispenser to one cassette version) as TurnKey had a customer visiting their shop on September 5, 2013 and TurnKey wanted to do a demo of Ganart services on the demo kiosk.

19. On September 5, 2013, Ganart received emergency call from TurnKey that their demo unit was not responding. TurnKey also made an emergency request to enable Self-Service Registration at Kiosk service on the demo unit for a customer demo. Ganart responded to the requests. TurnKey sent a confirmation email to Ganart that the demo unit was working and the Self-Service Registration at Kiosk service worked very well. TurnKey also requested Ganart to restore the previous services on the demo unit. On September 6, 2013 TurnKey sent another email that Self-Service Registration at Kiosk service worked great during customer demo.

20. On September 12, 2013 Gary Strachan made a request to ship the lab kiosk in Ganart lab back to TurnKey with the explanation that they had an opportunity to sell it to a customer. Ganart erased its software from the hard drive and removed its own devices from the lab kiosk prior to shipment.

21. On September 20, 2013 TurnKey made an emergency request to enable Self-Service Registration at Kiosk service again on their demo unit for a customer demo later that day. Ganart responded to the request by enabling the Self-Service Registration at Kiosk service for that customer demo.

22. During the week of September 23, 2013 TurnKey had the Ganart lab kiosk picked up from Ganart premises by UPS.

23. On October 23, 2013 TurnKey sent an email that the ID Tech (ID scanner) device on their demo unit was not working. Upon information and belief, TurnKey unplugged the ID Tech device from the demo unit, plugged in another device, and then when they re-plugged the ID Tech device, it stopped working.

24. On or about October 28, 2013 Ganart learned from media reports that Robocoin Technologies installed a kiosk (supplied by TurnKey) in Vancouver, Canada. The kiosk

installed by Robocoin is the same model manufactured by TurnKey for Ganart. Photographs of the kiosk accompanying the news reports reveal that the palm vein scanner assembly installed on the Robocoin kiosk is the same as the Assembly designed by Ganart. Also, the software-based customer registration process used on Robocoin kiosk appears to be a replica of Ganart's Self-Service Registration at Kiosk. When confronted with this information, TurnKey admitted that the palm vein scanner Assembly installed on the Robocoin kiosk had the same components provided by Ganart and same design of the Assembly provided to TurnKey by Ganart.

25. TurnKey has:

A. Violated the terms of the NDA with Ganart by providing Robocoin Technologies the design of Assembly, which is proprietary to Ganart.

B. Infringed upon the intellectual property of Ganart by providing Robocoin Technologies the entire Self-Service Registration at Kiosk process, which is proprietary to Ganart.

### VII.  CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT

26. Ganart repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs.

27. TurnKey has misappropriated Ganart's trade secrets through improper means.

28. Turnkey has disclosed and used Ganart's trade secrets in violation of the NDA.

29. As a result of TurnKey's misappropriation, disclosure and improper use, Ganart has suffered losses and irreparable injury.

30. TurnKey is likely to continue to breach the NDA and act in a manner to irreparably harm Ganart unless restrained and enjoined.

31. Ganart's remedy at law is not by itself adequate to compensate it for the injuries inflicted and threatened by TurnKey's conduct. As such, Ganart is entitled to injunctive relief pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 134A.003.

32. In addition to injunctive relief, Ganart is also entitled to recover damages for TurnKey's misappropriation including, but not limited to, actual losses, unjust enrichment, and lost royalties.

33. TurnKey's conduct in misappropriating Ganart's trade secret was willful and malicious, and thus, Ganart is entitled to and seeks exemplary damages.

34. Ganart has been required to retain the services of the undersigned attorneys in prosecution of this claim. Pursuant to TEX. CIV. PRAC. & REM. CODE § 134A.005, Ganart seeks to reimburse its attorneys' fees and costs expended in presenting this mater.

## COUNT II

### BREACH OF CONTRACT

35. Ganart repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs.

36. Ganart and TurnKey entered into a valid contract, namely the NDA.

37. TurnKey breached the NDA by, among other things misappropriating Ganart's trade secrets and disclosing them to a third party or parties.

38. TurnKey has admitted it violated the terms of the NDA.

39. As a direct result of TurnKey's breaches, Ganart has sustained general and special damages in a sum to be proved at trial.

40. Ganart has been required to retain the services of the undersigned attorneys in prosecution of this claim. Pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001, Ganart seeks to reimburse its attorneys' fees and costs expended in presenting this matter.

### VIII. REQUEST FOR TEMPORARY INJUNCTION

41. Ganart repeats and incorporates by this reference each and every allegation set forth in the preceding paragraphs.

42. Ganart's request for a temporary injunction is authorized by Texas Civil Practice and Remedies Code § 65.011 and 134A.003 because, among other things, the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant.

43. In executing the NDA, Ganart and TurnKey agreed as follows:

> Because monetary damages are difficult to ascertain and may be inadequate as a remedy for a Party in the event that the other Party were to violate the terms of this Agreement, Ganart and TurnKey agree that each Party may seek to obtain an injunction to prevent unauthorized use or disclosure of its Confidential Information by the other Party.

44. Ganart asks the Court to prevent the Defendant from engaging in business activities that violates the NDA. Specifically, Ganart asks to the Court to:

A. Restrain TurnKey from disclosing any and all information or data of Ganart, and any information or data related to third parties that Ganart has an obligation to treat as confidential, including without limitations, trade secrets, proprietary technical & business data, technical & business expertise, idea, design, features, software functions, hardware materials, manufacturing processes, software and firmware computer programs, algorithm, architecture, source code, patterns, devices, invention, trademarks, copyright, compilations of information, records and specifications, business methods and techniques, customer list, and product information, whether provided by Ganart in written or verbal form, or as data recorded in machine-readable form, or printed facsimile form.

  B. Restrain TurnKey from using any and all information or data of Ganart, and any information or data related to third parties that Ganart has an obligation to treat as confidential, including without limitations, trade secrets, proprietary technical & business data, technical & business expertise, idea, design, features, software functions, hardware materials, manufacturing processes, software and firmware computer programs, algorithm, architecture, source code, patterns, devices, invention, trademarks, copyright, compilations of information, records and specifications, business methods and techniques, customer list, and product information, whether provided by Ganart in written or verbal form, or as data recorded in machine-readable form, or printed facsimile form.

45. It is probable that Ganart will recover from Defendant after a trial on the merits because, as discussed in detail and as will be shown by the evidence and testimony, TurnKey has violated the terms of the NDA.

46. Ganart is willing to post bond or cash deposit in lieu of a bond.

### IX. REQUEST FOR PERMANENT INJUNCTION

47. Ganart repeats and incorporates by this reference each and every allegation set forth in the preceding paragraphs.

48. Ganart asks the Court to set its request for permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against TurnKey.

### X. CONDITIONS PRECEDENT

49. All conditions precedent to Ganart's claims for relief have been performed or have occurred.

### XI. REQUEST FOR DISCLOSURE

50. Under Texas Rule of Civil Procedure 194, Ganart requests that Defendant disclose, within 50 days of service of this request, the information or materials described in Rule 194.2.

## XII. Prayer for Relief

WHEREFORE, for these reasons, Ganart asks that Defendant be cited to appear and answer, and that Ganart be awarded a judgment against Defendant for the following:

(1) Temporary injunction.

(2) Permanent injunction.

(3) Actual damages.

(4) Exemplary Damages.

(5) Prejudgment and postjudgment interest.

(6) Attorneys' fees.

(7) Court costs.

(8) All other relief to which Ganart is entitled.

Respectfully submitted,

**COBB MARTINEZ WOODWARD PLLC**
1700 Pacific Avenue, Suite 3100
Dallas, Texas 75201
(214) 220-5204
(214) 220-5254 (Fax)

By: *[signature]*

**JONATHAN C. LaMENDOLA**
Texas Bar No. 00792637
email: jlamendola@cobbmartinez.com
**DAVID R. WOODWARD**
Texas Bar No. 21975650
email: dwoodward@cobbmartinez.com

**ATTORNEYS FOR PLAINTIFF GANART TECHNOLOGIES, INC.**

# EXHIBIT A



## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Confidentiality and Non-Disclosure Agreement ("Agreement"), effective as of the 6 day of Dec, 2011 ("Effective Date") by and between Ganart Technologies, Inc., having its office at 1700 Columbian Club Drive, Carrollton, Texas 75006, USA, (hereinafter referred to as "**Ganart**"), and Turnkey Kiosks LLC  14705 N 83rd Ave #105 having its office at 14705 N 83rd Ave #105, Peoria, AZ 85382 (hereinafter referred to as "**Individual**"), is intended to preserve the confidentiality and proprietary status of information to be disclosed or exchanged between Ganart and Individual, each a "**Party**" and collectively "**Parties**".

WHEREAS, each Party may, from time to time, for Purposes defined hereunder, disclose to the other Party certain technical and/or business information that Disclosing Party considers confidential and proprietary.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Definition of Confidential Information. As used herein, "**Confidential Information**" of a Party disclosing such information ("**Disclosing Party**") to the other Party ("**Receiving Party**") shall mean any and all information or data of Disclosing Party, and any information or data related to third parties that Disclosing Party has an obligation to treat as confidential, including without limitation, trade secrets, proprietary technical & business data, technical & business expertise, idea, design, features, software functions, hardware materials, manufacturing processes, software and firmware computer programs, algorithm, architecture, source code, patterns, devices, invention, trademarks, copyright, compilations of information, records and specifications, business methods and techniques, customer list, and product information, whether provided by Disclosing Party in written or verbal form, or as data recorded in machine-readable form, or printed facsimile form. Such Confidential Information is either designated as confidential by Disclosing Party at the time such disclosure is made, or is disclosed in circumstances of confidence, or would otherwise be understood by Receiving party, exercising reasonable judgment, to be confidential.

   "**Customer/Consumer Information**" means all information relating to any customer, consumer or prospective or former customer or consumer of Ganart or of any of Ganart's affiliates, and including without limitation: (a) any and all non-public personal information of consumers or customers (within the meaning of Title V of the Gramm-Leach-Bliley Act and its implementing regulations), and (b) any information from which a customer or consumer's identity can be ascertained, either from the information itself or by combining the information with information from other sources. Customer/Consumer Information is Confidential Information.

2. Purposes. Each Party agrees to use Confidential Information received from the other Party only for the purpose(s) of discussing a potential business opportunity in connection with development of products or services for Ganart by Individual, or modifications to the products or services of Individual enabling such products or services to interface with Ganart's products or services, and/or determining whether to enter into a mutual business relationship concerning the same or similar products or services ("**Purposes**").

3. Obligations of Confidentiality. The Parties agree, with respect to any Confidential Information to which either is a Receiving Party, to the following:

   3.1 Receiving Party shall protect and keep confidential and secure all Confidential Information of the Disclosing Party with the same degree of precautions and safeguards it uses to protect and keep its own Confidential Information of a similar nature, but in no case with less than reasonable care.

   3.2 Receiving Party will not copy and distribute, furnish or otherwise disclose any Confidential Information of Disclosing Party to any third party, without the specific written permission of Disclosing Party. As a condition of granting such permission, Disclosing Party may require Receiving Party to execute an agreement with the third party in substantially the same form as this Agreement.

3.3 Receiving Party agrees to disclose Confidential Information received from Disclosing Party only to representatives, officers, employee(s), or agents of Receiving Party who have a "need to know" such Confidential Information, only for Purposes set forth in this Agreement, and who have agreed in writing to be bound by confidentiality terms no less restrictive than the terms of this Agreement.

3.4 Receiving Party shall not decompile, disassemble, decode, reproduce, redesign, reverse engineer, reverse design, duplicate in whole or part, replicate, develop derivatives of or copy the design of any software, algorithm, source code, schematics, diagrams, technical documentation, or related products provided by Disclosing Party or to which Receiving Party has access to.

4. Exceptions to Confidentiality. Notwithstanding any other provisions of this Agreement, the term "Confidential Information" does not include information which: (a) has been published by Disclosing Party, or is otherwise in the public domain without breach of this Agreement by Receiving Party; (b) is properly within the legitimate possession of Receiving Party prior to its disclosure hereunder, and without obligation of confidentiality; (c) after disclosure, is received by Receiving Party from a third party which, to Receiving Party's knowledge, had rights in such Confidential Information and was not restricted from disclosing the information to Receiving Party hereunder; (d) is independently developed by Receiving Party without using the Confidential Information, or; (e) is approved for disclosure by Disclosing Party, in writing, prior to its disclosure.

Notwithstanding anything to the contrary in this Agreement, Receiving Party may disclose Confidential Information to a Court or other government body having applicable jurisdiction upon request; in which case, Receiving Party shall disclose only that portion of the Confidential Information that it is legally required to disclose, provided however, that Receiving Party shall first give prompt notice to Disclosing Party upon receipt of such request so that Disclosing Party may seek a protective order or other appropriate relief as Disclosing Party, in its sole discretion, may elect, and Receiving Party shall reasonably cooperate, at Disclosing Party's expense, with Disclosing Party in Disclosing Party's effort to obtain such order or relief.

5. No License. All Confidential Information furnished by Disclosing Party pursuant to this Agreement shall remain the sole property of Disclosing Party. Receiving Party recognizes and agrees that nothing in this Agreement shall be construed as granting any right or license to Receiving Party, express or implied, to any Confidential Information of Disclosing Party disclosed pursuant to this agreement, or to any patent, copyright, trademark, trade secret, or other intellectual property of Disclosing Party that has issued or that may issue based upon the Confidential Information.

6. Disclaimer. No representation or warranty of any kind is given by Disclosing Party, either expressly or by implication, including without limitation any representation or warranty of merchantability, fitness for any particular purpose, non-infringement, accuracy, or completeness, with respect to the Confidential Information disclosed to Receiving Party pursuant to this Agreement.

7. No Obligation. Nothing in this Agreement shall obligate either Party to disclose any information to the other Party or obligate either Party to enter into any other agreement or business transaction. Subject to the obligations hereof, neither Party shall be precluded from independently developing or acquiring products, services or technology, or pursuing business opportunities similar to or competitive with those covered by this Agreement.

8. Return or Destruction of Information. Upon termination of this Agreement, or upon written request by Disclosing Party made at any time, Receiving Party shall within ten (10) business days return all Confidential Information (original, copies, or extracts), or Receiving Party shall, upon Disclosing Party's option, destroy all Confidential Information, and provide a written certification by an officer of Receiving Party to Disclosing Party of such return or destruction. Notwithstanding the foregoing, either Party may retain one copy of the Confidential Information of the other Party for its records if it is necessary solely for compliance with legal or regulatory obligations, subject to the continuing confidentiality obligations set forth in this Agreement.

9. **Termination.** Either Party may terminate this Agreement on thirty (30) days written notice to the other Party at the address set forth in this Agreement or at such other address that a Party may hereafter give to the other Party in writing. Notwithstanding the termination of this Agreement by either Party, all provisions of this Agreement relating to the rights and obligations concerning Confidential Information disclosed prior to the effective date of termination of this Agreement shall continue for a period of five (5) years after the date of such termination; *provided, however,* that with respect to (a) Confidential Information which consists of technical information (including without limitation, software, schematics, diagrams, algorithm, source code, and other technical documentation), and (b) trade secrets, the obligations of the Receiving Party contained in this Agreement shall continue indefinitely, and with respect to Customer/Consumer Information the obligations of Individual under this Agreement shall continue indefinitely.

10. **Severability.** In the event that any portion of this Agreement shall be ruled invalid by a court of competent jurisdiction, the remaining portions shall be deemed valid and in effect, and interpreted as if the invalid portion had never been part hereof.

11. **Modification; Assignment.** This Agreement cannot be amended, nor its provisions modified, except in writing by authorized representatives of Ganart and Individual. Neither Party may transfer or otherwise assign its rights, duties, and obligations under this Agreement, in whole or in part, without the prior written consent of the other Party.

12. **Waiver.** No waiver of a Party's rights, remedies, powers, or privileges under this Agreement shall be effective unless expressed in writing. The failure or delay or neglect by Disclosing Party to enforce at any time any of the provisions of this Agreement shall not be construed or deemed to be a waiver of Disclosing Party's rights, remedy, power, or privileges hereunder, nor prejudice Disclosing party's rights to take subsequent action.

13. **Remedies.** Because monetary damages are difficult to ascertain and may be inadequate as a remedy for a Party in the event that the other Party were to violate the terms of this Agreement, Ganart and Individual agree that each Party may seek to obtain an injunction to prevent unauthorized use or disclosure of its Confidential Information by the other Party. Should an action be brought, the prevailing Party (as determined by the court) shall be entitled to a reasonable sum for attorney's fees and costs in addition to any other relief that may be awarded.

14. **Compliance with Laws.** Both Parties agree to comply with all applicable laws and regulations relating to its performance of this Agreement.

15. **Governing Law; Arbitration.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, USA, without regard to the conflict of laws principles thereof. Ganart and Individual will make all commercially reasonable efforts to resolve all disputes and disagreements through good faith negotiations conducted by informal means, such as by written correspondence, teleconference, and/or meetings. The venue of any arbitration shall be Dallas, Texas, USA.

16. **Headings.** Captions and titles of sections and subsections of this Agreement are for convenience only and will not be considered or referred to in resolving questions of interpretation or construction.

17. **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties with respect to the Purposes set forth herein, and supersedes any prior understandings, agreements, or representations, expressed or implied, between the Parties regarding the subject matter of this Agreement.

18. **Counterparts.** This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered to the other Party by facsimile, email, postal service, courier or commercial delivery service shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date listed above.

GANART:

*Signature*

Anttrony M. Cochern
*Printed Name*

President / CEO
*Title*

INDIVIDUAL:

*Signature*

Gary Strachan
*Printed Name*

Director of Operations
*Title*

1700 Columbine Club Drive, Corollina, Texas USA
(O): 1-972-416-1301   Email: info@ganart.net   Web: www.ganart.com