IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC. | § § | CIVIL ACTION NO. |
| VS. | § § | 3:14-CV-00616-BF |
| TURNKEY KIOSKS, LLC | § § | |

### AFFIDAVIT OF WAYNE McHUGH

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned authority, on this day personally appeared Wayne McHugh, who being duly sworn upon his oath deposed and stated as follows:

1. "My name is Wayne McHugh. I am the President and COO for Ganart Technologies, Inc. ("Ganart"). I am over eighteen (18) years of age and am fully competent to testify regarding the facts set forth in this Affidavit of my own personal knowledge.

2. Ganart is a local technology company specializing in self-service technology solutions for financial services.

3. Ganart developed and owns Workplace Solution™, an automated wage handling and currency dispensing system that provides companies with a secure, in-house, and automated option for providing employees immediate access to earned wages when needed before the next scheduled pay period. Kiosks provide a physical interface with Workplace Solution through the use of Ganart's proprietary and patented software and hardware. Ganart's patented software platform is known as Transaction-as-a-Service or TaaS®. It works in conjunction with a palm vein scanner assembly developed by Ganart and a palm secure cube by Fujitsu (the "Assembly"). The two capture a biometric image which supports Ganart's Know-Your Customers (KYC) and Anti-Money Laundering (AML) compliant Self-Service Registration at Kiosk System.

4. Ganart spent more than two years and hundreds of thousands of dollars researching and developing Self-Service Registration at Kiosk system in order to perfect the capture of biometric images in support of Ganart's Self-Service Registration and biometric user authentication functions at kiosks. This patent pending process is proprietary to Ganart and has been in commercial use by Ganart and Ganart's customers since July 2010. This proprietary process is not shared with others absent a Non-Disclosure Agreement. All non-public information is protected and secured in a Tier III data center located in Dallas, Texas.

5. On December 6, 2011 Ganart and TurnKey Solutions, LLC ("TurnKey") entered into a Non-Disclosure Agreement as a prerequisite to Ganart working with TurnKey to develop a customized TurnKey kiosk that would interface with Ganart's proprietary software and hardware designs and operate

Workplace Solution. A true and correct copy of the Non-Disclosure Agreement is attached to this Affidavit.

6. Kiosk development and testing ensued in 2012 after Ganart provided TurnKey with confidential information and designs, including three Ganart Assemblies, which were to be installed in production ready kiosks manufactured for Ganart by TurnKey.

7. On March 8, 2013 Ganart provided TurnKey a hard drive loaded with Ganart's proprietary software, including Self-Service Registration at Kiosk technology and process, which was installed, along with a Ganart Assembly in a demo kiosk placed at TurnKey's corporate offices. The demo kiosk was to be solely used for demonstrations to potential Ganart Workplace Solution™ customers.

8. During a phone call with Gary Strachan, Margaret Strachan, Kelly Strachan, and Casey Strachan on or about August 2013 TurnKey offered to provide me a copy of the hard drive image of the software from their previous software company, Pay-Ease, in support of product development for our common customer, PayCenter1. I refused the offer and warned TurnKey to never make a copy of Ganart's proprietary software (hard drive image) without written authorization or specific direction from Ganart.

9. On August 20, 2013 Ganart received several system-generated terminal management alerts from the TurnKey demo kiosk indicating TurnKey had unplugged and/or removed several devices from the demo kiosk.

10. On September 4, 2013 TurnKey requested changes to Ganart software (from two cassette dispenser to one cassette version) as they had a customer visiting TurnKey on September 5, 2013.

11. On September 5, 2013:

> At 10:57 a.m. TurnKey sent an emergency email to Ganart indicating their demo kiosk loaded with Ganart's software was not responding.
>
> At 3:27 p.m. TurnKey made another emergency request to enable Ganart's Self-Service Registration at Kiosk on TurnKey's demo kiosk for a customer demonstration.
>
> At 4:53 p.m. TurnKey sent a confirmation email to Ganart that Ganart's Self-Service Registration at Kiosk worked great and Ganart can restore the previous services on TurnKey's demo kiosk.

12. On September 6, 2013 5:01 p.m. TurnKey sent another email to Ganart indicating Ganart's Self-Service Registration at Kiosk worked great.

13. On September 12, 2013 TurnKey requested Ganart ship the TurnKey kiosk in Ganart lab to TurnKey with the explanation that TurnKey had an opportunity to sell it to a customer.

14. On September 20, 2013 10:53 a.m. TurnKey made an emergency request to enable Ganart's Self-Service Registration at Kiosk service on TurnKey's demo kiosk for a customer demonstration later that day.

15. On or about September 23, 2013 TurnKey picked up its kiosk in Ganart lab.

16. On October 23, 2013, TurnKey contacted Ganart regarding a nonfunctioning identification scanner on TurnKey's demo kiosk. The ID scanner stopped functioning because TurnKey had removed it, plugged in another device and then attempted to reconnect the ID scanner.

17. On or about October 28, 2013, I learned that TurnKey had sold Robocoin Technologies ("Robocoin") a kiosk which was deployed in Vancouver, Canada. Robocoin is a company that exchanges Bitcoins for cash. Prior to its relationship with TurnKey, the process by which Robocoin accomplished the exchange was done with a cell phone and QR Code, which can be seen on the internet at:

http://www.bing.com/videos/search?q=Youtube+robocoin&FORM=VIRE1#view=detail&mid=DAF1C467768D69BD95B8DAF1C467768D69BD95B8

18. The kiosk deployed by Robocoin in Canada incorporated Ganart's proprietary Assembly and appears to duplicate Ganart's Self-Service Registration at Kiosk system. This can be seen on the internet at:

http://www.bing.com/videos/search?q=youtube+robocoin&FORM=VIRE3#view=detail&mid=C1DA06D849E6DA9E8D5EC1DA06D849E6DA9E8D5E

http://www.wired.com/wp-content/uploads/blogs/wiredenterprise/wp-content/uploads/2013/10/bitcoin2-1.jpg

19. The kiosk deployed by Robocoin appears to be the same model manufactured for Ganart and the palm vein scanner TurnKey installed on it was the same one designed by Ganart.

20. After learning of the Robocoin kiosk, I emailed Gary Strachan, TurnKey's Director of Operations. Gary denied demonstrating Ganart's Workplace Solution, including Self-Service Registration at Kiosk. He told me Robocoin came to them with all the devices for self-service registration. In a subsequent call Gary Strachan admitted that TurnKey installed Ganart's palm vein scanner Assembly in the Robocoin kiosk deployed in Vancouver, Canada. He then apologized and asked if there was any way we could continue doing business together.

21. Ganart has ceased doing business with TurnKey and has demanded the return of all confidential information and the palm vein scanner Assemblies of Ganart. Of the three Assemblies, only two were returned and one of those was returned completely disassembled.

22. On November 11, 2013 Ganart sent a notice to TurnKey of termination of mutual NDA with TurnKey with effective date of December 11, 2013.

23. On February 25, 2014, I learned that Robocoin deployed a TurnKey-built kiosk in Austin, Texas with palm vein scanner assisted self-service registration, which appears to duplicate Ganart's Self-Service Registration at Kiosk process.

24. I have since learned that Robocoin has deployed additional kiosks in the United States (at least three more in Texas), Canada, and several other countries all with palm vein scanner assisted self-service registration, which appears to duplicate Ganart's Self-Service Registration at Kiosk process.

Further, affiant sayeth not."

_____
WAYNE McHUGH

SUBSCRIBED AND SWORN TO before me on this 19 day of May, 2014, to certify which witness my hand and seal of office.



JANIE WHITE
Notary Public, State of Texas
My Commission Expires
March 13, 2017

_____
NOTARY PUBLIC IN AND
FOR THE STATE OF TEXAS

My Commission Expires:

March 13, 2017

AFFIDAVIT OF WAYNE McHUGH - Page 4
Doc. #119722




## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Confidentiality and Non-Disclosure Agreement ("Agreement"), effective as of the 6 day of Dec, 2011 ("Effective Date") by and between Ganart Technologies, Inc., having its office at 1700 Columbian Club Drive, Carrollton, Texas 75006, USA (hereinafter referred to as "Ganart"), and Turnkey Kiosks U.S. 19205 - N 83rd Ave #105, having its office at 19205 - N 83, 4 Ave #105, Gera, AZ 85382 (hereinafter referred to as "Individual"), is intended to preserve the confidentiality and proprietary status of information to be disclosed or exchanged between Ganart and Individual; each a "Party" and collectively "Parties".

WHEREAS, each Party may, from time to time, for Purposes defined hereunder, disclose to the other Party certain technical and/or business information that Disclosing Party considers confidential and proprietary.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Definition of Confidential Information.** As used herein, "**Confidential Information**" of a Party disclosing such information ("**Disclosing Party**") to the other Party ("**Receiving Party**") shall mean any and all information or data of Disclosing Party, and any information or data related to third parties that Disclosing Party has an obligation to treat as confidential, including without limitation, trade secrets, proprietary technical & business data, technical & business expertise, idea, design, features, software functions, hardware materials, manufacturing processes, software and firmware computer programs, algorithm, architecture, source code, patterns, devices, invention, trademarks, copyright, compilations of information, records and specifications, business methods and techniques, customer list, and product information, whether provided by Disclosing Party in written or verbal form, or as data recorded in machine-readable form, or printed facsimile form. Such Confidential Information is either designated as confidential by Disclosing Party at the time such disclosure is made, or is disclosed in circumstances of confidence, or would otherwise be understood by Receiving party, exercising reasonable judgment, to be confidential.

   "**Customer/Consumer Information**" means all information relating to any customer, consumer or prospective or former customer or consumer of Ganart or of any of Ganart's affiliates, and including without limitation: (a) any and all non-public personal information of consumers or customers (within the meaning of Title V of the Gramm Leach-Bliley Act and its implementing regulations), and (b) any information from which a customer or consumer's identity can be ascertained, either from the information itself or by combining the information with information from other sources. Customer/Consumer Information is Confidential Information.

2. **Purposes.** Each Party agrees to use Confidential Information received from the other Party only for the purpose(s) of discussing a potential business opportunity in connection with development of products or services for Ganart by Individual, or modifications to the products or services of Individual enabling such products or services to interface with Ganart's products or services, and/or determining whether to enter into a mutual business relationship concerning the same or similar products or services ("**Purposes**").

3. **Obligations of Confidentiality.** The Parties agree, with respect to any Confidential Information to which either is a Receiving Party, to the following:

   3.1 Receiving Party shall protect and keep confidential and secure all Confidential Information of the Disclosing Party with the same degree of precautions and safeguards it uses to protect and keep its own Confidential Information of a similar nature, but in no case with less than reasonable care.

   3.2 Receiving Party will not copy and distribute, furnish or otherwise disclose any Confidential Information of Disclosing Party to any third party, without the specific written permission of Disclosing Party. As a condition of granting such permission, Disclosing Party may require Receiving Party to execute an agreement with the third party in substantially the same form as this Agreement.

3.3 Receiving Party agrees to disclose Confidential Information received from Disclosing Party only to representatives, officers, employee(s), or agents of Receiving Party who have a "need to know" such Confidential Information, only for Purposes set forth in this Agreement, and who have agreed in writing to be bound by confidentiality terms no less restrictive than the terms of this Agreement.

3.4 Receiving Party shall not decompile, disassemble, decode, reproduce, redesign, reverse engineer, reverse design, duplicate in whole or part, replicate, develop derivatives of or copy the design of any software, algorithm, source code, schematics, diagrams, technical documentation, or related products provided by Disclosing Party or to which Receiving Party has access to.

4. Exceptions to Confidentiality. Notwithstanding any other provisions of this Agreement, the term "Confidential Information" does not include information which: (a) has been published by Disclosing Party, or is otherwise in the public domain without breach of this Agreement by Receiving Party; (b) is properly within the legitimate possession of Receiving Party prior to its disclosure hereunder, and without obligation of confidentiality; (c) after disclosure, is received by Receiving Party from a third party which, to Receiving Party's knowledge, had rights in such Confidential Information and was not restricted from disclosing the information to Receiving Party hereunder; (d) is independently developed by Receiving Party without using the Confidential Information, or; (e) is approved for disclosure by Disclosing Party, in writing, prior to its disclosure.

Notwithstanding anything to the contrary in this Agreement, Receiving Party may disclose Confidential Information to a Court or other government body having applicable jurisdiction upon request; in which case, Receiving Party shall disclose only that portion of the Confidential Information that it is legally required to disclose, provided however, that Receiving Party shall first give prompt notice to Disclosing Party upon receipt of such request so that Disclosing Party may seek a protective order or other appropriate relief as Disclosing Party, in its sole discretion, may elect, and Receiving Party shall reasonably cooperate, at Disclosing Party's expense, with Disclosing Party in Disclosing Party's effort to obtain such order or relief.

5. No License. All Confidential Information furnished by Disclosing Party pursuant to this Agreement shall remain the sole property of Disclosing Party. Receiving Party recognizes and agrees that nothing in this Agreement shall be construed as granting any right or license to Receiving Party, express or implied, to any Confidential Information of Disclosing Party disclosed pursuant to this agreement, or to any patent, copyright, trademark, trade secret, or other intellectual property of Disclosing Party that has issued or that may issue based upon the Confidential Information.

6. Disclaimer. No representation or warranty of any kind is given by Disclosing Party, either expressly or by implication, including without limitation any representation or warranty of merchantability, fitness for any particular purpose, non-infringement, accuracy, or completeness, with respect to the Confidential Information disclosed to Receiving Party pursuant to this Agreement.

7. No Obligation: Nothing in this Agreement shall obligate either Party to disclose any information to the other Party or obligate either Party to enter into any other agreement or business transaction. Subject to the obligations hereof, neither Party shall be precluded from independently developing or acquiring products, services or technology, or pursuing business opportunities similar to or competitive with those covered by this Agreement.

8. Return or Destruction of Information. Upon termination of this Agreement, or upon written request by Disclosing Party made at any time, Receiving Party shall within ten (10) business days return all Confidential Information (original, copies, or extracts), or Receiving Party shall, upon Disclosing Party's option, destroy all Confidential Information, and provide a written certification by an officer of Receiving Party to Disclosing Party of such return or destruction. Notwithstanding the foregoing, either Party may retain one copy of the Confidential Information of the other Party for its records if it is necessary solely for compliance with legal or regulatory obligations, subject to the continuing confidentiality obligations set forth in this Agreement.

9. **Termination.** Either Party may terminate this Agreement on thirty (30) days written notice to the other Party at the address set forth in this Agreement or at such other address that a Party may hereafter give to the other Party in writing. Notwithstanding the termination of this Agreement by either Party, all provisions of this Agreement relating to the rights and obligations concerning Confidential Information disclosed prior to the effective date of termination of this Agreement shall continue for a period of five (5) years after the date of such termination; provided, however, that with respect to (a) Confidential Information which consists of technical information (including without limitation, software, schematics, diagrams, algorithm, source code, and other technical documentation), and (b) trade secrets, the obligations of the Receiving Party contained in this Agreement shall continue indefinitely, and with respect to Customer/Consumer Information the obligations of Individual under this Agreement shall continue indefinitely.

10. **Severability.** In the event that any portion of this Agreement shall be ruled invalid by a court of competent jurisdiction, the remaining portions shall be deemed valid and in effect, and interpreted as if the invalid portion had never been part hereof.

11. **Modification; Assignment.** This Agreement cannot be amended, nor its provisions modified, except in writing by authorized representatives of Ganart and Individual. Neither Party may transfer or otherwise assign its rights, duties, and obligations under this Agreement, in whole or in part, without the prior written consent of the other Party.

12. **Waiver.** No waiver of a Party's rights, remedies, powers, or privileges under this Agreement shall be effective unless expressed in writing. The failure or delay or neglect by Disclosing Party to enforce at any time any of the provisions of this Agreement shall not be construed or deemed to be a waiver of Disclosing Party's rights, remedy, power, or privileges hereunder, nor prejudice Disclosing party's rights to take subsequent action.

13. **Remedies.** Because monetary damages are difficult to ascertain and may be inadequate as a remedy for a Party in the event that the other Party were to violate the terms of this Agreement, Ganart and Individual agree that each Party may seek to obtain an injunction to prevent unauthorized use or disclosure of its Confidential Information by the other Party. Should an action be brought, the prevailing Party (as determined by the court) shall be entitled to a reasonable sum for attorney's fees and costs in addition to any other relief that may be awarded.

14. **Compliance with Laws:** Both Parties agree to comply with all applicable laws and regulations relating to its performance of this Agreement.

15. **Governing Law; Arbitration.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, USA, without regard to the conflict of laws principles thereof. Ganart and Individual will make all commercially reasonable efforts to resolve all disputes and disagreements through good faith negotiations conducted by informal means, such as by written correspondence, teleconference, and/or meetings. The venue of any arbitration shall be Dallas, Texas, USA.

16. **Headings.** Captions and titles of sections and subsections of this Agreement are for convenience only and will not be considered or referred to in resolving questions of interpretation or construction.

17. **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties with respect to the Purposes set forth herein, and supersedes any prior understandings, agreements, or representations, expressed or implied, between the Parties regarding the subject matter of this Agreement.

18. **Counterparts.** This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered to the other Party by facsimile, email, postal service, courier or commercial delivery service shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1700 Columbian Club Drive, Carrollton, Texas, USA
(O) +1-972-416-1304   Email: info@ganart.net   Web: www.ganart.com

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date listed above.

GANART:

_____
Signature

Antthony M. Cachere
Printed Name

President/CEO
Title

INDIVIDUAL:

_____
Signature

Gary S Trachan
Printed Name

Director of Operations
Title

1700 Cottonwood Club Drive, Carrollton, Texas USA
Tel: 1-972-416-1304   Email: info@ganart.net   Web: www.ganart.com