IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC. | § | CIVIL ACTION NO. 3:14-cv-00616-BF |
| Plaintiffs, | § | |
| | § | |
| | § | |
| | § | |
| V. | § | |
| | § | |
| TURNKEY KIOSKS, LLC | § | |
| Defendant. | § | |
| | § | |
| | § | |

---

**DEFENDANT TURNKEY KIOSK, LLC'S RESPONSE TO PLAINTIFF'S BRIEF IN
SUPPORT OF ITS APPLICATION FOR TEMPORARY INJUNCTION**

---

**DAVID W. WILLIAMS**
*Admitted Pro Hac Vice*
Email: dwilliams@davismiles.com

**JOSHUA W. CARDEN**
Texas Bar No. 24050379
Email: jcarden@davismiles.com

**DAVIS MILES MCGUIRE GARDNER, PLLC**
545 E. John Carpenter Freeway, Suite 300
Irving, Texas 75062
P. 972.674.3885
F. 972.674.2935

**Attorneys for Defendant, TurnKey Kiosks, LLC**

**TABLE OF CONTENTS**

TABLE OF CONTENTS…………………………………………………………………ii

TABLE OF AUTHORITIES…………………………………………………………..…....iii

I.     INTRODUCTION…………………………………………………………..1

II.    FACTUAL BACKGROUND……………………………………………......………..2

    A.    TurnKey Manufactures Custom Kiosks for its Customers…………..…………..2

    B.    Ganart's Business Relationship with TurnKey…………..…………......................3

    C.    Ganart Was Aware of TurnKey's Attempt to Promote the Sale of Kiosks on Behalf of Both TurnKey and Ganart…………..……….......................................5

    D.    TurnKey's Business Relationship with RoboCoin Technologies, LLC…………..………………………………………………….…..8

    E.    TurnKey Has Returned All of Ganart's Proprietary Information…………..………………………………………………….11

III.    GANART HAS FAILED TO ESTABLISH ITS ENTITLEMENT TO A PRELIMINARY INJUNCTION. …………..…………………………………………..11

    A.    Ganart Cannot Establish a Likelihood of Success on the Merits…........................12

        1.    *Ganart Fails to Even Identify What Its Trade Secret Is, and How it is Even a Trade Secret.* …………..……………………………………………....13

        2.    *Ganart Has Failed to Show That TurnKey has Misappropriated the Alleged Trade Secrets.* …………..…………............................................17

    B.    Ganart Cannot Show Irreparable Harm. …………..…………………………....19

    C.    Imposing A Preliminary Injunction Will Put TurnKey Out of Business. ……....21

    D.    Public Policy Interest Supports Denial of the Injunction. …………..…………..22

IV.    A SIGNIFICANT BOND IS WARRANTED. …………..…………………………....22

V.    CONCLUSION…………..…………………………………………….………...23

## TABLE OF AUTHORITIES

### STATUTES

Tex. Civ. Prac. & Rem. Code § 134A.001……………………………………………………12

Tex. Civ. Prac. & Rem. Code § 134A.002(2)…………………………………………………17

Tex. Civ. Prac. & Rem. Code § 134A.002(3)…………………………………………………17

Tex. Civ. Prac. & Rem. Code § 134A.002(6)…………………………………………………13

Tex. Civ. Prac. & Rem. Code § 134A.002……………………………………………………12

### CASES

*Alliance Research Corp. v. Telular Corp.*, 859 F. Supp. 400, 405 (C.D. Cal. 1994)………........21

*Atlas Powder Co. v. Ireco Chem.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985)………………………20

*Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*,
370 F.3d 151, 163 (1st Cir. 2004) …………………………………………………………21

*Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 996 (Fed. Cir. 1985)…………………………...20

*Engelhard Corp. v. Savin Corp.*, 505 A.2d 30, 33 (Del. Ch. 1986) ……………………….……15

*Oscar Mayer Foods Corp. v. Sara Lee Corp.*, 743 F. Supp. 1326, 1333
(W.D. Wis. 1990)……………………………………………………………………………...21

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
907 F.2d 679, 683 (Fed. Cir. 1990)……………………………………………….…..21, 22

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003)………..12

*Luccous v. J.C. Kinley Co.*,
376 S.W. 2d 336, 338 (Tex. 1964)……………………………………….……………...13, 15

*MAI Sys. Corp. v. Peak Computer*,
991 F.2d 511, 522 (9th Cir. 1983)………………………………………………………….13

*Mercer v. C.A. Roberts Co.*,
570 F.2d 1232, 1239 (5th Cir. 1978)………………………….…………………………13

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
760 F.2d 618, 621 (5th Cir. 1985)……………………………………………………...12

*O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*,
389 F.3d 973, 1017, (10th Cir.2004)……………………………………………………20

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985)………20

*Oscar Mayer Foods Corp. v. Sara Lee Corp.*,
    743 F. Supp. 1326, 1333,        (W.D. Wis. 1990)………………………………………..21

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*,
    292 F.Supp.2d 594, 609 (D.N.J. 2003)………………… …………………………22

*Plains Cotton Coop. Ass'n v. Goodpasture Serv., Inc.*, 807 F.2d 1256, 1261 (5th Cir. 1987)…...12

*Rimes v. Club Corp. of America*,
    542 S.W. 2d 909, 913 (Tex. Civ. App. 1976)……………………………………....15

*StorageCraft Tech. Corp. v. Symantec*,
    No. 2:07-CV-856 CW, 2009 WL 112434, at *2 (D. Utah Jan. 16, 2009)………….....15


*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
    667 F.3d 570, 574 (5th Cir. 2012)……………………………………………………12

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F.Supp. 2d  935, 959 (S.D. Tex. 2013)………..13

*Wilson v. Continental Dev. Co.*,
    112 F.Supp. 2d 648, 662 (W.D. Mich. 1999)……………………………………...…13

*Wissman v. Boucher*, 150 Tex. 326, 240 S.W.2d 278, 280 (Tex. 1951)…………………………15

*Xerox Corp. v. International Business Business Corp.*, 64 F.R.D. 367, 371 (S.D.N.Y. 1974)…15

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC. | § | CIVIL ACTION NO. 3:14-cv-00616-BF |
| Plaintiffs, | § | |
| | § | |
| | § | |
| | § | |
| V. | § | |
| | § | |
| TURNKEY KIOSKS, LLC | § | |
| Defendant. | § | |
| | § | |
| | § | |

---

**DEFENDANT TURNKEY KIOSK, LLC'S RESPONSE TO PLAINTIFF'S BRIEF IN
SUPPORT OF ITS APPLICATION FOR TEMPORARY INJUNCTION**

---

Defendant TurnKey Kiosks, LLC ("TurnKey") submits its response to Plaintiff Ganart Technologies, Inc.'s ("Ganart") brief in support of its application for a temporary injunction.

**I.      INTRODUCTION**

This lawsuit arises out of a failed business partnership between Ganart and TurnKey related to a joint venture to develop kiosks.  Through this lawsuit and its request for injunctive relief, Ganart seeks to prevent TurnKey from doing business with a separate, unrelated customer, RoboCoin Technologies, LLC based upon an alleged violation of the Texas Uniform Trade Secrets Act.

Ganart has alleged that TurnKey shared parts of a "palm vein scanner assembly" and Ganart's "Self-Service Registration at Kiosk" software with RoboCoin, or other unidentified third-parties.  TurnKey has not shared any proprietary information with RoboCoin that is being used in RoboCoin's current business relationship with TurnKey, nor has Ganart even identified how the "palm vein scanner assembly" or "Self-Service Registration at Kiosk" constitutes a trade secret, and how TurnKey even shared the alleged trade secret with RoboCoin.   Ganart is not

entitled to injunctive relief because it has failed to even set out the most basic elements of its claim for violation of the Texas Trade Secret Act against TurnKey, or the other necessary elements to support a temporary restraining order.  Because such elements have not been met, TurnKey requests that the Court deny Ganart's request for injunctive relief.

## II.      FACTUAL BACKGROUND

### A.      TurnKey Manufactures Custom Kiosks for its Customers

TurnKey is a family owned business and a manufacturer and supplier of custom kiosks, including financial services kiosks, automatic teller machines, outdoor service kiosks, ticketing kiosks, print-on-demand kiosks, and other custom ordered kiosks, to customers across various industries.  *See* Declaration of Gary Strachan, ¶ 3, Exhibit 1 of the Appendix ("App. 2, ¶ 3").  TurnKey is a creator of custom kiosk solutions.  App. 2, ¶ 4.  TurnKey consults with their customers to understand what the business problem to be solved is and then set about to build the solution.  *Id.*  Generally, TurnKey builds a custom kiosk enclosure, installs Original Equipment Manufacturer ("OEM") components and if the customer does not have software to operate the solution, TurnKey will recommend one of its software partners to develop a software solution to run on the custom kiosk.  *Id.*

TurnKey works with its customer to design the specific custom kiosk needed by the customer in their specific field of interest.  App. 3, ¶ 5.  Generally, a customer will supply information to TurnKey for what the customer needs for its custom kiosk, and TurnKey will design and assemble the kiosk, which includes various OEM off the shelf hardware components.  *Id.*  Many times TurnKey will supply its customer with off the shelf hardware components and OEM software tools to aid in the use of these components.  App. 3, ¶ 6.  The software tools include device drivers, software development kits ("SDK's") and application program interfaces ("API's") which are provided by the OEM hardware manufacturers to allow the customer to integrate the OEM hardware component into their software program which allows them

personalized control of the hardware components in the kiosk to the customer's specific needs. *Id.*

### B.     Ganart's Business Relationship with TurnKey

On or about December 6, 2011, TurnKey and Ganart Technologies, Inc. entered into a "Confidentiality and Non-Disclosure Agreement" ("the NDA"), which provided that TurnKey and Ganart could share confidential and propriety information with each other for the purpose of development of products and services and other joint business opportunities so long as such information was not disclosed to other third parties. App. 3, ¶ 7.

Ganart and TurnKey were interested in developing a kiosk solution whereby TurnKey supplied the custom made kiosk enclosure and OEM hardware components, and Ganart supplied software for the kiosks. App. 3, ¶ 8. Ganart had previously attempted to design their own kiosks that utilized their software program that allowed the end consumer of the kiosk to do the Ganart proprietary transaction Money Earned® (a software that allowed an employee to obtain a payroll advance before they were paid) and conduct other financial transactions such as ATM withdrawals, bill payment and wire transfers. App. 3, ¶ 8.

In Paragraph 6 of his affidavit, Mr. McHugh avers that TurnKey manufactured the three demonstration kiosks specifically for Ganart. This is untrue. App. 4, ¶ 10. Ganart had difficulty manufacturing its own kiosks, and thus, it was fortuitous when TurnKey contacted Ganart as a potential business partner. As part of the business venture with Ganart, TurnKey supplied Ganart access to three demonstration kiosks that had been built by TurnKey with various OEM hardware components, and were standard models of their TK-8200 Financial Series kiosks used by TurnKey in its business. *Id.*, ¶ 11. The kiosks were modified to utilize Ganart's software program that was used to allow an employee to take cash from their paycheck before pay day. TurnKey supplied the hardware for the kiosks. *Id.*, ¶ 12.

The only "hardware" supplied by Ganart for the three demonstration kiosks was three sheet metal housings, three finger guides, at least three domes, and one Fujitsu PalmSecure®

---

DEFENDANT TURNKEY KIOSK, LLC'S RESPONSE TO PLAINTIFF'S BRIEF IN SUPPORT OF ITS
APPLICATION FOR TEMPORARY INJUNCTION                                              PAGE 3

cube. *Id.*, ¶ 13.  These materials are not "trade secrets" of Ganart.  The major components of the palm vein scanner assembly are (1) the Fujitsu PalmSecure® cube (2) the metal housing (3) a rounded dome; and (4) finger guides.  *Id.*, ¶ 14.  The "Fujitsu PalmSecure® cube" is a highly reliable biometric authentication system based on palm vein pattern recognition technology which is used to capture a biometric scan of a consumer/user's palm and the unique palm vein patterns in the user's hand, which is used to identify the user.  *Id.*, ¶ 15.  The Fujitsu PalmSecure® cube is an OEM component available to anyone including manufacturers such as TurnKey. The companion to the Fujitsu PalmSecure® cube is the Fujitsu PalmSecure® hand guide. *Id.*, ¶ 16.  The Fujitsu PalmSecure® cube scanner is mounted within the sheet metal housing.  *Id.*, ¶ 17.  In order to use the scanner, the user places their hand within the housing on the finger/hand guide.  The hand guide is necessary to prevent the users hand from moving so that the scanner can capture the biometric image of the user's hand.  *Id.*, ¶ 17.

On November 19, 2012, Mr. McHugh provided the Ganart technical drawings for the metal housing, the dome and the finger/hand guide and gave permission to Casey Strachan to "morph it into a TurnKey kiosk."  *See* App. 14-16, Email from Wayne McHugh to Casey Strachan dated November 19, 2012; *See also* App. 5, ¶ 18.  TurnKey independently developed its own sheet metal housing and dome components for a palm vein scanner component that would work on all TurnKey's kiosks.  App. 5, ¶ 18.  In November 2012, TurnKey requested Ganart's permission to create its own components that could be used in future kiosks.  *Id.*, ¶ 18.  TurnKey contracted with its own CAD designer to create a version for the metal housing, the dome and the finger/hand guide component that would be compatible within all TurnKey's kiosks.  *Id.*, ¶ 19.  TurnKey also contracted with its own plastic molding company to create a dome for the TurnKey kiosks that would allow a Fujitsu PalmSecure® cube to work on a TurnKey kiosk. *Id.*, ¶ 20.

The housing and dome components created by TurnKey are completely different than Ganart's housing and dome components for its palm vein scanner assemblies.  *Id.*, ¶ 21.  For

instance, the dome that was manufactured for TurnKey by its plastic molding company was made out of a clear acrylic plastic, while the Ganart dome component is a different tint and plastic material.  *Id.*, ¶ 22.  Casey Strachan made Mr. McHugh aware that TurnKey was developing the dome and housing components and at no time, did Mr. McHugh or anyone else from Ganart object to TurnKey developing its own independent dome and housing components. *Id.*, ¶ 23.  Such was confirmed in emails exchanged between Mr. McHugh and Casey Strachan on June 19, 2013.  *See* App. 17-19, Emails exchanged between Wayne McHugh and Casey Strachan dated June 19, 2013.

### C.   Ganart Was Aware of TurnKey's Attempt to Promote the Sale of Kiosks on Behalf of Both TurnKey and Ganart.

Ganart's user identification software and Ganart's palm vein scanners assemblies were installed on the three demonstration kiosks.  App. 5, ¶ 24.  Two of the kiosks were shipped to Ganart's headquarters in Texas.  *Id.*  The third kiosk was kept at TurnKey's place of business in Phoenix, Arizona.  *Id.*  Ganart's representatives had indicated to me on various occasions that Ganart would attempt to find a potential buyer for the two demonstration kiosks that were at its Texas facility.  App. 6, ¶ 25.  However, over the course of the business relationship between Ganart and TurnKey, Ganart failed to sell any of the TurnKey kiosks to any third-party customers.  *Id.*

One of the kiosks kept by Ganart was used by Ganart for the benefit of demonstrating the kiosk services to potential customers and for its employees to use the payroll advance and the other functions of the kiosk.  *Id.*, ¶ 26.  The kiosk was kept in its lunch room to be used by Ganart employees.  *Id.*, ¶ 27.  It is my understanding that Ganart actually earned income and generated revenue from the kiosk that it used for its employees.  Ganart never shared any of the income generated from this kiosk with TurnKey.  *Id.*, ¶ 27.

Ganart did not pay Turnkey anything for the three development kiosks, for any parts for the kiosks, or development at any time.  *Id.*, ¶ 28.  Ganart did buy some parts from TurnKey for

another project during the relationship.  TurnKey offered to sell Ganart the kiosk used by their employees in the Ganart lunchroom, but Ganart refused to purchase it. *Id.*, ¶ 28.

TurnKey also worked to promote the kiosk solution to other potential customers, and regularly demonstrated the third kiosk that was kept at TurnKey's business headquarters to potential purchasers.  *Id.*, ¶ 29.  Ganart was well aware of TurnKey's attempt to promote the sale of the kiosks as Gary Strachan and his two sons, Casey Strachan and Kelly Strachan, had repeated conversations with Ganart's employees about promoting the sale of the kiosks to other third-parties.  *Id.*, ¶ 29.  Wayne McHugh also visited the TurnKey facility in April of 2013.  *Id.*, ¶ 30. On or about April 11, Wayne McHugh gave a seminar to our Sales Staff on the Work Place Solution.  *Id.*, ¶ 30.  On or about April 12, 2013, Wayne McHugh and I visited a potential customer, Planet Payroll to present the solution, but this sales visit resulted in no business.  *Id.*, ¶ 31.

Despite Ganart's lack of support, TurnKey actually referred some of its other customers to Ganart.  On or about July 17, 2013, Jim Kidd from PayCenter1, a customer of TurnKey visited the TurnKey facility.  App. 7, ¶ 32.  PayCenter1 was not happy with their current software solution from PayEase. *Id.*, ¶ 32.  TurnKey made arrangements with Ganart to demonstrate the demonstration kiosk that had the "Work Place Solution" software supplied by Ganart to Mr. Kidd at the TurnKey facility.  *Id.*, ¶ 33.  Mr. Kidd reviewed the demonstration. After the demonstration, Mr. Kidd made arrangements to travel to Ganart's headquarters in Texas with his partner, Ken Upcraft for the purpose of transferring his existing kiosks to the Ganart "Work Place Solution" software. *Id.*, ¶ 33.  On or about July 23 and 24, 2013, Mr. Kidd and Mr. Upcraft arrived at Ganart's business to further review the software and enter into a business relationship with Ganart.  *Id.*, ¶ 34.  It is TurnKey's understanding that an agreement was reached.  *Id.*, ¶ 35. In Paragraph 8 of his affidavit, Mr. McHugh avers that Mr. Strachan and other employees of TurnKey offered to share Pay-Ease proprietary information with Ganart in August 2013.  Mr.

McHugh's assertion is false.  No one from TurnKey ever attempted to share or offered to share Pay-Ease's information with another third-party.

In Paragraphs 10 through 12 of his affidavit, Mr. McHugh discusses a demonstration of one of the kiosks that occurred at TurnKey's business office in early September 2013.  *Id.*, ¶ 39. Contrary to the insinuation in Mr. McHugh's affidavit, TurnKey was demonstrating the features of the prototype kiosk in order to sell the TurnKey/Ganart kiosk as Ganart had failed to promote or sell the any TurnKey/Ganart Workplace Solution kiosks up to this point.  *Id.*, ¶ 39.  On September 4, 2013, Casey Strachan sent an email to Safir Salihu at Ganart requesting Ganart to place the kiosk software in "test mode," which would allow a new user to be registered on the kiosk in order use the wage/paycheck features of the Ganart software.  App. 8, ¶ 40.

In early September 2013, TurnKey had unprecedented access to a Las Vegas casino chain that would be a good fit for purchasing and using the TurnKey kiosk with the Ganart Workplace Solution.  *Id.*, ¶ 41.  On September 5, 2013, TurnKey was able to show the prospective customer how the demonstration kiosk operated, which was only reason that TurnKey requested that the registration feature of the Ganart software be activated.  *Id.*, ¶ 41.  In mid-September 2013, TurnKey also requested that Ganart return of one of the two demonstration kiosks that were at Ganart's headquarters.  *Id.*, ¶ 42.  TurnKey had identified three potential kiosk placements into two customer locations and were working on finalizing the details when  Ganart ended its business relationship with TurnKey in late October 2013, and thus, TurnKey was unable to complete the sale of three demonstration kiosks because Ganart ended the relationship and remotely erased its software from the TurnKey lobby demonstration kiosk.  *Id.*, ¶ 43.  TurnKey had to back out of the potential business deals that were pending causing major embarrassment to TurnKey.  *Id.*, ¶ 44.

In Paragraph 9 of his affidavit, Mr. McHugh also avers that in August 2013, TurnKey removed several components from the third demonstration kiosk that was at TurnKey's headquarters in Phoenix, Arizona.  *Id.*, ¶ 45.  TurnKey regularly removed components from the

demonstration kiosk to meet customer demand for use in other kiosks, and would replace those components with new components. *Id.*, ¶ 45. Each time TurnKey removed hardware components from the demonstration kiosk, Ganart receive a remote alert from the kiosk as we believe that is a normal function of the Ganart software. *Id.*, ¶ 45. The hardware components removed from demonstration kiosk were components that were purchased and owned by TurnKey and had been installed in the kiosk prior to the time Ganart and TurnKey ever did business. App. 9, ¶ 46.

### D.    TurnKey's Business Relationship with RoboCoin Technologies, LLC

In May 2013, TurnKey was contacted by a prospective customer, RoboCoin. App. 9, ¶ 47. RoboCoin is in the business of developing products directed at persons involving in the transfer and exchange of "Bitcoin." *Id.*, ¶ 48. Bitcoin is an open source, peer-to-peer electronic money and payment network that is used in online and internet transactions. *Id.*, ¶ 48. RoboCoin contacted TurnKey to develop a prototype kiosk for RoboCoin that was to be displayed at a trade show in San Jose, California on May 17, 2013. *Id.*, ¶ 49. RoboCoin was interested in developing a kiosk that would allow an end consumer to sell, transfer and purchase "Bitcoin" through the RoboCoin kiosks. *Id.* TurnKey developed a first generation prototype kiosk for RoboCoin that was displayed at the San Jose trade show. *Id.*, ¶ 50. The prototype kiosk was to be used as a basic proof of concept to demonstrate RoboCoin's services in the Bitcoin market. *Id.*, ¶ 51.

After RoboCoin received positive feedback about its kiosk prototype, RoboCoin refined its requirements for a next generation prototype kiosk, and worked with TurnKey to identify the hardware components for the next generation kiosk. *Id.*, ¶ 51. Such requirements included hardware components that would comply with federally mandated regulations in the United States, including but not limited to "Know Your Customer" and "Anti-Money Laundering" regulations. *Id.*, ¶ 51. Based on RoboCoin's research, RoboCoin asked TurnKey to identify biometric scanners available in the marketplace. *Id.*, ¶ 52. TurnKey regularly uses biometric

scanning devices in its kiosks and RoboCoin expressed interest in using the palm vein scanner technology in its new generation kiosk.  *Id.*, ¶ 52.

In early September 2013, RoboCoin ordered a second prototype kiosk from TurnKey. When it provided its hardware requirements to TurnKey for the second prototype kiosk, RoboCoin wanted to use a palm vein scanner as a means of identification for users of the prototype kiosk.  App. 10, ¶ 53.  TurnKey used a Fujitsu PalmSecure® cube scanner as the means of identifying users of the prototype kiosk.  *Id.*, ¶ 54.  TurnKey also used the housing and dome components that TurnKey had independently created to house the Fujitsu PalmSecure® cube scanner in the kiosk.  *Id.*, ¶ 54.  Because TurnKey did not have sufficient time to fabricate a "finger guide" for the Fujitsu PalmSecure® cube scanner that was used on the second prototype kiosk, TurnKey used the "finger guide" that had been supplied by Ganart.  *Id.*, ¶ 55.  Upon completion of construction by TurnKey, the second prototype kiosk was sent to RoboCoin's customer in Vancouver, Canada.  A photograph of the second prototype kiosk was taken and displayed in an issue of Wired Magazine in October 2013,  *Id.*, ¶ 56.

In October 2013, Mr. McHugh contacted Gary Strachan and an inquired about the RoboCoin second generation kiosk that had been photographed in Wired Magazine.  *Id.*, ¶ 57. Mr. Strachan indicated to Mr. McHugh that TurnKey had used the finger guides from one of the Ganart palm vein scanner assemblies in the second generation kiosk due to fact that TurnKey did not have sufficient time to fabricate its own finger guides for the palm vein scanner assembly that was in the RoboCoin kiosk.  *Id.*, ¶ 57.

When TurnKey became aware of Ganart's concerns about the photograph of the second prototype kiosk in Wired Magazine, Kelly Strachan traveled to RoboCoin's customer in Vancouver, Canada, and removed the entire TurnKey palm vein housing, the dome and the finger guides that TurnKey installed in the prototype kiosk.  App. 10, ¶ 58; *See also* App. 20-24, Photographs of the RoboCoin Second Generation Kiosk.  Turnkey replaced the metal housing, dome and finger guides in the second prototype unit installed in Vancouver, Canada with an "off

the shelf" hand guide from Fujitsu made specifically to work with the Fujitsu PalmSecure®
cube. App. 10, ¶ 59; *See also* App. 20-24.

To the extent there was an alleged violation of the NDA agreement with respect to the
RoboCoin prototype kiosk; TurnKey has remedied any such alleged violation by removing the
finger/hand guides from the second prototype kiosk.  App. 11, ¶ 60.  Further, the housing and
dome components that were independently created by TurnKey were also removed from the
prototype kiosk and have not been used in any other TurnKey kiosks.  *Id.*, ¶ 60.

RoboCoin has ordered additional kiosks from TurnKey modeled after the second
generation prototype kiosk.  *Id.*, ¶ 61.  However, all of those kiosks now use the "off the shelf"
Fujitsu PalmSecure® cube along with the Fujitsu hand guide and have no Ganart components or
any palm vein scanner components that were designed by TurnKey.  *Id.*, ¶ 61.

Ganart has alleged that TurnKey shared Ganart's "Self-Service Registration at Kiosk"
software with RoboCoin. TurnKey denies providing Ganart's software to RoboCoin or any other
persons. *Id.*, ¶ 62.  TurnKey was never given any Ganart source code, passwords or any other
access to any Ganart software.  *Id.*, ¶ 62.  RoboCoin installed its own proprietary software on the
second prototype kiosk, which is used in the current production model RoboCoin kiosks.  *Id.*, ¶
63.  It is TurnKey's understanding that RoboCoin independently developed its own complete
software package which TurnKey has no knowledge of.  *Id.*, ¶ 64.  It is TurnKey's understanding
that the RoboCoin user identification software is completely and fundamentally different from
Ganart's software and user identification process.  *Id.*, ¶ 64.  TurnKey understands that
RoboCoin's software runs on a Windows-based operating system, while Ganart's software runs
on a Linux-based operating system.  *Id.*, ¶ 64.  TurnKey would have been unable to share
Ganart's software with RoboCoin because the Ganart software is compiled, and cannot be
deconstructed. *Id.*, ¶ 65.  Moreover, TurnKey had no way to access the Linux root user protocols
of the Ganart software because Ganart never provided the passwords needed to access such

protocols.  *Id.*, ¶ 66.  Ganart did all of the configurations for the software that was on the demonstration kiosk that was kept at TurnKey's offices online via remote access.  App. 12, ¶ 67.

E.      **TurnKey Has Returned All of Ganart's Proprietary Information**

On October 29, 2013, Ganart requested that TurnKey return all of Ganart's proprietary information.  *Id.*, ¶ 68.  Ganart alleges that TurnKey has not returned all of the palm vein scanner assemblies to Ganart.  This allegation is false.  On November 8, 2013, Gary Strachan personally sent correspondence to Ganart confirming that all of Ganart's physical property had been returned, and all electronic confidential information had been destroyed.  *Id.*, ¶ 69; *See also* App. 25-26, Correspondence from Gary Strachan dated November 8, 2013.  TurnKey no longer has any of the Ganart palm vein scanner assemblies and or parts.  *Id.*, ¶ 70.

The first Ganart palm vein scanner assembly was installed in the first demonstration kiosk that was sent to Ganart and used in the first demonstration kiosk located in the Ganart lab environment.  *Id.*, ¶ 71.  This assembly was removed by Ganart before the kiosk was returned to TurnKey. Ganart still has possession of that palm vein scanner assembly.  *Id.*

The second palm vein scanner assembly was sent to Ganart's office in Texas on January 27, 2013, and installed in the second demonstration kiosk, located in the Ganart lunchroom at Ganart's headquarters.  *Id.*, ¶ 72.  On or about September 25, 2013, Ganart returned the second demonstration kiosk to TurnKey's office, and prior to returning the kiosk to TurnKey, Ganart removed the second palm vein scanner assembly. *Id.*, ¶ 73.  Ganart still has possession of that palm vein scanner assembly.

The third palm vein scanner assembly was used in the demonstration kiosk at TurnKey's Phoenix office, and was returned to Ganart pursuant to request for return of all of Ganart's property.  *Id.*, ¶ 74.  Ganart still has possession of that palm vein scanner assembly.

III.    **GANART HAS FAILED TO ESTABLISH ITS ENTITLEMENT TO A PRELIMINARY INJUNCTION.**

In order to be entitled to a preliminary injunction, Ganart must "show (1) a substantial

likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)  "[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements.'" *Id.* (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003)); *See also Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (stating that a preliminary injunction will "only be granted if the movant has clearly carried the burden of persuasion").  Ganart must establish all four factors supporting the preliminary injunction to even be entitled to injunctive relief.  *Plains Cotton Coop. Ass'n v. Goodpasture Serv., Inc.*, 807 F.2d 1256, 1261 (5th Cir. 1987) ("[W]e have made it clear in our decisions that preliminary injunctions will be denied based on a failure to prove separately each of the four elements of the four prong test for obtaining the injunction.")

> **A.     Ganart Cannot Establish a Likelihood of Success on the Merits.**

In its brief, Ganart only discusses its claim for a violation of the Texas Uniform Trade Secret Act ("TUTSA").  In 2013, Texas adopted the Uniform Trade Secret Act, which applied to any claims for misappropriation of trade secret that allegedly occurred after September 1, 2013.  *See* Tex. Civ. Prac. & Rem. Code § 134A.001, *et seq.*  Under the TUTSA, Ganart must show that its proprietary information is a "trade secret" and that TurnKey allegedly "misappropriated" the trade secret.  *See* Tex. Civ. Prac. & Rem. Code § 134A.002.

In its brief, Ganart provides a conclusory explanation that TurnKey has misappropriated its alleged trade secrets.  Ganart fails to show what exactly its trade secret is, why it is even considered a trade secret, and how TurnKey even allegedly misappropriated the trade secret.  Because Ganart cannot establish a violation of the TUTSA, it cannot establish a likelihood of success on the merits.

>    1.    *Ganart Fails to Even Identify What Its Trade Secret Is, and How it is Even a Trade Secret.*

Ganart has failed to show that the two items at issue—the palm vein scanner assemblies and "Self-Service Registration at Kiosk" are protectable trade secrets.  The Texas Uniform Trade Secrets Act defines "trade secret" to include formulas, patterns, compilations, programs, devices, methods, techniques, or processes that both derive independent economic value (actual or potential) from not being generally known, and which are subject to reasonable efforts to maintain their secrecy.  *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6).

"A plaintiff in a trade secrets case bears the burden of pleading and proving the specific nature of the trade secret. Plaintiff must also present evidence that the items or information were truly secret; that is, that specific measures were taken to guard their confidentiality."  *Wilson v. Continental Dev. Co.*, 112 F.Supp. 2d 648, 662 (W..D. Mich. 1999); *See also MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 522 (9th Cir. 1983) (A party seeking relief for trade secret misappropriation "must identify the trade secrets and carries the burden of showing that they exist."); *See also Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex. 1964) ("The key part of the definition of trade secret is secrecy.").  "However strong may be the [plaintiff's] case on other indicia of trade secret status, it is elemental that '[t]he subject matter of a trade secret must be secret . . . The subject of a trade secret 'must not be of public knowledge or of general knowledge in the trade or business.'".  *See Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F.Supp. 2d  935, 959 (S.D. Tex. 2013). Furthermore, to qualify as a trade secret in Texas the information cannot be readily ascertainable by an independent investigation. See *Mercer v. C.A. Roberts Co.*, 570 F.2d 1232, 1239 (5th Cir. 1978).

Ganart has failed to establish the prerequisite for a violation of the TUTSA because it does not identify how its alleged proprietary information is a trade secret or how Ganart has taken steps to maintain the secrecy of its proprietary information.  Even in its brief, Ganart is unclear what its trade secret is.  In pre-litigation correspondence and in written discovery in this litigation TurnKey has repeatedly asked Ganart to identify its trade secrets.  TurnKey served

interrogatories on Ganart asking it to identify with particularity what it claimed were its alleged trade secrets, and specifically how TurnKey allegedly misappropriated the trade secrets. *See* App. 27-33, Ganart's Responses to TurnKey's First Set of Interrogatories, Exhibit 6 to the Appendix. In its interrogatory responses, Ganart provided non-responsive answers that directed TurnKey to Ganart's application for preliminary injunction, Ganart's initial disclosure (which is as vague as Ganart's discovery responses), or Ganart's pleadings. In Interrogatory No. 5, TurnKey was asked the following:

> Regarding each trade secret which you contend was misappropriated by Defendant, please describe with particularity the complete, precise trade secret that you content was misappropriated, including the Bates number of (or other description enabling Defendant to identify) the documents produced by you which show the alleged trade secret and/or describe each such trade secret with specificity and particularity, and how Defendant allegedly misappropriated the alleged trade secret. Ganart's evasive answers in interrogatories.

*See* App. 31, Interr. No. 5. In response to Interrogatory No. 5, Ganart provided a non-verified, evasive response: "*See* Plaintiff's live pleadings and briefing in support of its Application for a Temporary Injunction." *See* App. 31. In Interrogatory No. 11, TurnKey also asked, "Please describe with particularity Plaintiff's 'Self-Service Registration at Kiosk,' including how the 'Self-Service Registration at Kiosk' constitutes a 'trade secret.'" App. 32. Ganart provided another evasive, non-responsive answer when it stated "*See* Plaintiff's live pleadings and briefing in support of its Application for a Temporary Injunction." *See* App. 33. Ganart's non-verified, evasive answers to straightforward interrogatories are proof positive that Ganart cannot even meet its basic burden of even identifying and proving that its alleged proprietary information is an actual trade secret.

If Ganart is unwilling to even comply with its discovery obligations and provide complete responses to interrogatories, then it is not entitled to injunctive relief. Courts have repeatedly held that a plaintiff asserting a trade secret claim is required to identify that trade secret with particularity, even before being able to obtain discovery from the defendant. *See Engelhard Corp. v. Savin Corp.*, 505 A.2d 30, 33 (Del. Ch. 1986) (A "plaintiff will normally be

required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed (given a proper showing of need) to compel discovery of its adversary's trade secrets."); *StorageCraft Tech. Corp. v. Symantec*, No. 2:07-CV-856 CW, 2009 WL 112434, at *2 (D. Utah Jan. 16, 2009) ("There is no question that the magistrate's July 23 order correctly stated the correct legal standard. That is, Symantec is required to identify its claimed trade secret with reasonable particularity before being allowed discovery on that claim."); *Xerox Corp. v. International Business Machines Corp*., 64 F.R.D. 367, 371 (S.D.N.Y. 1974) ("At the very least, a defendant is entitled to know the bases for plaintiff's charges against it. The burden is upon the plaintiff to specify those charges, not upon the defendant to guess at what they are.").

In its brief, Ganart appears to argue that its palm vein scanner assemblies and "Self-Service Registration at Kiosk" software are the alleged trade secrets at issue in this lawsuit.[1]

The palm vein scanners are not a trade secret as they are made up of components that are readily available and ascertainable to the general public.  *See Wissman v. Boucher*, 150 Tex. 326, 240 S.W.2d 278, 280 (Tex. 1951) ("Matters which are completely disclosed by the goods which one markets cannot be his secret."); *See also Rimes v. Club Corp. of America*, 542 S.W. 2d 909, 913 (Tex. Civ. App. 1976) ("Information that can be discovered by proper means and readily duplicated without involving considerable time, effort and expense generally will not be afforded trade secret protection.").  As described in Gary Strachan's declaration, the major components of the palm vein scanner assembly are (1) the Fujitsu PalmSecure® cube (2) the metal housing (3) a rounded dome; and (4) finger guides.  App. 4, ¶ 14.  The "Fujitsu PalmSecure® cube" is a commercially available OEM biometric authentication system based on palm vein pattern recognition technology which is used to capture a biometric scan of a consumer/user's palm and the unique palm vein patterns in the user's hand, which is used to identify the user.  *Id.*, ¶ 15.

---

[1] Ganart also indentifies is "Workplace Solution" and "Transaction as a Service" patents.  These patented applications cannot be "trade secrets" because of the fact that they are disclosed patents. *See Luccous v. J.C. Kinley Co.*, 376 S.W. 2d 336, 338 (Tex. 1964) ("The key part of the definition of trade secret is secrecy.")

The Fujitsu PalmSecure® cube also works with the Fujitsu PalmSecure® hand guide. *Id.*, ¶ 16. These commercially available components cannot be considered trade secrets since Ganart did not even manufacture them.

Ganart may argue that the sheet metal housing where the Fujitsu PalmSecure® cube scanner is mounted and the rounded domes are trade secrets. However, this metal housing and dome component are fabricated components that anyone can readily duplicate. *Id.*, ¶ 17. In fact, with Ganart's permission, TurnKey fabricated its own dome and metal housing that were distinct from Ganart's fabricated components. *See* App. 5, ¶¶ 18, 19. For instance, the dome that was manufactured for TurnKey by its plastic molding company was made out of a clear acrylic plastic, while the Ganart dome component is a different tint and plastic material. *Id.*, ¶ 22. Ganart was aware that TurnKey was developing its own dome and housing components and at no time, did Mr. McHugh or anyone else from Ganart object to TurnKey developing its own independent dome and housing components. *Id.*, ¶ 23.

Ganart also appears to argue that its "Self-Service Registration at Kiosk" software is also a trade secret. For instance, Ganart argues in Paragraph 17 of its brief that the RoboCoin kiosk appears to "duplicate" the "Self-Service Registration at Kiosk." However, at no time, does Ganart ever explain what exactly is "Self-Service Registration at Kiosk" software is, or how it is uniquely proprietary. As noted earlier, TurnKey requested in interrogatories that Ganart explain how the "Self-Service Registration at Kiosk" constitutes a trade secret, and Ganart could not even provide an explanation. *See* App. 31-32.

Numerous companies use a self-service user registration process with their kiosks. In 2010, Fujitsu began selling and marketing a self-service registration kiosks for the health care industry, which allows patients to fill out forms and create their own unique user profiles at a kiosk using Fujitsu's palm vein scanner technology. *See* App. 34-36, Marketwired.com article regarding the Fujitsu Self-Service Patient Kiosk. This process used by Fujitsu is arguably the same type of process used by Ganart, which provides additional proof that Ganart's self-service

registration process is not truly a "trade secret."

2.   *Ganart Has Failed to Show That TurnKey has Misappropriated the Alleged Trade Secrets.*

A person misappropriates a trade secret under the following circumstances:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:

(i) Used improper means to acquire knowledge of the trade secret.

(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*See* Tex. Civ. Prac. & Rem. Code § 134A.002(3).  Further, "improper means" involve acts of "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means."   *See* Tex. Civ. Prac. & Rem. Code § 134A.002(2).

Here, Ganart fails to provide a factual explanation for how its alleged trade secrets were misappropriated.   TurnKey has avowed that it is not using any of Ganart's proprietary information in its business relationship with RoboCoin kiosks.  *See* App. 11,  ¶¶ 61, 62.  Ganart has argued that Gary Strachan admitted to using the palm vein scanners in the second generation RoboCoin kiosk.  However, this is incorrect.  The second prototype kiosk that was developed for RoboCoin and depicted in the October 2013 Wired Magazine article uses palm vein scanner technology that was developed by Fujitsu.  App. 10, ¶ 54. TurnKey also used the housing and dome components that TurnKey had independently created to house the Fujitsu PalmSecure® cube scanner in the kiosk.  *Id.*, ¶ 54.  The only "component" that TurnKey used that was supplied by Ganart was the finger/hand guide, only because TurnKey did not have sufficient time to

fabricate a new hand guide for the RoboCoin kiosk.  *Id.*, ¶ 55.

After TurnKey became aware of Ganart's concerns with the RoboCoin kiosk and the use of the hand guides, TurnKey removed the entire TurnKey palm vein housing, the dome and the finger guides that TurnKey installed in the RoboCoin prototype kiosk.  App. 10, ¶ 58; *See also* App. 20-24.  Turnkey replaced the metal housing, dome and finger guides in the second prototype unit installed in Vancouver, Canada with an "off the shelf" hand guide from Fujitsu made specifically to work with the Fujitsu PalmSecure® cube. App. 10, ¶ 59; *See also* App. 20-24.  To the extent there was an alleged violation of the NDA agreement with respect to the RoboCoin prototype kiosk; TurnKey has remedied any such alleged violation by removing the finger/hand guides from the second prototype kiosk.

Ganart has also failed to explain how its alleged "Self-Service Registration at Kiosk" has been incorporated into the RoboCoin kiosks.  First, there is no explanation at all how such an event was possible or even occurred.  TurnKey never did a demonstration of the TurnKey/Ganart demonstration kiosk for RoboCoin.  Second, TurnKey was never given any Ganart source code, passwords or any other access to any Ganart software, which would be necessary for TurnKey to even share the software with RoboCoin.  App. 11, ¶ 62.  Third, RoboCoin independently developed its own proprietary software for the second prototype kiosk, which is used in the current production model RoboCoin kiosks.  *Id.*, ¶ 63.  Fourth, the RoboCoin user identification software is completely and fundamentally different from Ganart's software and user identification process because RoboCoin's software runs on a Windows-based operating system, while Ganart's software runs on a Linux-based operating system.  *Id.*, ¶ 64.  Fifth, TurnKey would have been unable to share Ganart's software with RoboCoin because the Ganart software is compiled, and cannot be deconstructed.  *Id.*, ¶ 65. Ganart did all of the configurations for the software that was on the demonstration kiosk that was kept at TurnKey's offices online via remote access.  App. 12, ¶ 67.

Without any proof, Ganart also argues that TurnKey performed a demonstration of the

"Self-Service Registration at Kiosk" for RoboCoin.  TurnKey never did a demonstration of the Ganart/TurnKey kiosk system for RoboCoin.  TurnKey did a demonstration in early September 2013 for a potential casino client who was interested in Ganart's pay advance system with TurnKey's kiosk. There was nothing inappropriate in conducting such a demonstration.  Ganart was fully aware that TurnKey was marketing the Ganart/TurnKey kiosk system for sale to multiple third-parties, all of which was done in furtherance of the parties' business relationship.  App. 8, ¶¶ 40-44.

Ganart implies that TurnKey regularly removed parts from the demonstration kiosk that was kept at TurnKey's business in Phoenix. However, such was entirely appropriate because the demonstration kiosk was owned by TurnKey and had components that had been purchased by TurnKey.  App. 8, ¶ 45.  Finally, TurnKey has returned all of Ganart's proprietary information, which Gary Strachan has repeatedly confirmed in writing to Ganart and now under oath in this litigation.  App. 11-12, ¶¶ 68-73.

Thus, because Ganart cannot show that there was an alleged trade secret, and that it has been somehow misappropriated by TurnKey, Ganart cannot show a likelihood of success on the merits.

**B.      Ganart Cannot Show Irreparable Harm.**

Ganart makes the blanket statement that the threatened disclosure of a trade secret constitutes irreparable harm.  However, Ganart's theory of irreparable harm is dependent on its unsupported, speculative theory that TurnKey disclosed any alleged trade secrets to RoboCoin. As indicated above, RoboCoin independently developed its own software to operate on its kiosks without any input from TurnKey, which is fundamentally distinct from Ganart's software.  App. 11, ¶¶ 62-65.  With respect to the palm vein scanner assembly, the only component supplied Ganart that was used on a prototype kiosk was the finger/hand guide.   All of the other components were either off the shelf components or were fabricated by TurnKey independent of any materials supplied by Ganart.      App. 10, ¶¶ 53-54.  Ganart's entire theory of irreparable

harm is based upon events that never occurred, and which Ganart cannot prove.

More importantly, TurnKey has returned all of Ganart's proprietary information, and Ganart's assertions to contrary are false.  App. 11-12, ¶¶ 68-74.

Irreparable injuries are those that are impossible to measure in monetary terms.  *Atlas Powder Co. v. Ireco Chem.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985). [O]nly a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." *Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 996 (Fed. Cir. 1985).   Ganart offers no explanation how it is being harmed by TurnKey's business relationship with Ganart.  Ganart made no attempt to market the TurnKey/Ganart kiosk system during the entire business relationship with TurnKey.  It was only TurnKey that made any attempt to market the joint venture with Ganart to other potential third-parties.  Even if Ganart has been potentially harmed, money damages will suffice, which shows that there is no irreparable harm.

Ganart became aware of the alleged misappropriation in October 2013, but waited until May 20, 2014 to even seek injunctive relief (which was only after this Court ordered Ganart to file its application for injunctive relief).  Ganart's failure to seek injunctive relief sooner shows that there is no irreparable or imminent harm.  *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1017 (10th Cir. 2004) ("'Equity  aids the vigilant, not those who slumber on their rights.'   Thus, when a plaintiff is complaining of irreparable injury from a long-established state of affairs, a court may naturally ask why, if the injury is so pressing as to warrant preliminary relief, the plaintiff waited so long before bringing a claim."); *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("C-H's cries of urgency are sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief.").  Thus, Ganart's own lack of diligence and urgency in

seeking injunctive relief establishes that there is no immediate or irreparable harm.

        **C.**        **Imposing A Preliminary Injunction Will Put TurnKey Out of Business.**

The imposition of a preliminary injunction will cause extensive harm to TurnKey and its owners, Gary Strachan, his wife Margaret Strachan, and their sons, Casey and Kelly Strachan. "The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating." *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 907 F.2d 679, 683 (Fed. Cir. 1990). Indeed, granting a preliminary injunction may irreparably damage a defendant's reputation and keep the defendant's product out of the market permanently. *See Alliance Research Corp. v. Telular Corp.*, 859 F. Supp. 400, 405 (C.D. Cal. 1994). Partly in light of such considerations, a court must remain free to deny a preliminary injunction, regardless of the showing of likelihood of success, when equity in light of all of the factors so requires. *Illinois Tool Works*, 906 F.2d at 683; *See also Oscar Mayer Foods Corp. v. Sara Lee Corp.*, 743 F. Supp. 1326, 1333 (W.D. Wis. 1990) (denying injunction where balance of hardships tipped in defendant's favor because it would suffer disproportionately if injunction issued, even though other three factors for injunctive relief weighed in plaintiff's favor).

Ganart has requested that the Court require TurnKey to stop selling any kiosks to RoboCoin. Such a requirement would have an irreparable harm on TurnKey, and likely force TurnKey to cease doing business. App. 13, ¶ 75. RoboCoin is TurnKey's largest customer, and without RoboCoin's business, TurnKey would likely have to shut down its operations. *Id.*, ¶ 76.

The Strachans sole income is derived from TurnKey's business, and if TurnKey were to close, the Strachans would be in a severe financial crisis. *Id.*, ¶ 77. Casey and Kelly Strachan, are Canadian citizens that have been granted visas to work in the United States solely because of their work at TurnKey. *Id.*, ¶ 78. If TurnKey were to cease operations, Casey and Kelly Strachans' visas would not longer be valid, and they would be required to return to Canada, thus forcing the break-up of the Strachans' family. *Id.*

Ganart has also requested that TurnKey be ordered to recall any kiosk that is based upon Ganart's alleged proprietary information.  While TurnKey disputes that any kiosk that it has sold to any third party uses Ganart's proprietary information, having to recall the kiosks that have been sold to RoboCoin will likely result in TurnKey going out of business.   App. 13, ¶ 79. TurnKey would have to refund any monies paid to any third-party that it has sold the kiosks to, and pay to have the kiosk returned to TurnKey's business in Arizona, which will likely costs hundreds of thousands of dollars.  *Id.*, ¶ 80.  Again, this would be cost prohibitive and would force TurnKey out of business.  *Id.*

Given the extensive harm that TurnKey and the Strachans will suffer if a preliminary injunction is entered, the balance of hardship favors TurnKey.

### D.   Public Policy Interest Supports Denial of the Injunction.

The public interest favors legitimate competition in the market. *See Illinois Tool Works, Inc.*, 906 F.2d at 684 (recognizing the public interest in alleged patent infringer's continuing right to compete in the market  where patentee was only remotely likely to successfully show infringement at trial); *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F.Supp.2d 594, 609 (D.N.J. 2003) (emphasizing the strong public interest in free competition). Here, TurnKey has legitimately developed a business relationship with RoboCoin.   That relationship developed through free and fair competition, and the public interest favors allowing TurnKey to compete in the marketplace.

## IV.   A SIGNIFICANT BOND IS WARRANTED.

Ganart concedes that a bond is warranted if the Court enters a preliminary injunction. TurnKey sells its kiosks for approximately $15,000 each, and TurnKey anticipates selling at least 100 kiosks to RoboCoin in 2014.  Thus, a bond of at least $1.5 million is the least amount that Ganart should be required to post with the Court.

## V.       CONCLUSION

Ganart cannot show the necessary elements to be entitled to injunctive relief.  There is no basis for Ganart's trade secret claim, and the balance of the hardship and public policy considerations favor TurnKey.   Further, to the extent the Court is considering entering a preliminary injunction; a bond of not less than $1.5 million should be required.

DAVIS MILES MCGUIRE GARDNER, PLLC

By:   /s/ David W. Williams
David W. Williams, admitted Pro Hac Vice
Joshua W. Carden
Texas Bar No. 24050379
545 E. John Carpenter Freeway, Suite 300
Irving, Texas 75062
P. 972.674.3885
F. 972.674.2935
jcarden@davismiles.com
Attorney for Defendant, TurnKey Kiosks, LLC

**CERTIFICATE OF SERVICE**

On June 10, 2014, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the CM/ECF system, which will send a notice of electronic filing to all counsel of record. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ David W. Williams
David W. Williams