# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC.<br>Plaintiffs, | §<br>§<br>§<br>§<br>§ | 3:14-cv-616 |
| V.<br><br>TURNKEY KIOSKS, LLC<br>Defendant. | §<br>§<br>§<br>§<br>§<br>§ | |

## DECLARATION OF GARY STRACHAN

I, Gary Strachan, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief:

1.      I am over the age of 18 years of age and am personally familiar with contents of this declaration set forth below.

2.      I am the Director of Operations of TurnKey, LLC.

### TURNKEY'S BUSINESS MODEL

3.      TurnKey is a family owned business and a manufacturer and supplier of custom kiosks, including financial services kiosks, automatic teller machines, outdoor service kiosks, ticketing kiosks, print-on-demand kiosks, and other custom ordered kiosks, to customers across various industries.

4.      TurnKey is a creator of custom kiosk solutions.  They consult with their customers to understand what the business problem to be solved is and then set about to build the solution.  Generally, TurnKey builds a custom kiosk enclosure, installs Original Equipment Manufacturer ("OEM") components and if the customer does not have software to operate the

solution, TurnKey will recommend one of its software partners to develop a software solution to run on the custom kiosk.

5.     TurnKey works with its customer to design the specific custom kiosk needed by the customer in their specific field of interest.  Generally, a customer will supply information to TurnKey for what the customer needs for its custom kiosk, and TurnKey will design and assemble the kiosk, which includes various OEM off the shelf hardware components.

6.     Many times TurnKey will supply its customer with off the shelf hardware components and OEM software tools to aid in the use of these components. The software tools include device drivers, software development kits ("SDK's") and application program interfaces ("API's") which are provided by the OEM hardware manufacturers to allow the customer to integrate the OEM hardware component into their software program which allows them personalized control of the hardware components in the kiosk  to the customer's specific needs.

7.     On or about December 6, 2011, TurnKey and Ganart Technologies, Inc. entered into a "Confidentiality and Non-Disclosure Agreement" ("the NDA"), which provided that TurnKey and Ganart could share confidential and propriety information with each other for the purpose of development of products and services and other joint business opportunities so long as such information was not disclosed to other third parties.

### GANART'S BUSINESS RELATIONSHIP WITH TURNKEY

8.     Ganart and TurnKey were interested in developing a kiosk solution whereby TurnKey supplied the custom made kiosk enclosure and OEM hardware components, and Ganart supplied software for the kiosks.  Ganart had previously attempted to design their own kiosks that utilized their software program that allowed the end consumer of the kiosk to do the Ganart proprietary transaction Money Earned® (a software that allowed an employee to obtain a payroll advance before they were paid) and conduct other financial transactions such as ATM withdrawals, bill payment and wire transfers.

9.    I have reviewed the affidavit submitted by Wayne McHugh of Ganart, and believe many of the allegations contained in his affidavit are misleading or factually incorrect.

10.    In Paragraph 6 of his affidavit, Mr. McHugh avers that TurnKey manufactured the three demonstration kiosks specifically for Ganart. This is untrue.

11.    It is my understanding that Ganart had difficulty manufacturing its own kiosks, and thus, it was fortuitous when TurnKey contacted Ganart as a potential business partner. As part of the business venture with Ganart, TurnKey supplied Ganart access to three demonstration kiosks that had been built by TurnKey with various OEM hardware components, and were standard models of their TK-8200 Financial Series kiosks used by TurnKey in its business.

12.    The kiosks were modified to utilize Ganart's software program that was used to allow an employee to take cash from their paycheck before pay day. TurnKey supplied the hardware for the kiosks.

13.    The only "hardware" supplied by Ganart for the three demonstration kiosks was three   sheet metal housings, three finger guides, at least three domes, and   one Fujitsu PalmSecure® cube..

14.    The major components of the palm vein scanner assembly are (1) the Fujitsu PalmSecure® cube (2) the metal housing (3) a rounded dome; and (4) finger guides.

15.    The "Fujitsu PalmSecure® cube" is a highly reliable biometric authentication system based on palm vein pattern recognition technology which is used   to capture a biometric scan of a consumer/user's palm and the unique palm vein patterns in the user's hand, which is used to identify the user.

16.    The Fujitsu PalmSecure® cube is an OEM component available to anyone including manufacturers such as TurnKey. The companion to the Fujitsu PalmSecure® cube is the Fujitsu PalmSecure® hand guide.

17.    The Fujitsu PalmSecure® cube scanner is mounted within the sheet metal housing. In order to use the scanner, the user places their hand within the housing on the

finger/hand guide. The hand guide is necessary to prevent the users hand from moving so that the scanner can capture the biometric image of the user's hand.

18.     On November 19, 2012, Mr. McHugh provided the Ganart technical drawings for the metal housing, the dome and the finger/hand guide and gave permission to Casey Strachan to "morph it into a TurnKey kiosk." TurnKey independently developed its own sheet metal housing and dome components for a palm vein scanner component that would work on all TurnKey's kiosks. In November 2012, TurnKey requested Ganart's permission to create its own components that could be used in future kiosks.

19.     TurnKey contracted with its own CAD designer to create a version for the metal housing, the dome and the finger/hand guide component that would be compatible within all TurnKey's kiosks.

20.     TurnKey also contracted with its own plastic molding company to create a dome for the TurnKey kiosks that would allow a Fujitsu PalmSecure® cube to work on a TurnKey kiosk.

21.     The housing and dome components created by TurnKey are completely different than Ganart's housing and dome components for its palm vein scanner assemblies.

22.     For instance, the dome that was manufactured for TurnKey by its plastic molding company was made out of a clear acrylic plastic, while the Ganart dome component is a different tint and plastic material.

23.     I am aware that Casey Strachan made Mr. McHugh aware that TurnKey was developing the dome and housing components and at no time, did Mr. McHugh or anyone else from Ganart object to TurnKey developing its own independent dome and housing components. Such was confirmed in emails exchanged between Mr. McHugh and Casey Strachan on June 19, 2013.

24.     Ganart's user identification software and Ganart's palm vein scanners assemblies were installed on the three demonstration kiosks. Two of the kiosks were shipped to Ganart's

00005

headquarters in Texas. The third kiosk was kept at TurnKey's place of business in Phoenix, Arizona.

25.     Ganart's representatives had indicated to me on various occasions that Ganart would attempt to find a potential buyer for the two demonstration kiosks that were at its Texas facility. However, over the course of the business relationship between Ganart and TurnKey, Ganart failed to sell any of the TurnKey kiosks to any third-party customers.

26.     One of the kiosks kept by Ganart was used by Ganart for the benefit of demonstrating the kiosk services to potential customers and for its employees to use the payroll advance and the other functions of the kiosk. The kiosk was kept in its lunch room to be used by Ganart employees.

27.     It is my understanding that Ganart actually earned income and generated revenue from the kiosk that it used for its employees. Ganart never shared any of the income generated from this kiosk with TurnKey.

28.     Ganart did not pay Turnkey anything for the three development kiosks, for any parts for the kiosks, or development at any time. Ganart did buy some parts from TurnKey for another project during the relationship. TurnKey offered to sell Ganart the kiosk used by their employees in the Ganart lunchroom, but Ganart refused to purchase it.

29.     TurnKey also worked to promote the kiosk solution to other potential customers, and regularly demonstrated the third kiosk that was kept at TurnKey's business headquarters to potential purchasers. Ganart was well aware of TurnKey's attempt to promote the sale of the kiosks as I and my two sons, Casey Strachan and Kelly Strachan, had repeated conversations with Ganart's employees about promoting the sale of the kiosks to other third-parties.

30.     Wayne McHugh also visited the TurnKey facility in April of 2013. On or about April 11, Wayne McHugh gave a seminar to our Sales Staff on the Work Place Solution.

31.     On or about April 12 Wayne McHugh and I visited a potential customer, Planet Payroll to present the solution, but this sales visit resulted in no business.

---

32.   On or about July 17, 2013, Jim Kidd from PayCenter 1, a customer of TurnKey visited the TurnKey facility.  PayCenter1 was not happy with their current software solution from PayEase.

33.   TurnKey made arrangements with Ganart to demonstrate the demonstration kiosk that had the "Work Place Solution" software supplied by Ganart to Mr. Kidd at the TurnKey facility.   Mr. Kidd reviewed the demonstration. After the demonstration, Mr. Kidd made arrangements to travel to Ganart's headquarters in Texas with his partner, Ken Upcraft for the purpose of transferring his existing kiosks to the Ganart "Work Place Solution" software.

34.   On or about July 23 and 24, Mr. Kidd and Mr. Upcraft arrived at Ganart's business to further review the software and enter into a business relationship with Ganart.

35.   TurnKey was only allowed into the introduction part of the meetings and was not privy to any of the business meetings that took place. It is our understanding that an agreement was reached.

36.   In Paragraph 8 of his affidavit, Mr. McHugh avers that I and other employees of TurnKey offered to share Pay-Ease proprietary information with Ganart in August 2013.  Mr. McHugh's assertion is false.  No one from TurnKey ever attempted to share or offered to share Pay-Ease's information with another third-party.

37.   It is our understanding that PayCenter1 and Ganart entered into a business relationship and it was TurnKey's introduction of PayCenter1's Mr. Kidd to Ganart that facilitated this relationship.

38.   On or about July 24, 2013, TurnKey was directed by PayCenter1 to ship a PayCenter1 kiosk to Ganart with the existing components so they can modify the software.

39.   In Paragraphs 10 through 12 of his affidavit, Mr. McHugh discusses a demonstration of one of the kiosks that occurred at TurnKey's business office in early September 2013. Contrary to the insinuation in Mr. McHugh's affidavit, TurnKey was demonstrating the

---

features of the prototype kiosk in order to sell the TurnKey/Ganart kiosk as Ganart had failed to promote or sell the any TurnKey/Ganart Workplace Solution kiosks up to this point.

40.     On September 4, 2013, Casey Strachan sent an email to Safir Salihu requesting Ganart place the kiosk software in "test mode," which would allow a new user to be registered on the kiosk in order use the wage/paycheck features of the Ganart software.

41.     In early September 2013, TurnKey had unprecedented access to a Las Vegas casino chain whom would be a good fit for purchasing and using the TurnKey kiosk with the Ganart Workplace Solution.

42.     On September 5, 2013, TurnKey was able to show the prospective customer how the demonstration kiosk operated, which was only reason that TurnKey requested that the registration feature of the Ganart software be activated.

43.     In mid-September 2013, TurnKey also requested that Ganart return of one of the two demonstration kiosks that were at Ganart's headquarters.  TurnKey had identified three potential kiosk placements into two customer locations and were working on finalizing the details when   Ganart ended its business relationship with TurnKey in late October 2013, TurnKey was unable to complete the sale of three  demonstration kiosks because Ganart ended the relationship and remotely erased its software from the TurnKey lobby demonstration kiosk.

44.     TurnKey had to back out of the potential business deals that were pending causing major embarrassment to TurnKey.

45.     In Paragraph 9 of his affidavit, Mr. McHugh also avers that in August 2013, TurnKey removed several components from the third demonstration kiosk that was at TurnKey's headquarters in Phoenix, Arizona.  TurnKey regularly removed components from the demonstration kiosk to meet customer demand for use in other kiosks, and would replace those components with new components.  Each time TurnKey removed hardware components from the demonstration kiosk, Ganart receive a remote alert from the kiosk as we believe that is a normal function of the Ganart software.

46.    The hardware components removed from demonstration kiosk were components that were purchased and owned by TurnKey and had been installed in the kiosk prior to the time Ganart and TurnKey ever did business.

### TurnKey's Business Relationship with RoboCoin Technologies, LLC

47.    In May 2013, TurnKey was contacted by a prospective customer, RoboCoin.

48.    RoboCoin is in the business of developing products directed at persons involving in the transfer and exchange of "Bitcoin." Bitcoin is an open source, peer-to-peer electronic money and payment network that is used in online and internet transactions.

49.    RoboCoin contacted TurnKey to develop a prototype kiosk for RoboCoin that was to be displayed at a trade show in San Jose, California on May 17, 2013. RoboCoin was interested in developing a kiosk that would allow an end consumer to sell, transfer and purchase "Bitcoin" through the RoboCoin kiosks.

50.    TurnKey developed a first generation prototype kiosk for RoboCoin that was displayed at the San Jose trade show. The prototype kiosk was to be used as a basic proof of concept to demonstrate RoboCoin's services in the Bitcoin market.

51.    After RoboCoin received positive feedback about its kiosk prototype, RoboCoin refined its requirements for a next generation prototype kiosk, and worked with TurnKey to identify the hardware components for the next generation kiosk. Such requirements included hardware components that would comply with federally mandated regulations in the United States, including but not limited to "Know Your Customer" and "Anti-Money Laundering" regulations.

52.    Based on RoboCoin's research, RoboCoin asked Turnkey to identify biometric scanners available in the marketplace. TurnKey regularly uses biometric scanning devices in its kiosks and RoboCoin expressed interest in using the palm vein scanner technology in its new generation kiosk.

53.    In early September 2013, RoboCoin ordered a second prototype kiosk from TurnKey. When it provided its hardware requirements to TurnKey for the second prototype kiosk, RoboCoin wanted to use a palm vein scanner as a means of identification for users of the prototype kiosk.

54.    TurnKey used a Fujitsu PalmSecure® cube scanner as the means of identifying users of the prototype kiosk. TurnKey also used the housing and dome components that TurnKey had independently created to house the Fujitsu PalmSecure® cube scanner in the kiosk.

55.    Because TurnKey did not have sufficient time to fabricate a "finger guide" for the Fujitsu PalmSecure® cube scanner that was used on the second prototype kiosk, TurnKey used the "finger guide" that had been supplied by Ganart.

56.    Upon completion of construction by TurnKey, the second prototype kiosk was sent to RoboCoin's customer in Vancouver, Canada. A photograph of the second prototype kiosk was taken and displayed in an issue of Wired Magazine in October 2013.

57.    In October 2013, Mr. McHugh contacted me and an inquired about the RoboCoin second generation kiosk that had been photographed in Wired Magazine. I indicated to Mr. McHugh that TurnKey had used the finger guides from one of the Ganart palm vein scanner assemblies in the second generation kiosk due to fact that TurnKey did not have sufficient time to fabricate its own finger guides for the palm vein scanner assembly that was in the RoboCoin kiosk.

58.    When TurnKey became aware of Ganart's concerns about the photograph of the second prototype kiosk in Wired Magazine, Kelly Strachan traveled to RoboCoin's customer in Vancouver, Canada, and removed the entire TurnKey palm vein housing, the dome and the finger guides that TurnKey installed in the prototype kiosk.

59.    Turnkey replaced the metal housing, dome and finger guides in the second prototype unit installed in Vancouver, Canada with an "off the shelf" hand guide from Fujitsu made specifically to work with the Fujitsu PalmSecure® cube.

60.    To the extent there was an alleged violation of the NDA agreement with respect to the RoboCoin prototype kiosk; TurnKey has remedied any such alleged violation by removing the finger/hand guides from the second prototype kiosk.  Further, the housing and dome components that were independently created by TurnKey were also removed from the prototype kiosk and have not been used in any other TurnKey kiosks.

61.    RoboCoin has ordered additional kiosks from TurnKey modeled after the second generation prototype kiosk.  However, all of those kiosks now use the "off the shelf" Fujitsu PalmSecure® cube along with the Fujitsu hand guide and have no Ganart components or any palm vein scanner components that were designed by TurnKey.

62.    I am also aware that Ganart has alleged that TurnKey shared Ganart's "Self-Service Registration at Kiosk" software with RoboCoin. TurnKey denies providing Ganart's software to RoboCoin or any other persons. TurnKey was never given any Ganart source code, passwords or any other access to any Ganart software.

63.    RoboCoin installed its own proprietary software on the second prototype kiosk, which is used in the current production model RoboCoin kiosks.  It is my understanding that RoboCoin independently developed its own complete software package which TurnKey has no knowledge of.

64.    It is my understanding that the RoboCoin user identification software is completely and fundamentally different from Ganart's software and user identification process. I understand that RoboCoin's software runs on a Windows-based operating system, while Ganart's software runs on a Linux-based operating system.

65.    TurnKey would have been unable to share Ganart's software with RoboCoin because the Ganart software is compiled, and cannot be deconstructed.

66.    Moreover, TurnKey had no way to access the Linux root user protocols of the Ganart software because Ganart never provided the passwords needed to access such protocols.

00011

67.     Ganart did all of the configurations for the software that was on the demonstration kiosk that was kept at TurnKey's offices online via remote access.

### TURNKEY HAS RETURNED ALL OF GANART'S PROPRIETARY INFORMATION

68.     On October 29, 2013, Ganart requested that TurnKey return all of Ganart's proprietary information,

69.     Ganart alleges that TurnKey has not returned all of the palm vein scanner assemblies to Ganart.  This allegation is false.  On November 8, 2013, I personally sent correspondence to Ganart confirming that all of Ganart's physical property had been returned, and all electronic confidential information had been destroyed.

70.     TurnKey no longer has any of the Ganart palm vein scanner assemblies and or parts.

71.     The first Ganart palm vein scanner assembly was installed in the first demonstration kiosk that was sent to Ganart and used in the first demonstration kiosk located in the Ganart lab environment.  This assembly was removed by Ganart before the kiosk was returned to TurnKey. Ganart still has possession of that palm vein scanner assembly.

72.     The second palm vein scanner assembly was sent to Ganart's office in Texas on January 27, 2013, and installed in the second demonstration kiosk, located in the Ganart lunchroom at Ganart's headquarters.

73.     On or about September 25, 2013, Ganart returned the second demonstration kiosk to TurnKey's office, and prior to returning the kiosk to TurnKey, Ganart removed the second palm vein scanner assembly. Ganart still has possession of that palm vein scanner assembly.

74.     The third palm vein scanner assembly was used in the demonstration kiosk at TurnKey's Phoenix office, and was returned to Ganart pursuant to request for return of all of Ganart's property.  Ganart still has possession of that palm vein scanner assembly.

00012

## ANY INJUNCTION WOULD CAUSE IRREPARABLE HARM TO TURNKEY

75.     Ganart has requested that the Court require TurnKey to stop selling any kiosks to RoboCoin. Such a requirement would have an irreparable harm on TurnKey, and likely force TurnKey to cease doing business.

76.     RoboCoin is TurnKey's largest customer, and without RoboCoin's business, TurnKey would likely have to shut down its operations.

77.     My family's sole income is derived from TurnKey's business. If TurnKey were to close, my family would be in a severe financial crisis.

78.     My sons, Casey and Kelly Strachan, are Canadian citizens that have been granted visas to work in the United States solely because of their work at TurnKey. If TurnKey were to cease operations, my sons' visas would not longer be valid, and they would be required to return to Canada, thus forcing the break-up of my family.

79.     Ganart has also requested that TurnKey be ordered to recall any kiosk that is based upon Ganart's alleged proprietary information. While TurnKey disputes that any kiosk that it has sold to any third party uses Ganart's proprietary information, having to recall the kiosks that have been sold to RoboCoin will likely result in TurnKey going out of business.

80.     TurnKey would have to refund any monies paid to any third-party that it has sold the kiosks to, and pay to have the kiosk returned to TurnKey's business in Arizona, which will likely costs hundreds of thousands of dollars. Again, this would be cost prohibitive and would force TurnKey out of business.

FURTHER AFFIDANT SAYETH NAUGHT.

6/9/2014
Date

Gary Strachan

# Exhibit 2

## Casey Strachan

| | |
|---|---|
| **From:** | Wayne McHugh [wmchugh@ganart.com] |
| **Sent:** | Monday, November 19, 2012 9:48 AM |
| **To:** | Casey Strachan |
| **Subject:** | Re: Progress |

Thanks for the update Casey. We are tweaking some of our device libraries to handle the exact devices on the unit and testing, testing, testing. I will also be sending over the Palm Vein assembly for your review. We see this as a crucial piece of biometric validation for the Money Services Business (MSB) which we see as a big player.

I should have files from engineering later today and will fire them over.

We are all feeling really good about the unit and as such, we should layout a roadmap between the two companies. Would like to get your thoughts on that.

Lastly, not sure what your collective schedules are for after the holiday, but as we mentioned previously, would love to get you guys out here to see the technology first hand and to work through business roadmap between TurnKey and Ganart.

Just in case I get tied up over the next couple days, I wanted to wish all you guys (and your families) a safe and happy Thanksgiving.

Best regards,

**Wayne McHugh**
*Managing Director - Sales*
GANART Technologies Inc.
1700 Columbian Club Drive
Carrollton, TX
75006
Email: wmchugh@ganart.com
wmchugh@ganart.com

U.S. Cell: 603.930.8229


India Cell: +91.976.372.0497




On Nov 19, 2012, at 10:37 AM, Casey Strachan wrote:


Hi Wayne,

Just wanted to check in and let you know that I did receive the webcam. I looked at it and I think I should be able to make a bracket to hold that webcam in the kiosk without an issue. My sheet metal contact will be here tomorrow, I will get him to confirm that for me.

1

TURNKEY000245

00015

I also looked into a UPS and found an option.  It has a connection to the PC via USB port.  Should hold the kiosk up for at least 5 minutes.

Gary said that the testing is going well, is there anything else that you need from us?

Thanks,

*Casey W. Strachan*   Director of I.T.
      <image001.jpg>

cstrachan@turnkeykiosks.com

8957 W. Windsor Drive, #118
Peoria, Arizona 85381
Office: (602) 606-7771
Fax: (623) 372-2381
Cell: (623) 297-5202

2

TURNKEY000246

# Exhibit 3

## Casey Strachan

| | |
|---|---|
| **From:** | Wayne McHugh [wmchugh@ganart.com] |
| **Sent:** | Wednesday, June 19, 2013 5:36 PM |
| **To:** | Casey Strachan |
| **Subject:** | Re: Palm Dome |

Thanks. Let me know how the testing goes.

Sent from my iPhone

On Jun 19, 2013, at 7:35 PM, "Casey Strachan" <cstrachan@turnkeykiosks.com> wrote:

> Makes sense, we will make the one tweak we know it needs and do some extensive testing here. But I believe you are correct. We made this one out of acrylic and it will read through it.
>
> Thanks,
>
> Casey Strachan
> Cstachan@turnkeykiosks.com
> 8957 W. Windsor Drive, #118
> Peoria, Arizona 85381
>
> On Jun 19, 2013, at 5:19 PM, Wayne McHugh <wmchugh@ganart.com> wrote:
>
>> We had a very special material, process and tint. We were very concerned about striations, light absorption etc. I do not feel tht is any longer a factor, but I am not the one building them anymore. I just need them to be able to read. They do not take a beating by the design itself.
>>
>> Make sense?
>>
>> On Jun 19, 2013, at 7:11 PM, Casey Strachan wrote:
>>
>>
>>> Hi Wayne,
>>>
>>> Overkill in which way? It is a good protection against damaging the palm scanning sensor itself so we would want to keep them. But maybe it does not need to be special material or tint anymore.
>>>
>>> Casey Strachan
>>> Cstachan@turnkeykiosks.com
>>> 8957 W. Windsor Drive, #118
>>> Peoria, Arizona 85381
>>>
>>> On Jun 19, 2013, at 5:00 PM, Wayne McHugh <wmchugh@ganart.com> wrote:
>>>
>>>> If the dome you had made works in a production environment, that is fine with us. The first units were overkill by design.But based on changes in Fujitsu's Palm Scan, it may no longer be needed.

1

TURNKEY000258

00018

On Jun 19, 2013, at 6:11 PM, Casey Strachan wrote:

Wayne,

I just wanted to send you this.  Before I got the info last week about where you had your domes made, we had our plastic company make us some to the print that was in the STP file you sent originally.

This is the difference between the two.  I am curious if there is any particular reason that the dome needs to be tinted or shaped in the way that it is?

We have tested ours here and found that it needs a small tweak in it's height, it's about a tenth of an inch too short. However, it still scans your palm with an accurate read everytime.

We have a quote from your original company on the domes they made for you.  They seem a bit pricey compared to what we were getting but that could be the construction of the dome.  We just wanted to check if there was a particular reason that it was built in that manner and if you would mind if we went with the new design?

Thanks,

*Casey W. Strachan* | Director of I.T.

cstrachan@turnkeykiosks.com

8957 W. Windsor Drive, #118
Peoria, Arizona 85381
Office: (602) 606-7771
Fax: (623) 372-2381
Cell: (623) 297-5202

Check out our new Website
Like us on Facebook & Twitter!

2

00019

# Exhibit 4

Wired Magazine Picture (Before)



TURNKEY000287



Installed Fujitsu Part (After)



TURNKEY000289



Fujitsu Palm Vein Scanner "Assembly"

PART # FAT1362A2L

TURNKEY000290

00024

# Exhibit 5



November 08, 2013
Art Holbrook
Chief Executive Officer
1700 Columbian Club Drive
Carrollton, TX  75006

### Subject: Return and Destruction of Confidential Information

Mr. Holbrook,

We have shipped all physical property of Ganart Technologies by UPS, tracking number 1Z2358YEA699686522, addressed to you.

All electronic confidential information has been destroyed and as Director of Operations of TurnKey Kiosks LLC, I certify that this has been completed.

Our website has also been updated to remove any reference to Ganart's products or services including logo's, trademarks, Work Place Solution, and any business relationship between TurnKey Kiosks LLC and Ganart Technologies.

TurnKey Kiosks LLC

Gary Strachan
Director of Operations

8957 W Windsor Drive, #118, Peoria AZ  85381  Office: (602) 606-7771
Fax: (623) 376-2381

TURNKEY000001

# Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **GANART TECHNOLOGIES, INC.** | § | |
| | § | **CIVIL ACTION NO.** |
| **VS.** | § | **3:14-CV-00616-BF** |
| | § | |
| **TURNKEY KIOSKS, LLC** | § | |

### PLAINTIFF'S OBJECTIONS AND ANSWERS TO DEFENDANT'S
### FIRST SET OF INTERROGATORIES

**TO:** **Defendant, TurnKey Kiosks, LLC, by and through its attorney of record, David W. Williams and Joshua W. Carden, Davis Miles McGuire Gardner, The Summit at law Colinas, 545 E. John Carpenter Freeway, Suite 300, Irving, Texas 75062**

**COMES NOW,** Ganart Technologies, Inc., Plaintiff in the above-entitled and numbered cause and pursuant to the Texas Rules of Civil Procedure, files this its Objections and Answers to Defendant's First Set of Interrogatories.

Respectfully submitted,

**COBB MARTINEZ WOODWARD P**LLC
1700 Pacific Avenue, Suite 3100
Dallas, Texas 75201
(214) 220-5204
(214) 220-5254 (Fax)

By: _/s/ Jonathan C. LaMendola_
    **JONATHAN C. LaMENDOLA**
    Texas Bar No. 00792637
    email: jlamendola@cobbmartinez.com
    **DAVID R. WOODWARD**
    Texas Bar No. 21975650
    email: dwoodward@cobbmartinez.com

**ATTORNEYS FOR PLAINTIFF GANART TECHNOLOGIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to the following counsel of record either by hand-delivery, telefax, certified mail, return receipt requested, e-mail and/or regular U.S. mail on this 6th day of June, 2014.

David W. Williams
Joshua W. Carden
Davis Miles McGuire Gardner
The Summit at law Colinas
545 E. John Carpenter Freeway, Suite 300
Irving, TX 75062

_/s/ Jonathan C. LaMendola_
**JONATHAN C. LaMENDOLA**

## INTERROGATORIES

<u>INTERROGATORY NO. 1:</u>        State the names, current addresses, and telephone numbers of each and every individual who you believe has knowledge of facts concerning this matter, including but not limited to any persons whom you have obtained written or recorded statements pertaining to this case from, and provide the substance of each individual's knowledge and give the date of any statements obtained, if applicable.

**ANSWER:** *See* Plaintiff's Initial Disclosures.

<u>INTERROGATORY NO. 2:</u>        Please separately state the amounts you are claiming for economic damages, non-economic damages, special damages, and explain how you arrived at those amounts.

**ANSWER:** *See* Plaintiff's Initial Disclosures.

<u>INTERROGATORY NO. 3:</u>        Please identify each and every exhibit you propose to use at the trial or any hearing of this case, including the title of each exhibit, a description of the contents of each exhibit, identify any limited purpose for which the exhibit will be offered, the names, addresses of and job titles of authenticating witnesses and current custodians. This interrogatory is directed both to exhibits you intend to use upon the trial and exhibits you may use.

**ANSWER:** Plaintiff objects to this Interrogatory as premature, but will supplement its response.  Plaintiff, however, may use any document or items produced in this case.

<u>INTERROGATORY NO. 4:</u>        Please identify every witness, including expert witnesses,

PLAINTIFF'S OBJECTIONS AND ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES/Page 3
Doc. #119671

who may testify at the trial of this matter including their names, addresses, job titles, relationship to any party, the subject matter and summary of the anticipated testimony.

**ANSWER:** *See* Plaintiff's Initial Disclosures.

INTERROGATORY NO. 5:        Regarding each trade secret which you contend was misappropriated by Defendant, please describe with particularity how Defendant allegedly misappropriated the trade secret, each person with knowledge of any such misappropriation, and when you contend the each such trade secret was misappropriate.

**ANSWER:** *See* Plaintiff's live pleadings and briefing in support of its Application for a Temporary Injunction.

INTERROGATORY NO. 6:        Regarding each trade secret you contend was utilized by Defendant, identify with particularity the following:

        (a)    The complete, precise trade secret you contend was utilized;

        (b)    The Bates numbers of (or description enabling Defendant to identify) the documents produced by you which show or describe each trade secret or its utilization by Defendant;

        (c)    Each person with knowledge of any such utilization; and

        (d)    When the trade secret was allegedly utilized by Defendant.

**ANSWER:** (a) *See* Plaintiff's live pleadings and briefing in support of its Application for a Temporary Injunction; (b) Plaintiff will supplement this response; (c) *See* Plaintiff's Initial Disclosures; (d) *See* Plaintiff's live pleadings and briefing in support of its Application for a Temporary Injunction.

INTERROGATORY NO. 7:        Please state the complete factual basis for any allegation

PLAINTIFF'S OBJECTIONS AND ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES/Page 4
Doc. #119671

that Defendant allegedly shared any trade secret or proprietary information with any third-party, including all documents that support the allegation and any person with knowledge of such allegations.

      **ANSWER:** *See* Plaintiff's live pleadings and Initial Disclosures.

**INTERROGATORY NO. 8:**      Please identify in detail any confidential or proprietary information belonging to Plaintiff that is not a trade secret and that you contend Defendant wrongfully utilized or misappropriated, each document pertaining or related to such utilization or misappropriation, and each person who has knowledge of such misappropriation or utilization.

      **ANSWER:** *See* Plaintiff's live pleadings.

**INTERROGATORY NO. 9:**      Please state the complete factual basis for any allegation that supports your claim that Defendant breached the non-disclosure agreement, including all documents that support the allegation and any person with knowledge of such allegations.

      **ANSWER:** *See* Plaintiff's live pleading and Defendant's Answer.

**INTERROGATORY NO. 10:**      Please state the complete factual basis for any allegation that supports your claim that Defendant breached the non-disclosure agreement, including all documents that support the allegation and any person with knowledge of such allegations.

      **ANSWER:** *See* Plaintiff's live pleading and Defendant's Answer.

**INTERROGATORY NO. 11:**      Please describe with particularity Plaintiff's "Self-Service Registration at Kiosk, including how the "Self-Service Registration at Kiosk" constitutes a "trade secret."

PLAINTIFF'S OBJECTIONS AND ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES/Page 5
Doc. #119671

**ANSWER:** *See* Plaintiff's live pleading and briefing in support of its Application for a Temporary Injunction.

# Exhibit 7

Fujitsu Self-Service Patient Kiosk Helps Reduce Patient Stress, Lower Administrative Co...   Page 2 of 3

**ARRA Stimulus Package Spurs Demand for Patient Self-Service Solutions Like the Fujitsu Med-Serv 50 Patient Kiosk**

ATLANTA, GA--(Marketwire - March 1, 2010) - HIMSS 2010 -- Fujitsu (http://solutions.us.fujitsu.com) today announced the Fujitsu Med-Serv(TM) 50 patient registration kiosk, an open hardware platform that lets the healthcare industry's innovative ISVs provide new applications to reduce patient stress and cut healthcare administrative costs. With the Fujitsu Med-Serv 50 kiosk, applications can be developed to ease and speed up the process for patient check-in. In addition, other applications for easily filling out satisfaction surveys, paying outstanding balances or co-pay fees can be supported. In order to eliminate fraud, another optional feature, the Fujitsu PalmSecure(TM) palm vein biometric reader, can be deployed to authenticate the patient. Self-service kiosks allow healthcare providers to increase patient satisfaction while reducing administrative staff in favor of additional medical staff.

**News Highlights**

- The American Recovery and Reinvestment Act (ARRA) includes $17.2 billion in incentives, via Medicare and Medicaid reimbursement systems, to assist providers in adopting electronic health records (EHRs). The shift to EHRs will enable organizations to launch patient self-service initiatives -- such as deploying Med-Serv 50 kiosks -- as a way to lower operational costs and improve the patient experience.
- The Med-Serv 50 platform offers several features and options that distinguish it from the competition, including a large 19-inch display, Fujitsu PalmSecure biometric technology, integrated camera and patient proximity mat.
- The Med-Serv 50 hardware platform has been available for more than a year as the hardware foundation for the Allscripts Patient Kiosk(TM). Allscripts Patient Kiosk solves a common patient complaint -- the seemingly endless stream of paperwork they must fill out every time they register for an appointment. Allscripts Patient Kiosk eliminates this frustration while helping physician practices reduce the costs and overhead associated with traditional patient check-in. Through integration with Allscripts Electronic Health Records, Patient Kiosk helps patients take control of their own healthcare with a dashboard view of all their personal information, including a complete health maintenance plan.
- To develop this highly reliable, free-standing patient registration hardware platform, Fujitsu leveraged years of experience in delivering industry-leading retail self-service solutions, such as Fujitsu ticketing kiosks for the two largest theatre chains in the United States.
- The Fujitsu self-service kiosk is a key element of the end-to-end healthcare solutions provided by Fujitsu. For example, new Fujitsu datacenter options for healthcare organizations include cloud computing, managed data center services and hosted offshore solutions based on award-winning Fujitsu PRIMERGY(R) servers, and ETERNUS(R) storage and virtualization systems. For organizations needing specialized applications not supplied by an ISV, Fujitsu can develop custom software solutions.
- See Fujitsu healthcare solutions in action at the HIMSS Conference and Exhibition in Atlanta, March 1-4, at the Georgia World Congress Center in booth 5232. Fujitsu will demonstrate how their offerings help healthcare organizations in North America reduce operating costs and deliver state-of-the-art patient experiences.

**Related Links**

Fujitsu Healthcare Overview

Fujitsu Med-Serv 50

**Quotes**

**Glen Tullman, Chief Executive Officer, Allscripts:** "Patients want to remove the pain of completing paper forms during every visit and physician practices want to find better, faster, more effective ways to complete accurate patient registrations and collect co-pays. The Fujitsu MedServ kiosk provides the perfect hardware for our kiosk solution, which is being used today by clients like George Washington University Medical Faculty Associates in Washington D.C. to deliver a superior patient experience and a solid return on investment."

**Steve Sybert, Industry Vice President for Healthcare and Life Sciences, Fujitsu America:** "The key to a successful self-service kiosk initiative in the healthcare industry is providing a streamlined and user-friendly patient and care provider experience. Fujitsu accomplishes this by matching the industry's best software applications with a highly reliable, highly flexible hardware platform. Fujitsu has a long track record of providing extremely successful self-service solutions, enabling us to deliver an advanced healthcare system with features other vendors can't match."

**John Lovelock, Research Vice President, Gartner:** "Under the US ARRA of 2009, eligible providers and hospitals seeking incentive payments for using EHRs must meet a series of increasingly challenging requirements for patient engagement. The expanding use of PHRs has the potential to bolster the clinical self-service kiosks market and improve its long term market potential."

**About Fujitsu**
Fujitsu is a leading provider of IT-based business solutions for the global marketplace. With approximately 175,000 employees supporting customers in 70 countries, Fujitsu combines a worldwide corps of systems and services experts with highly reliable computing and communications products and advanced microelectronics to deliver added value to customers. Headquartered in Tokyo, Fujitsu Limited (TSE: 6702) reported consolidated revenues of 4.6 trillion yen (US$47 billion) for the fiscal year ended March 31, 2009. For more information, please see: www.fujitsu.com.

TURNKEY000199   11/12/2013

00035

Fujitsu America, Inc. provides a complete portfolio of business technology services, computing platforms, and industry solutions. Fujitsu platform products are based on scalable, reliable and high-performance server, storage, software, point-of-sale, and mobile technologies. Fujitsu combines its renowned platform offerings with a full suite of onshore, near shore and offshore system integration, outsourcing, and datacenter services covering applications, operations, infrastructure, customer service, and multi-vendor lifecycle services. Fujitsu provides industry-specific solutions for retail, manufacturing, healthcare, government, education, financial services, and telecommunications sectors. For more information on Fujitsu America's business scope, visit http://solutions.us.fujitsu.com.

Fujitsu, the Fujitsu logo and ETERNUS are trademarks or registered trademarks of Fujitsu Limited in the United States and other countries. PRIMERGY is a trademark or registered trademark of Fujitsu Technology Solutions in the United States and other countries. Med-Serv and PalmSecure are trademarks of Fujitsu Frontech North America, Inc. Allscripts Patient Kiosk is a trademark of Allscripts-Misys Healthcare Solutions, Inc. All other trademarks and product names are the property of their respective owners.

The statements provided herein are for informational purposes only and may be amended or altered by Fujitsu Limited without notice or liability. Product description data represents Fujitsu design objectives and is provided for comparative purposes; actual results may vary based on a variety of factors. Specifications are subject to change without notice.

CONTACT INFORMATION

Quick Response Image

View Release

Press Contacts

Fujitsu America, Inc.
Karen Richardson
Public Relations Manager
1-408-746-3300
karen.richardson@us.fujitsu.com

Eastwick Communications
Kevin Cheng
Associate
1-650-480-4080
kcheng@eastwick.com

Close

TURNKEY000200

00036