IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC. | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | 3:14-CV-00616-BF |
| | § | |
| TURNKEY KIOSKS, LLC | § | |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE**

Plaintiff Ganart Technologies, Inc. ("Ganart") submits this Reply to Defendant TurnKey, LLC's ("TurnKey") Response to Ganart's Brief in Support of its Application for a Temporary Injunction.

### I. TURNKEY MISREPRESENTS KEY FACTS

**A. TurnKey Shared Ganart's Proprietary Software, Hardware and Process with Robocoin.**

1. TurnKey denies demonstrating Ganart's proprietary Self-Service Registration at Kiosk process and Assembly to Robocoin. TurnKey makes this denial not once, but twice. ("TurnKey never did a demonstration of the TurnKey/Ganart demonstration kiosk for Robocoin." "TurnKey never did a demonstration of the Ganart/TurnKey system for Robocoin.") *See* Defendant's Response pp. 18 and 19. This is an outright misrepresentation. Robocoin's counsel has acknowledged TurnKey demonstrated Ganart's proprietary Self-Service Registration at Kiosk process to Robocoin. *See* Reply Appendix p. 2. This misrepresentation, coupled with TurnKey's admission that it installed Ganart's proprietary Assembly in the first kiosk it sold to Robocoin is prima facie evidence of TurnKey's violation of the NDA and the Texas Uniform Trade Secrets Act.

2. Although TurnKey denies sharing Ganart's proprietary software, the facts are this: (1) TurnKey had a hard drive with the software installed on it in the demonstration kiosk in

its possession; (2) TurnKey disconnected components from the kiosk at which time TurnKey could have made an image of the hard drive; (3) TurnKey represented it had software expertise (*See* Reply Appendix p. 6), which would have enabled it to deconstruct Ganart's compiled software and use the information it extracted from Ganart's compiled software and use the information it extracted from Ganart's Linux system to reconstruct the process for a Windows based (or other) system; (4) The interface and process flow on Robocoin's prototype kiosk displayed at a tradeshow in San Jose, California in May 2013 was substantially different from the interface and process flow featured in the TurnKey-manufactured Robocoin kiosk deployed in Vancouver, Canada in October 2013, presumably after TurnKey had demonstrated Ganart's proprietary Self-Service Registration at Kiosk process to Robocoin. The prototype kiosk used QR codes and cell phones. The Vancouver kiosk did away with those and now featured Ganart's biometric Assembly (which TurnKey admits it installed) and replicated Ganart's Self-Service Registration at Kiosk process.

    **B.**  **TurnKey Did Not Independently Develop its Own Palm Vein Scanner Assembly.**

    3.  Contrary to TurnKey's reductionist characterization, the proprietary biometric palm reading Assembly is more than just the sum of its parts. Ganart spent hundreds of thousands of dollars researching and developing the Assembly, so that the housing, finger guide, dome, and palm secure cube were fully integrated into a robust, reliable, secure, industrial grade, biometric reader. Unlike the Fujitsu consumer grade, plastic, off the shelf scanner, Ganart's Assembly integrates features (e.g. the acrylic dome covering the cube) which differentiate it from other biometric identification devices in the market.

    4.  Ganart never consented to TurnKey pirating the design of its Assembly. Ganart provided the design and CAD drawings to TurnKey pursuant to the NDA with the understanding

that TurnKey's use of this information was limited to use with Ganart's Workplace Solution kiosks which TurnKey was to supply to Ganart and to mutual customers. The emails TurnKey relies upon (*see* Reply Appendix pp. 8-11) must be read in the context of the NDA. Ganart consented to TurnKey manufacturing a different dome to be used in the Assembly. It was not carte blanche consent to TurnKey allowing them to take and use Ganart's design and integration of the component parts of the Assembly for their own purposes. The consent was so that TurnKey could manufacture kiosks for Ganart's Workplace Solution.

5. TurnKey's assertion that it independently developed a palm vein scanner assembly ignores the fact its Assembly is nothing more than a slight modification of Ganart's design — it uses the same materials, has the same profile, and the same angles developed by Ganart. The base geometry for TurnKey's version is identical to Ganart's proprietary Assembly. Why else would TurnKey disassemble one of the Assemblies if not to reverse engineer it? More telling is the fact that TurnKey has not produced any evidence in its Response that substantiate its claim that it independently developed its own biometric reader.

6. One last point on this topic. If TurnKey had independently developed its own Assembly and could use an off the shelf Fujitsu palm secure cube and Fujitsu hand guide — why did TurnKey install Ganart's Assembly on the first unit it sold to Robocoin that was deployed in Vancouver?

**C.    TurnKey has Not Returned All of Ganart's Proprietary Information and Property.**

7. Ganart sent three Assemblies to TurnKey. Only two have been returned. One of which was completely disassembled. TurnKey is wrong when it represents "the first palm vein scanner Assembly was installed in the first demonstration kiosk located that was sent to Ganart and used in the first demonstration kiosk located in the Ganart lab environment." *See* Response,

p. 11. The Assembly installed in that unit was provided onsite by Ganart and was installed onsite at Ganart by Casey Strachan and Kelly Strachan. This Assembly was in addition to the three Assembly units previously shipped by Ganart to TurnKey's office in Arizona. Two Assemblies were returned. TurnKey still has one. *See* Plaintiff's Second Amended Complaint, Request for Temporary Injunction and Request for Permanent Injunction ¶¶ 12-14.

## II.  GANART HAS MADE A PRIMA FACIE SHOWING IT IS ENTITLED TO INJUNCTIVE RELIEF

### A.  Ganart has Identified its Trade Secrets.

8. Ganart described its trade secrets in its initial state court pleading and directed counsel to the pleading in response to Interrogatories. When TurnKey's counsel complained, Ganart provided verified supplemental Interrogatory answers to address TurnKey's complaint that it could not figure out what Ganart claimed was protected and why. Reply Appendix pp. 12-22 The fact that TurnKey went on in its Response to argue why the Assembly and Self-Service Registration at Kiosk process were not trade secrets belies its claims that Ganart did not identify its trade secrets with particularity.

### B.  Ganart Should Not be Penalized for any Alleged "Delay" in Seeking Injunctive Relief.

9. TurnKey misrepresents that Ganart delayed taking any action in response to TurnKey's conduct. Ganart's CEO confronted TurnKey executives the day he learned of their misappropriation. Response Appendix p. 3, ¶ 20. Ganart promptly hired counsel and filed suit, seeking injunctive relief on December 3, 2013.

10. Ganart recognizes that injunctive relief is extraordinary in nature and determined that rather than move prematurely for a Temporary Restraining Order, that it would seek injunctive relief after obtaining preliminary discovery so that a more fully developed record could be before the Court. Ganart indicated as much in the parties Joint Status Report and

Proposed Discovery Plan. Document 11, p. 3, § 11. The alleged delay was the result of the action having been removed to Federal Court.

### III. TURNKEY OVERSTATES THE HARM A TEMPORARY INJUNCTION WOULD CAUSE

11. Contrary to TurnKey's assertion, Ganart has not requested an injunction prohibiting TurnKey from selling kiosks to Robocoin. Instead, Ganart requested limited relief:

(a) prohibiting TurnKey from copying, distributing, furnishing or otherwise disclosing any confidential information, software or hardware to any third party.

(b) prohibiting TurnKey from using, selling, distributing, or manufacturing any device or process which was generated as a result of decompiling, disassembling, decoding, reproducing, redesigning, reverse engineering, reverse designing, duplicating (in whole or in part), developing derivatives, or copying the original, software or hardware provided to TurnKey by Ganart.

(c) requiring TurnKey to return the remaining palm vein scanner Assembly in its possession.

(d) requiring TurnKey to recall any kiosk which incorporates any Ganart Confidential Information or incorporates any software or hardware Turnkey generated as a result of decompiling, disassembling, decoding, reproducing, redesigning, reverse engineering, reverse designing, duplicating (in whole or in part), developing derivatives, or copying the original, software or hardware provided to TurnKey by Ganart.

12. If TurnKey did not misappropriate Ganart's confidential and proprietary information, hardware, software or process, the impact of any injunctive relief would be minimal, if it had any impact at all. This leads one to wonder why, if TurnKey has not done anything wrong, it does not agree to the relief requested.

13. Since the relief requested is narrowly tailored, a substantial bond should not be required.

Respectfully submitted,

**COBB MARTINEZ WOODWARD PLLC**
1700 Pacific Avenue, Suite 3100
Dallas, Texas 75201
(214) 220-5204
(214) 220-5254 (Fax)

By: */s/ Jonathan C. LaMendola*
    **JONATHAN C. LaMENDOLA**
    Texas Bar No. 00792637
    email: jlamendola@cobbmartinez.com
    **DAVID R. WOODWARD**
    Texas Bar No. 21975650
    email: dwoodward@cobbmartinez.com

**ATTORNEYS FOR PLAINTIFF GANART TECHNOLOGIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2014, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means: David W. Williams and Joshua W. Carden.

    */s/ Jonathan C. LaMendola*
    **JONATHAN C. LaMENDOLA**