IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC.<br>Plaintiffs, | § § § § § | CIVIL ACTION NO. 3:14-cv-00616-BF |
| V. | § § | |
| TURNKEY KIOSKS, LLC<br>Defendant. | § § § § | |

---

**DEFENDANT TURNKEY KIOSK, LLC'S BRIEF IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

---

**DAVID W. WILLIAMS**
*Admitted Pro Hac Vice*
Email: dwilliams@davismiles.com

**JOSHUA W. CARDEN**
Texas Bar No. 24050379
Email: jcarden@davismiles.com

**DAVIS MILES MCGUIRE GARDNER, PLLC**
545 E. John Carpenter Freeway, Suite 300
Irving, Texas 75062
P. 972.674.3885
F. 972.674.2935

**Attorneys for Defendant, TurnKey Kiosks, LLC**

## TABLE OF CONTENTS

TABLE OF CONTENTS ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ii

TABLE OF AUTHORITIES ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... .... ... iii, iv

I.    INTRODUCTION ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...1

II.    STATEMENT OF UNDISPUTED
      FACTS ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ..... ... ... ...3

III.    TURNKEY IS ENTITLED TO SUMMARY JUDGMENT ON ALL
       CLAIMS ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... 19

      A.    Ganart Cannot Establish THE Prima Facie Elements of its Trade Secret

            Claim  ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... 20

            1.    Ganart's Proprietary Information Is Not a Trade Secret ... ... ... ... ... ... ... 20

                  a.    The Palm Vein Scanner is not a Trade Secret ... ... ... ... ... ... ... 21

                  b.    The "Self-Service Registration at Kiosk" ... ... ... ... ... ... ... ... ...22

            2.    Ganart's Has Failed to Show That TurnKey has Misappropriated the Alleged

                  Trade Secrets ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...  ... ... ... ...25

                  a.    There Was No Misappropriation of the Palm Vein Scanner

                        Assembly ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... 26

                  b.    There Was No Misappropriation of the Self-Service Registration

                        at Kiosk Software ... ... ... ... ... ... ... ... ... ... ... ... ...  ... ... ...   28

                  c.    RoboCoin Independently Developed its Own Proprietary Software and

                        Process for Registration and Identification of Kiosk Users ... ... ... ... 29

      B.    Ganart Cannot Prove the Prima Facie Elements of Its Breach of Contract

            Claim ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...    ... ... ... ... ... ... 30

      C.    Ganart's Civil Conspiracy and Aiding and Abetting Claims also Fail as a Matter

            of Law ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...   ... ... ... ... ... ... 32

IV.    CONCLUSION ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...... ... ... ...34

V.    CERTIFICATE OF SERVICE ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...... ... ... ... 35

## TABLE OF AUTHORITIES

### STATUTES

Tex. Civ. Prac. & Rem. Code § 134A.001 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...20

Tex. Civ. Prac. & Rem. Code § 134A.002 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...20

Tex. Civ. Prac. & Rem. Code § 134A.002(2) ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...26

Tex. Civ. Prac. & Rem. Code § 134A.002(3) ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...26

Tex. Civ. Prac. & Rem. Code § 134A.002(6) ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...8, 20

### RULES

Fed.R.Civ.P. 56(a) ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...19

### TREATISES

*Milgrim on Trade Secrets* § 1.06 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...  25

*Restatement (Second) of Torts* § 876 (1977) ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...33

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986) 19

*Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ... ... ... ... ... ... ...19

*BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 710 (7th Cir. 2006) ...23, 25

*Chon Tri v. J.T.T.*, 162 S.W.3d 552, 554 (Tex. 2005) ... ... ... ... ... ... ... ... ... ... ... ... ...33

*Dow Chemical Canada v. HRD Corp.*, 909 F.Supp.2d 340, 346 (D. Del. 2012) ... ... ... ... ... ...  24

*Hovorka v. Community Health Systems*, 262 S.W. 3d 503, 509 (Tex. App. 2008) ... ... ... ... ...30

*IDX Systems Corp v. Epic Systems Corp.*, 285 F.3d 581, 583 ... ... ... ... ... ... ... ... ... ...23, 24

*Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex. 1996) ... ... ... ... ... ... ... ... ... ... ... ...33

*Luccous v. J.C. Kinley Co.*,
    376 S.W. 2d 336, 338 (Tex. 1964)... ... ... ... ... ... ... ... ... ...: ... ... ... ... ... ... ... ...21

*MAI Sys. Corp. v. Peak Computer*,
    991 F.2d 511, 522 (9th Cir. 1983)... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...21, 23

*Mercer v. C.A. Roberts Co.*,   570 F.2d 1232, 1239 (5th Cir. 1978)... ... ... ... ... ... ... ... ... ...21

*Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586
(1986)... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...19

*On-Line Techs. Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1141
(Fed. Cir. 2004) ... ... ... ... ... ... ... ...: ... ... ... ... ... ... ... ... ... ... ...: ... ... ... ... 25

*Rimes v. Club Corp. of America*, 542 S.W. 2d 909, 913 (Tex. Civ. App. 1976)... ... ... ... ...22

*Roundville Partners, L.L.C. v. Jones*, 118 S.W.3d, 73, 82 (Tex. App. 2003) ... ... ... ... ... ...30

*Sutra, Inc. v. Iceland Express, EHF*, 2008 U.S. Dist. LEXIS 52849 at *9, 2008 WL 2705580
(D. Mass. July 10, 2008) ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...24

*SL Montevideo Tech, Inc. v. Eaton Aero., LLC*, 491 F.3d 350, 354 (8th Cir. 2007) ... ... ... ... ...24

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F.Supp. 2d 935, 959 (S.D. Tex. 2013)... ... ...21

*Universal Analytics v. MacNeal-Schwender Corp.*, 707 F.Supp. 1170, 1177 (C.D. Cal. 1989) 23

*Vital State Can., Ltd. v. Dreampak, LLC*, 303 F.Supp.2d 516, 525 (D. N.J. 2003) ... ... ... ... ...25

*Wilson v. Continental Dev. Co.*, 112 F.Supp. 2d 648, 662 (W.D. Mich. 1999)... ... ... ... ... ...20

*Wissman v. Boucher*, 150 Tex. 326, 240 S.W.2d 278, 280 (Tex. 1951)... ... ... ... ... ... ... ... ...22

*Wright v. Christian & Smith*, 950 S.W.2d 411, 412 (Tex. App. 1997)... ... ... ... ... ... ... ... ...30

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC.<br>Plaintiffs, | § <br> § <br> § <br> § <br> § | CIVIL ACTION NO. 3:14-cv-00616-BF |
| V. | § <br> § | |
| TURNKEY KIOSKS, LLC<br>Defendant. | § <br> § <br> § <br> § | |

## DEFENDANT TURNKEY KIOSK, LLC'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant TurnKey Kiosks, LLC ("TurnKey") hereby submits its brief in support of its motion for summary judgment on all claims asserted by Plaintiff Ganart Technologies, Inc. ("Ganart").

### I.      INTRODUCTION

This lawsuit arises out of a failed business partnership between Ganart and TurnKey related to a joint venture to develop kiosks for financial transactions.  Ganart is a company that has attempted to develop its software to be used on a kiosk or ATM for financial transactions. TurnKey is a family owned manufacturer and supplier of custom kiosks, including financial services kiosks, automatic teller machines, and other types of kiosks.  As part of their joint venture, Ganart and TurnKey entered into a Non-Disclosure Agreement that would facilitate the sharing of information.

As part of the joint venture, TurnKey supplied Ganart with three demonstration kiosks that were independently manufactured and assembled by TurnKey.  Ganart supplied a hardware

component referred to as a "palm vein scanner assembly" that was incorporated into the demonstration kiosks. The kiosks also used a software program which was supplied by Ganart that would allow the consumer/user to register at the kiosk in order to conduct a designated financial transaction. Ganart has referred to its user identification process and software as "the "Self-Service Registration at Kiosk." Ultimately, in October 2013, Ganart terminated its business relationship with TurnKey.

TurnKey has independently worked with another company, RoboCoin Technologies, LLC ("RoboCoin") to develop custom built kiosks directed at the sale, transfer and purchase of "Bitcoin." Bitcoin is an open source, peer-to-peer electronic money and payment network that is used in online and internet transactions. RoboCoin's primary business is directed at persons involved in the transfer and exchange of "Bitcoin." In early 2013, RoboCoin and TurnKey began to collaborate on the design of custom, manufactured kiosks direct at Bitcoin users. TurnKey assembled the kiosks, including hardware, and RoboCoin supplied TurnKey with its own proprietary, independently developed user identification software to operate on the kiosks.

In this lawsuit, Ganart alleges that TurnKey has shared Ganart's alleged proprietary information with RoboCoin, including parts of a "palm vein scanner assembly" and Ganart's "Self-Service Registration at Kiosk" software. Ganart has asserted claims against TurnKey for an alleged violation of the Texas Uniform Trade Secrets Act ("TUTSA"), breach of the parties' Non-Disclosure Agreement, civil conspiracy and aiding and abetting with RoboCoin.

TurnKey is entitled to summary judgment on Ganart's claims set forth in its Second Amended Complaint.

First, Ganart cannot establish the prima facie elements of its misappropriation of trade secret claim because: (1) the palm vein scanner assembly and Self-Service Registration at Kiosk software/process are not trade secrets; (2) TurnKey did not provide Ganart's alleged trade secrets to RoboCoin or any other third parties; and (3) RoboCoin independently developed the user identification and registration process that is used in the RoboCoin kiosks.

Second, Ganart's breach of contract claim fails as a matter of law because: (1) TurnKey did not breach the non-disclosure agreement; and (2) to the extent there was an allege breach by the use of the palm vein scanner assembly in the RoboCoin prototype kiosk, TurnKey remedied the issue and thus, Ganart has not sustained any damages.

Third, Ganart's claims for aiding and abetting and civil conspiracy fail as a matter of law because there is no evidence that TurnKey conspired with or aided and abetted RoboCoin in misapprpriation any of Ganart's proprietary information.

Therefore, because Ganart cannot set forth the prima facie elements of its claims, TurnKey is entitled to summary judgment.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

### TURNKEY MANUFACTURES CUSTOM KIOSKS FOR ITS CUSTOMERS

1.      TurnKey is a family owned business and a manufacturer and supplier of custom kiosks, including financial services kiosks, automatic teller machines, outdoor service kiosks, ticketing kiosks, print-on-demand kiosks, and other custom ordered kiosks, to customers across various industries. *See* Declaration of Gary Strachan, ¶ 3, Exhibit 1 of the Appendix ("App. 2, ¶ 3").

2.      TurnKey is a creator of custom kiosk solutions.  App. 2, ¶ 4.

3.      TurnKey consults with their customers to understand what the business problem to be solved is and then sets about to build the solution.  App. 2, ¶ 4.  Generally, TurnKey builds a custom kiosk enclosure, installs Original Equipment Manufacturer ("OEM") components and if the customer does not have software to operate the solution, TurnKey will recommend one of its software partners to develop a software solution to run on the custom kiosk.  *Id.*

4.      TurnKey works with its customer to design the specific custom kiosk needed by the customer in their specific field of interest.  App. 3, ¶ 5.

---

[1] TurnKey refers to the statement of facts later in this brief as "DSOF."

5.      Generally, a customer will supply information to TurnKey for what the customer needs for its custom kiosk, and TurnKey will design and assemble the kiosk, which includes various OEM off the shelf hardware components. App. 2, ¶ 5.

6.      Many times TurnKey will supply its customer with off the shelf hardware components and OEM software tools to aid in the use of these components.  App. 3, ¶ 6.  The software tools include device drivers, software development kits ("SDK's") and application program interfaces ("API's") which are provided by the OEM hardware manufacturers to allow the customer to integrate the OEM hardware component into their software program which allows them personalized control of the hardware components in the kiosk  to the customer's specific needs. *Id.*

### GANART'S BUSINESS RELATIONSHIP WITH TURNKEY AND GANART'S ALLEGED TRADE SECRETS

7.      On or about December 6, 2011, TurnKey and Ganart Technologies, Inc. entered into a "Confidentiality and Non-Disclosure Agreement" ("the NDA"), which provided that TurnKey and Ganart could share confidential and propriety information with each other for the purpose of development of products and services and other joint business opportunities so long as such information was not disclosed to other third parties.  App. 3, ¶ 7; *See also* App. 13-17, Non-Disclosure Agreement, attached as Exhibit 2 to the Appendix.

8.      The NDA specifically provides that Ganart must designate any materials provided under the Agreement as confidential at the time the disclosure is made to TurnKey.  *See* App. 14, ¶ 1.  The NDA also provides that Texas law will govern the interpretation of the agreement. App. 16, ¶ 15.

9.      Ganart and TurnKey were interested in developing a kiosk solution whereby TurnKey supplied the custom made kiosk enclosure and OEM hardware components, and Ganart supplied software for the kiosks.  App. 3, ¶ 8.

10.     Ganart had previously attempted to design their own kiosks that utilized their software program that allowed the end consumer of the kiosk to do the Ganart proprietary transaction Money Earned® (a software that allowed an employee to obtain a payroll advance before they were paid) and conduct other financial transactions such as ATM withdrawals, bill payment and wire transfers.  App. 3, ¶ 8.

11.     Ganart had difficulty manufacturing its own kiosks, and thus, it was fortuitous when TurnKey contacted Ganart as a potential business partner.  App. 3, ¶ 9.

12.     As part of the business venture with Ganart, TurnKey supplied Ganart access to three demonstration kiosks that had been built by TurnKey with various OEM hardware components, and were standard models of their TK-8200 Financial Series kiosks used by TurnKey in its business.  App. 4, ¶ 11.

13.     The kiosks were modified to utilize Ganart's software program that was used to allow an employee to take cash from their paycheck before pay day.  TurnKey supplied the hardware for the kiosks.  App. 4, ¶ 12.

### *The Palm Vein Scanner Assembly*

14.     The only "hardware" supplied by Ganart for the three demonstration kiosks was three sheet metal housings, three finger guides, at least three domes, and one Fujitsu PalmSecure® cube.  App. 4, ¶ 13.  These materials are what Ganart refers to as its palm vein scanner assembly.

15.     In written discovery, Ganart was asked to explain how its palm vein scanner assembly qualifies as a "trade secret" under the TUTSA, and Ganart gave the following vague explanation as to how the palm vein scanner assembly was a trade secret:

> Ganart spent significant resources researching and developing the Assembly, so that the housing, finger guide, dome and palm secure cure were fully integrated into a robust, reliable, secure, industrial grade, biometric reader.  Unlike the Fujitsu consumer grade, plastic, off the shelf scanner, Ganart's Assembly integrates features (e.g. acrylic dome covering the cube) which differentiate it from other biometric identification devices.

*See* App. 32, Ganart's Responses to TurnKey's Second Set of Interrogatories, Interrogatory No. 11, Exhibit 3 to the Appendix.

16.     The major components of the palm vein scanner assembly are: (1) the Fujitsu PalmSecure® cube; (2) the metal housing; (3) a rounded dome; and (4) finger guides.  App. 4, ¶ 14.  The "Fujitsu PalmSecure® cube" is a highly reliable biometric authentication system based on palm vein pattern recognition technology which is used to capture a biometric scan of a consumer/user's palm and the unique palm vein patterns in the user's hand, which is used to identify the user.  App. 4, ¶ 15.

17.     The Fujitsu PalmSecure® cube is an OEM component available to anyone including manufacturers such as TurnKey.  App. 4, ¶ 14.

18.     The companion to the Fujitsu PalmSecure® cube is the Fujitsu PalmSecure® hand guide. App. 4, ¶ 14.  The Fujitsu PalmSecure® cube scanner is mounted within the sheet metal housing.  *Id.*, ¶ 15.

19.     In order to use the scanner, the user places their hand within the housing on the finger/hand guide.  App. 4, ¶ 15.  The hand guide is necessary to prevent the users hand from moving so that the scanner can capture the biometric image of the user's hand.  *Id.*, ¶ 16.

20.     On November 19, 2012, Wayne McHugh, Ganart's President, provided the Ganart technical drawings for the metal housing, the dome and the finger/hand guide and gave permission to Casey Strachan, one of the owners of TurnKey, to "morph it into a TurnKey kiosk."  *See* App. 4, ¶ 16; *See also* App. 36, Email from Wayne McHugh to Casey Strachan dated November 19, 2012, Exhibit 4 to the Appendix.  In the email, at no time did Mr. McHugh indicate that the parts of the palm vein scanner assembly were confidential or should be treated as confidential under the terms of the Non-Disclosure Agreement.  *See* App. 36.

21.     TurnKey independently developed its own sheet metal housing and dome components for a palm vein scanner component that would work on all TurnKey's kiosks.  App. 4, ¶ 16.

22.     In November 2012, TurnKey requested Ganart's permission to create its own components that could be used in future kiosks.  App. 4, ¶ 16.

23.     TurnKey contracted with its own CAD designer to create a version for the metal housing, the dome and the finger/hand guide component that would be compatible within all TurnKey's kiosks.  App. 5, ¶ 17.

24.     TurnKey also contracted with its own plastic molding company to create a dome for the TurnKey kiosks that would allow a Fujitsu PalmSecure® cube to work on a TurnKey kiosk. App. 5, ¶ 18.

25.     The housing and dome components created by TurnKey are completely different than Ganart's housing and dome components for its palm vein scanner assemblies.  App. 5, ¶ 19. For instance, the dome that was manufactured for TurnKey by its plastic molding company was made out of a clear acrylic plastic, while the Ganart dome component is a different tint and plastic material. *Id.*, ¶ 20.

26.     Casey Strachan made Mr. McHugh aware that TurnKey was developing the dome and housing components and at no time did Mr. McHugh or anyone else from Ganart object to TurnKey developing its own independent dome and housing components.  App. 5, ¶ 21.  Such was confirmed in emails exchanged between Mr. McHugh and Casey Strachan on June 19, 2013. *See* App. 38-39, Emails exchanged between Wayne McHugh and Casey Strachan dated June 19, 2013, Exhibit 5 to the Appendix.

### *The "Self-Service Registration at Kiosk"*

27.     Ganart has alleged that its other trade secret is its "Self-Service Registration at Kiosk".  *See* Plaintiff's Second Amend. Compl., ¶ 10, Docket 22.  In essence, the "Self-Service Registration at Kiosk" appears to be a means for a user of a kiosk to register at the kiosk to conduct a financial transaction, which operates on a Linux-based operating system.  *See* Plaintiff's Second Amend. Compl., ¶ 10, Docket 22; *See also* App. 45-46, Ganart's Responses to

TurnKey's First Set of Requests for Admission, Request for Admission No. 13, Exhibit 6 to the Appendix.

28.     In interrogatories, Ganart was asked to "[p]lease state with particularity the complete factual basis for your contention that the "Self-Service Registration" constitutes as 'trade secret' as defined by Tex. Civ. Prac. & Rem. Code § 134.002(6)" *See* App. 32-33, Ganart's Responses to TurnKey's Second Set of Interrogatories, Interrogatory No. 12, Exhibit 3 to the Appendix.

29.     In a supplemental response to that interrogatory, Ganart stated the following:

> Self-service Registration at Kiosk is a service that allows fully compliant (Anti-money Laundering Act) registration of an individual at a self-service device, such as a kiosk, without teller assistance, for access to [a] variety of services, such as regulated financial transactions like money transfer.  This service allows a complete Anti-Money Laundering (AML) compliant identification and registration of an individual at a self-service kiosk using Ganart's proprietary technology and process. It includes biometric signature (including palm vein), capture and validation of a government issued identification card and digital photographs of the registrant.

*See* App. 32-33, Ganart's Responses to TurnKey's Second Set of Interrogatories, Interrogatory No. 12, Exhibit 3 to the Appendix.

30.     Further, prior to December 2013, Ganart sought to patent its "Self-Service Registration at Kiosk" and the Patent Application was published on December 19, 2013.  *See* App. 61-85, Ganart's Patent Application Publication, attached as Exhibit 9 to the Appendix.

31.     In 2010, Fujitsu began selling and marketing self-service registration kiosks for the health care industry, which allows patients to fill out forms and create their own unique user profiles at a kiosk using Fujitsu's palm vein scanner technology.   *See* App. 86-88, Marketwired.com article regarding the Fujitsu Self-Service Patient Kiosk, attached as Exhibit 10.

#### GANART WAS AWARE OF TURNKEY'S ATTEMPT TO PROMOTE THE SALE OF KIOSKS ON BEHALF OF BOTH TURNKEY AND GANART

32.     Ganart claims that TurnKey disconnected certain components from the demonstration kiosks in August and September 2013, and that somehow supports Ganart's

breach of contract and trade secret misappropriation claims. *See* App. 26-31, Ganart's Responses to TurnKey's Second Set of Interrogatories, Interrogatory No. 7, attached as Exhibit 3 to the Appendix.

33.     Ganart has also alleged that TurnKey gave unauthorized demonstrations of one of the demonstration kiosks to undisclosed third-parties. *See* App. 26-31, Ganart's Responses to TurnKey's Second Set of Interrogatories, Interrogatory No. 7, attached as Exhibit 3 to the Appendix

34.     Ganart's user identification software and Ganart's palm vein scanners assemblies were installed on the three demonstration kiosks.  App. 5, ¶ 22.

35.     Two of the kiosks were shipped to Ganart's headquarters in Texas.  App. 5, ¶ 22.

36.     The third kiosk was kept at TurnKey's place of business in Phoenix, Arizona. App. 5, ¶ 22.

37.     Ganart's representatives had indicated to Gary Strachan on various occasions that Ganart would attempt to find a potential buyer for the two demonstration kiosks that were at its Texas facility.  App. 5, ¶ 23.

38.     However, over the course of the business relationship between Ganart and TurnKey, Ganart failed to sell any of the TurnKey kiosks to any third-party customers.  App. 5, ¶ 23.

39.     One of the kiosks kept by Ganart was used by Ganart for the benefit of demonstrating the kiosk services to potential customers and for its employees to use the payroll advance and the other functions of the kiosk.  App. 5, ¶ 24.  The kiosk was kept in its lunch room to be used by Ganart employees. *Id.*, ¶ 24.

40.     It is TurnKey's understanding that Ganart actually earned income and generated revenue from the kiosk that it used for its employees.  Ganart never shared any of the income generated from this kiosk with TurnKey.  App. 6, ¶ 25.

41.     Ganart did not pay Turnkey anything for the three development kiosks, for any parts for the kiosks, or development at any time. *Id.*, ¶ 26.

42.     Ganart did buy some parts from TurnKey for another project during the relationship.  App. 6, ¶ 26.

43.     TurnKey offered to sell Ganart the kiosk used by their employees in the Ganart lunchroom, but Ganart refused to purchase it. *Id.*, ¶ 26.

44.     TurnKey also worked to promote the kiosk solution to other potential customers, and regularly demonstrated the third kiosk that was kept at TurnKey's business headquarters to potential purchasers. *Id.*, ¶ 27.

45.     Ganart was well aware of TurnKey's attempt to promote the sale of the kiosks as Gary Strachan and his two sons, Casey Strachan and Kelly Strachan, had repeated conversations with Ganart's employees about promoting the sale of the kiosks to other third-parties.  App. 6, ¶ 27.

46.     Wayne McHugh also visited the TurnKey facility in April of 2013. *Id.*, ¶ 28. On or about April 11, Wayne McHugh gave a seminar to TurnKey's Sales Staff on the Work Place Solution. *Id.*, ¶ 28.

47.     On or about April 12, 2013, Wayne McHugh and Gary Strachan visited a potential customer, Planet Payroll to present the solution, but this sales visit resulted in no business. *Id.*, ¶ 29.

48.     Contrary to the insinuations by Ganart about the unauthorized demonstrations of the third kiosk, TurnKey was demonstrating the features of the prototype kiosk in order to sell the TurnKey/Ganart kiosk as Ganart had failed to promote or sell the any TurnKey/Ganart Workplace Solution kiosks up to this point.  App. 7, ¶ 36.

49.     In mid-September 2013, TurnKey also requested that Ganart return of one of the two demonstration kiosks that were at Ganart's headquarters. *Id.*, ¶ 37

50.     TurnKey had identified three potential kiosk placements into two customer locations and was working on finalizing the details when Ganart ended its business relationship with TurnKey in late October 2013.   Thus, TurnKey was unable to complete the sale of three demonstration kiosks because Ganart ended the relationship and remotely erased its software from the TurnKey lobby demonstration kiosk.  App. 7, ¶ 37.

51.     TurnKey had to back out of the potential business deals that were pending causing major embarrassment to TurnKey.  App. 7, ¶ 38.

52.     Ganart has also stated that in August 2013, TurnKey removed several components from the third demonstration kiosk that was at TurnKey's headquarters in Phoenix, Arizona. App. 7, ¶ 39.

53.     TurnKey regularly removed components from the demonstration kiosk to meet customer demand for use in other kiosks, and would replace those components with new components.  *Id.*, ¶ 39.

54.     Each time TurnKey removed hardware components from the demonstration kiosk, Ganart receive a remote alert from the kiosk as we believe that is a normal function of the Ganart software.  *Id.*, ¶ 39.

55.     The hardware components removed from demonstration kiosk were components that were purchased and owned by TurnKey and had been installed in the kiosk prior to the time Ganart and TurnKey ever did business.  App. 8, ¶ 40.

### TURNKEY'S BUSINESS RELATIONSHIP WITH ROBOCOIN TECHNOLOGIES, LLC

56.     The main thrust of Ganart's claims against TurnKey involve allegations that TurnKey shared Ganart's proprietary information with RoboCoin.  Plaintiff's Second Amend. Compl., ¶¶ 18-29, Docket 22

57.     In May 2013, TurnKey was contacted by a prospective customer, RoboCoin. App. 8, ¶ 41.  RoboCoin is in the business of developing products directed at persons involving in the transfer and exchange of "Bitcoin."  *Id.*, ¶ 41.

58.     Prior to contacting TurnKey, RoboCoin had identified the basic hardware components that it was interested in using in a custom built kiosk.  *See* Deposition of Jordan Kelley, pp. 132:18-134:15, attached to Appendix B, pp. B13-B15 (referred to as "App. B").[2]

59.     Bitcoin is an open source, peer-to-peer electronic money and payment network that is used in online and internet transactions.  App. 8, ¶ 42.  RoboCoin contacted TurnKey to develop a prototype kiosk for RoboCoin that was to be displayed at a trade show in San Jose, California on May 17, 2013. *Id.*, ¶ 42.

60.     RoboCoin was interested in developing a kiosk that would allow an end consumer to sell, transfer and purchase "Bitcoin" through the RoboCoin kiosks.  App. 8, ¶ 43.

61.     Prior to soliciting assistance from TurnKey in the development of a Bitcoin kiosk, RoboCoin had already developed its own independent user-registration software.  *See* App B-15, Deposition of Jordan Kelley, p. 134:4-11.

62.     TurnKey developed a first generation prototype kiosk for RoboCoin that was displayed at the San Jose trade show.  App. 8, ¶ 44.  The prototype kiosk was to be used as a basic proof of concept to demonstrate RoboCoin's services in the Bitcoin market. *Id.*, ¶ 44.

63.     After RoboCoin received positive feedback about its kiosk prototype, RoboCoin refined its requirements for a next generation prototype kiosk, and worked with TurnKey to identify the hardware components for the next generation kiosk. *Id.*, ¶ 45.

64.     Such requirements included hardware components that would comply with federally mandated regulations in the United States, including but not limited to "Know Your Customer" and "Anti-Money Laundering" regulations. *Id.*, ¶ 45.

65.     Independent of any assistance from TurnKey, RoboCoin continued to refine and develop its own unique and proprietary, user registration and identification process and software to be used on the Bitcoin kiosks.  *See* App. B16-B19, Deposition of Jordan Kelley, pp. 135:6-

---

[2] TurnKey has filed the deposition of Jordan Kelley as a separate Appendix under seal because the deposition was designated as confidential pursuant to the parties' protective order.  The Deposition is referred to as "Appendix B."

136:5 and 137:22-138:7.  TurnKey had no role in the development of RoboCoin's registration software.  *See* App. B17-B18, Deposition of Jordan Kelley, pp. 137:22-138:7.

66.     In developing its registration software for the kiosks, RoboCoin had also decided to use some form of a biometric capture, such as a fingerprint, as a way to identify users of the Bitcoin kiosk.  *See* App. B19, Deposition of Jordan Kelley, pp. 138:8-21.

67.     Based on RoboCoin's research, RoboCoin asked TurnKey to identify biometric scanners available in the marketplace. App. 8, ¶ 46.

68.     TurnKey regularly uses biometric scanning devices in its kiosks and RoboCoin expressed interest in using the palm vein scanner technology in its new generation kiosk.  *Id.*, ¶ 46.

69.     Ganart has alleged that TurnKey provided an authorized demonstration of the Ganart/TurnKey kiosk in September 2013 for RoboCoin representatives.

70.     On September 5, 2013, Jordan Kelley and John Russell from RoboCoin met with TurnKey's representatives, Gary Strachan, Margaret Strachan, Casey Strachan and Kelly Strachan to discuss greater collaboration for the development of additional kiosks.  App. 9, ¶ 47; *See also* App. B29, Deposition of Jordan Kelley, p. 148:4-24.

71.     During the meeting, Jordan Kelley indicated that his father was affiliated with a Las Vegas Casino at which point TurnKey's representatives indicated that the Casino may have an interest in purchasing kiosks with the Ganart's payroll advance/workplace solution so that Casino employees could use such kiosks for payroll advances.  App. 9, ¶ 48;

72.     Gary Strachan at TurnKey believed that the Las Vegas casino chain that would be a good fit for purchasing and using the TurnKey kiosk with the Ganart Workplace Solution. *Id.*, ¶ 48.

73.     During the September 5, 2013 meeting, TurnKey showed Mr. Kelley and Mr. Russell how the kiosk operated with the idea that the Las Vegas Casino may be interested in purchasing the Ganart Workplace Solution running on TurnKey kiosks and also to show the

types of kiosks that TurnKey manufactures.  App. 9, ¶ 49; *See also* App. B11-B12, Deposition of Jordan Kelley, p. 116:13-117:9.  Mr. Kelley considered the demonstration a hardware tutorial or hardware demonstration.  *See* App. B30, Deposition of Jordan Kelley, p. 149:16-18.

74.     Jordan Kelley has averred that there was nothing from the demonstration of the Ganart/TurnKey kiosk that RoboCoin integrated or used as a model for RoboCoin's own user identification and registration software.  *See* App. B29-B30, Deposition of Jordan Kelley, p. 148:25-149:18.

75.     During the demonstration, TurnKey did not identify any part of the kiosk as having been originated by Ganart, and TurnKey simply presented the demonstration kiosk as an example of the kind of product that TurnKey can manufacture.  *See* App. 49, Declaration of Jordan Kelley, ¶ 2, attached as Exhibit 7 to the Appendix.

76.     In early September 2013, RoboCoin ordered a second prototype kiosk from TurnKey.  When it provided its hardware requirements to TurnKey for the second prototype kiosk, RoboCoin wanted to use a palm vein scanner as a means of identification for users of the prototype kiosk.  App. 9, ¶ 50.

77.     TurnKey used a Fujitsu PalmSecure® cube scanner as the means of identifying users of the prototype kiosk.  *Id.*, ¶ 51.  TurnKey also used the housing and dome components that TurnKey had independently created to house the Fujitsu PalmSecure® cube scanner in the kiosk.  *Id.*, ¶ 51.

78.     Because TurnKey did not have sufficient time to fabricate a "finger guide" for the Fujitsu PalmSecure® cube scanner that was used on the second prototype kiosk, TurnKey used the "finger guide" that had been supplied by Ganart.  App. 9, ¶ 52.

79.     Upon completion of construction by TurnKey, the second prototype kiosk was sent to RoboCoin's customer in Vancouver, Canada.  A photograph of the second prototype kiosk was taken and displayed in an issue of Wired Magazine in October 2013.  *Id.*, ¶ 53.

80.     Ganart also argues that TurnKey admitted to using the palm vein assembly in the second generation RoboCoin kiosk.   *See* Plaintiff's Second Amend. Compl. ¶ 29, Docket 22.   In October 2013, Mr. McHugh contacted Gary Strachan and inquired about the RoboCoin second generation kiosk that had been photographed in Wired Magazine.  App. 9, ¶ 54.

81.     Mr. Strachan indicated to Mr. McHugh that TurnKey had used the finger guides from one of the Ganart palm vein scanner assemblies in the second generation kiosk due to fact that TurnKey did not have sufficient time to fabricate its own finger guides for the palm vein scanner assembly that was in the RoboCoin kiosk.  App. 10, ¶ 54.

82.     When TurnKey became aware of Ganart's concerns about the photograph of the second prototype kiosk in Wired Magazine, Kelly Strachan traveled to RoboCoin's customer in Vancouver, Canada, and removed the entire TurnKey palm vein housing, the dome and the finger guides that TurnKey installed in the prototype kiosk.  App. 10, ¶ 55; *See also* App. 56-60, Photographs of the RoboCoin Second Generation Kiosk, attached as Exhibit 8 to the Appendix; *See also* App. B21-B22, Deposition of Jordan Kelley, pp. 140:14-141:9.

83.     Turnkey replaced the metal housing, dome and finger guides in the second prototype unit installed in Vancouver, Canada with an "off the shelf" hand guide from Fujitsu made specifically to work with the Fujitsu PalmSecure® cube. App. 10, ¶ 56; *See also* App. 56-60, Photographs of the RoboCoin Second Generation Kiosk, attached as Exhibit 8 to the Appendix; *See also* App. B21-B22, Deposition of Jordan Kelley, pp. 140:14-141:9.

84.     To the extent there was an alleged violation of the NDA with respect to the RoboCoin prototype kiosk, TurnKey has remedied any such alleged violation by removing the finger/hand guides from the second prototype kiosk.  App. 10, ¶ 57.

85.     Further, the housing and dome components that were independently created by TurnKey were also removed from the prototype kiosk and have not been used in any other TurnKey kiosks. *Id.*, ¶ 57.

86.     RoboCoin has ordered additional kiosks from TurnKey modeled after the second generation prototype kiosk. *Id.*, ¶ 58.  However, all of those kiosks now use the "off the shelf" Fujitsu PalmSecure® cube along with the Fujitsu hand guide and have no Ganart components or any palm vein scanner components that were designed by TurnKey. *Id.*, ¶ 58; *See also* App. B22,  Deposition of Jordan Kelley, p. 141:10-18

87.     RoboCoin has also worked directly with Fujitsu to integrate the use of the Fujitsu palm vein scanner into RoboCoin's registration and user identification software that operates on the RoboCoin kiosks. *See* App. B22-B24, Deposition of Jordan Kelley, pp. 141:20-143:21. TurnKey was not involved in any discussions between RoboCoin and Fujitsu about integrating the Fujitsu palm vein scanners into the RoboCoin kiosk software.  *See also* App. B22-B24, Deposition of Jordan Kelley, pp. 141:20-143:21.

88.     Without any explanation, Ganart has alleged that TurnKey shared Ganart's "Self-Service Registration at Kiosk" software with RoboCoin. *See* App. 25, Ganart's Responses to TurnKey's Second Set of Interrogatories, Interrogatory No. 5, attached as Exhibit 3 to the Appendix.  In response to interrogatories, Ganart stated: "Ganart contends TurnKey access, copied and/or reverse engineered Ganart's proprietary software and either provided or made it available to Robocoin." *Id.*

89.     TurnKey denies providing Ganart's software to RoboCoin or any other persons. App. 10, 59.  TurnKey was never given any Ganart source code, passwords or any other access to any Ganart software.  App. 10, ¶ 59.

90.     RoboCoin installed its own proprietary software on the second prototype kiosk, which is used in the current production model RoboCoin kiosks.  App. 10, ¶ 60.

91.     RoboCoin independently developed its kiosk user identification and registration process that is compliant with U.S. anti-money laundering laws and independently developed its own process that incorporates the Fujitsu palm vein scanners.  *See* App. 50-51, Declaration of

Jordan Kelley, ¶¶ 5, 9, attached as Exhibit 8 to the Appendix; *See also* App. B18-B20, Deposition of Jordan Kelley, pp. 137:12-139:13.

92.    RoboCoin avers that it has not received any of Ganart's confidential or proprietary information and is not using any such information in its current software or Bitcoin kiosks. *See* App. 51, Declaration of Jordan Kelley, ¶ 8, attached as Exhibit 8 to the Appendix.

93.    RoboCoin did not receive or have access to any computer code from Ganart or TurnKey. *See* App. 50, Declaration of Jordan Kelley, ¶ 5, attached as Exhibit 8 to the Appendix.

94.    It is TurnKey's understanding that the RoboCoin user identification software is completely and fundamentally different from Ganart's software and user identification process. App. 11, ¶ 61.

95.    RoboCoin's software runs on a Windows-based operating system, while Ganart's software runs on a Linux-based operating system. App. 11, ¶ 64; *See also* App. 45-46, Ganart's Responses to TurnKey's First Set of Requests for Admission, Response No. 13, Exhibit 6 to the Appendix, *See also* App. B26-B27; Deposition of Jordan Kelley, pp. 145:25-146:3.

96.    Linux systems are not compatible with a Windows operating system. App. B27-B28, Deposition of Jordan Kelley, pp. 146:7-147:10.

97.    TurnKey would have been unable to share Ganart's software with RoboCoin because the Ganart software is compiled, and cannot be deconstructed. App. 11, ¶ 62.

98.    Moreover, TurnKey had no way to access the Linux root user protocols of the Ganart software because Ganart never provided the passwords needed to access such protocols. *Id.*, ¶ 63.

99.    Ganart did all of the configurations for the software that was on the demonstration kiosk that was kept at TurnKey's offices online via remote access. App. 11, ¶ 64.

100.    TurnKey also has no access to any root level command protocols or coding of the RoboCoin user identification software. App. B26, Deposition of Jordan Kelley, pp. 145:14-24.

### TurnKey Has Returned All of Ganart's Proprietary Information

101.     On October 29, 2013, Ganart requested that TurnKey return all of Ganart's proprietary information. App. 11, ¶ 65. Ganart alleges that TurnKey has not returned all of the palm vein scanner assemblies to Ganart. This allegation is false. *Id.*

102.     On November 8, 2013, Gary Strachan personally sent correspondence to Ganart confirming that all of Ganart's physical property had been returned, and all electronic confidential information had been destroyed. *Id.*, ¶ 66; *See also* App. 90, Correspondence from Gary Strachan dated November 8, 2013, attached as Exhibit 11 to the Appendix. TurnKey no longer has any of the Ganart palm vein scanner assemblies and/or parts. App. 11, ¶ 67.

103.     The first Ganart palm vein scanner assembly was installed in the first demonstration kiosk that was sent to Ganart and used in the first demonstration kiosk located in the Ganart lab environment. *Id.*, ¶ 68. This assembly was removed by Ganart before the kiosk was returned to TurnKey. Ganart still has possession of that palm vein scanner assembly. *Id.*

104.     The second palm vein scanner assembly was sent to Ganart's office in Texas on January 27, 2013, and installed in the second demonstration kiosk, located in the Ganart lunchroom at Ganart's headquarters. App. 12, ¶ 69.

105.     On or about September 25, 2013, Ganart returned the second demonstration kiosk to TurnKey's office, and prior to returning the kiosk to TurnKey, Ganart removed the second palm vein scanner assembly. App. 12, ¶ 70. Ganart still has possession of that palm vein scanner assembly. *Id.*

106.     The third palm vein scanner assembly was used in the demonstration kiosk at TurnKey's Phoenix office, and was returned to Ganart pursuant to request for return of all of Ganart's property. *Id.*, ¶ 71. Ganart still has possession of that palm vein scanner assembly. *Id.*

### III.   TURNKEY IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS.

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986).  An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *See also Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial as opposed to merely formal, pretended or a sham.").  To determine a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in its favor.

TurnKey is entitled to summary judgment all of Plaintiff's claims.

First, Ganart cannot establish the prima facie elements of its misappropriation of trade secret claim because: (1) the palm vein scanner assembly and Self-Service Registration at Kiosk software/process are not trade secrets; (2) TurnKey did not provide of Ganart's alleged trade secrets to RoboCoin or any other third parties; and (3) RoboCoin independently developed the user identification and registration process that is used in the RoboCoin kiosks.

Second, Ganart's breach of contract claim fails as a matter of law because: (1) TurnKey did not breach the non-disclosure agreement; and (2) to the extent there was an allege breach by the use of the palm vein scanner assembly in the RoboCoin prototype kiosk, TurnKey remedied the issue and thus, Ganart has not sustained any damages.

Third, Ganart's claims for aiding and abetting and civil conspiracy fail as a matter of law because there is no evidence that TurnKey conspired with or aided and abetted RoboCoin in misappropriating any of Ganart's proprietary information.

As set forth below, Ganart cannot show that TurnKey has misappropriated any alleged trade secret of Ganart, or show that there was a breach of the NDA or that Ganart sustained any damages even if there was a breach.

### A.     Ganart Cannot Establish the Prima Facie Elements of its Trade Secret Claim.

In 2013, Texas adopted the Uniform Trade Secret Act, which applied to any claims for misappropriation of trade secret that allegedly occurred after September 1, 2013.  *See* Tex. Civ. Prac. & Rem. Code § 134A.001, *et seq.*   Under the TUTSA, Ganart must show that its proprietary information is a "trade secret" and that TurnKey allegedly "misappropriated" the trade secret.  *See* Tex. Civ. Prac. & Rem. Code § 134A.002.  Ganart has generally alleged that TurnKey misappropriated Ganart's palm vein scanner technology and its vaguely described "Self-Service Registration at Kiosk" concept.  Neither of these items claimed by Ganart are trade secrets, and TurnKey never misappropriated them.

### 1.     *Ganart's Proprietary Information Is Not a Trade Secret.*

Ganart has failed to show that the two items at issue—the palm vein scanner assembly and "Self-Service Registration at Kiosk" are protectable trade secrets.  The TUTSA defines "trade secret" to include formulas, patterns, compilations, programs, devices, methods, techniques, or processes that both derive independent economic value (actual or potential) from not being generally known, and which are subject to reasonable efforts to maintain their secrecy. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6).

"A plaintiff in a trade secrets case bears the burden of pleading and proving the specific nature of the trade secret.  Plaintiff must also present evidence that the items or information were truly secret; that is, that specific measures were taken to guard their confidentiality." *Wilson v.*

*Continental Dev. Co.*, 112 F.Supp. 2d 648, 662 (W..D. Mich. 1999); *See also MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 522 (9th Cir. 1983) (A party seeking relief for trade secret misappropriation "must identify the trade secrets and carries the burden of showing that they exist."); *See also Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex. 1964) ("The key part of the definition of trade secret is secrecy."). "However strong may be the [plaintiff's] case on other indicia of trade secret status, it is elemental that '[t]he subject matter of a trade secret must be secret . . . The subject of a trade secret 'must not be of public knowledge or of general knowledge in the trade or business.'". *See Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F.Supp. 2d 935, 959 (S.D. Tex. 2013). Furthermore, to qualify as a trade secret in Texas the information cannot be readily ascertainable by an independent investigation. *See Mercer v. C.A. Roberts Co.*, 570 F.2d 1232, 1239 (5th Cir. 1978).

Neither the palm vein scanner assembly nor the "Self-Service Registration at Kiosk" are trade secrets as defined by the TUTSA. Ganart has failed to establish the prerequisite for a violation of the TUTSA because it does not identify how its alleged proprietary information is a trade secret or how Ganart has taken steps to maintain the secrecy of its proprietary information.

### a.   The Palm Vein Scanner is not a Trade Secret.

In answers to interrogatories, Ganart was specifically asked to identify how its palm vein scanner assembly qualifies as a trade secret under the TUTSA. Statement of Undisputed Facts ("DSOF") ¶ 15. With respect to the "palm vein scanner," Ganart gave the following vague explanation as to how the palm vein scanner assembly was a trade secret:

> Ganart spent significant resources researching and developing the Assembly, so that the housing, finger guide, dome and palm secure cure were fully integrated into a robust, reliable, secure, industrial grade, biometric reader. Unlike the Fujitsu consumer grade, plastic, off the shelf scanner, Ganart's Assembly integrates features (e.g. acrylic dome covering the cube) which differentiate it from other biometric identification devices.

*See* DSOF ¶ 15.

The palm vein scanner assembly is not a trade secret as the assembly is made up of

components that are readily available and ascertainable to the general public. *See Wissman v. Boucher*, 150 Tex. 326, 240 S.W.2d 278, 280 (Tex. 1951) ("Matters which are completely disclosed by the goods which one markets cannot be his secret."); *See also Rimes v. Club Corp. of America*, 542 S.W. 2d 909, 913 (Tex. Civ. App. 1976) ("Information that can be discovered by proper means and readily duplicated without involving considerable time, effort and expense generally will not be afforded trade secret protection."). The major components of the palm vein scanner assembly are: (1) the Fujitsu PalmSecure® cube; (2) the metal housing; (3) a rounded dome; and (4) finger guides. DSOF ¶ 16. The "Fujitsu PalmSecure® cube" is a commercially available OEM biometric authentication system based on palm vein pattern recognition technology which is used to capture a biometric scan of a consumer/user's palm and the unique palm vein patterns in the user's hand, which is used to identify the user. DSOF ¶¶ 16, 17. The Fujitsu PalmSecure® cube also works with the Fujitsu PalmSecure® hand guide. DSOF ¶¶ 17, 18. These commercially available components cannot be considered trade secrets since Ganart did not even manufacture them.

Ganart may argue that the sheet metal housing where the Fujitsu PalmSecure® cube scanner is mounted and the rounded domes are trade secrets. However, this metal housing and dome component are fabricated components that anyone can readily duplicate. DSOF ¶¶ 18, 19. In fact, with Ganart's permission, TurnKey fabricated its own dome and metal housing that were distinct from Ganart's fabricated components. DSOF ¶¶ 21-24. For instance, the dome that was manufactured for TurnKey by its plastic molding company was made out of a clear acrylic plastic, while the Ganart dome component is a different tint and plastic material. DSOF ¶ 25. Ganart was aware that TurnKey was developing its own dome and housing components and at no time did Mr. McHugh or anyone else from Ganart object to TurnKey developing its own independent dome and housing components. DSOF ¶ 26.

> ### b.    The "Self-Service Registration at Kiosk"

Ganart also asserts that its "Self-Service Registration at Kiosk" software is also a trade

secret.   However, Ganart has only provided a vague explanation of how the "Self-Service Registration at Kiosk" constitutes a trade secret.  DSOF ¶ 27.  In response to written discovery, Ganart stated the following:

> Self-service Registration at Kiosk is a service that allows fully compliant (Anti-money Laundering Act) registration of an individual at a self-service device, such as a kiosk, without teller assistance, for access to [a] variety of services, such as regulated financial transactions like money transfer.  This service allows a complete Anti-Money Laundering (AML) compliant identification and registration of an individual at a self-service kiosk using Ganart's proprietary technology and process. It includes biometric signature (including palm vein), capture and validation of a government issued identification card and digital photographs of the registrant.

DSOF ¶ 28.  In addition to its vague discovery response describing its alleged trade secret, Ganart has also produced a 23 page patent application publication that describes what Ganart claims is its Self-Service Registration at Kiosk.  DSOF ¶ 30.  However, even that is insufficient.

A vague description of its trade secret is insufficient as matter of law to even qualify as a trade secret under the TUTSA.  *See BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 710 (7th Cir. 2006) ("One expects a trade secret to be rich in detail, because a process described in general terms [...] will usually be widely known and thus not worth incurring costs to try to conceal and so not a trade secret.") (internal citations omitted); *See also MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 522 (9th Cir. 1993) (plaintiff "must identify the trade secrets and carry the burden of showing that they exist"); *Universal Analytics v. MacNeal-Schwender Corp.*, 707 F.Supp. 1170, 1177 (C.D. Cal. 1989) (plaintiff "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade").

A vague description in a discovery response or buried in pages of information does not satisfy the burden of establishing what Ganart seeks to protect is actually a "trade secret" under the TUTSA.  In *IDX Systems Corp v. Epic Systems Corp.*, 285 F.3d 581, 583, the Seventh Circuit affirmed summary judgment in favor of a defendant on the plaintiff's trade secret claim where the plaintiff provided only vague descriptions of its alleged trade secret or directed the trial court

to a voluminous document.  The *IDX Systems* court stated:

> Thus to show that particular information is a trade secret, a firm such as IDX must demonstrate that it is valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy. Like the district judge, we think that IDX failed to do this. It has been both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret. That's not plausible--and, more to the point, such a broad assertion does not match up to the statutory definition . . . unless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job.

The *IDX Systems* court rebuffed the plaintiff's "tender of the complete documentation for the software" because it did not identify "exactly which pieces of information are the trade secrets." 285 F.3d at 581; *See also Sutra, Inc. v. Iceland Express, EHF*, 2008 U.S. Dist. LEXIS 52849 at *9, 2008 WL 2705580 (D. Mass. July 10, 2008) ("'A plaintiff has no cognizable trade secret claim until it has adequately identified the specific trade secrets that are at issue.'  The description must be made 'with clarity that can be understood by a lay person . . . and distinguish what is protectable from that which is not.'") (internal citations omitted); *SL Montevideo Tech, Inc. v. Eaton Aero., LLC*, 491 F.3d 350, 354 (8th Cir. 2007) (upholding dismissal of a misappropriation of trade secret claim where the plaintiff failed to describe the trade secret with sufficient particularity); *Dow Chemical Canada v. HRD Corp.*, 909 F.Supp.2d 340, 346 (D. Del. 2012) (affirming granting of summary judgment on the plaintiff's misappropriate of trade secret claim where the plaintiff failed to identify the trade secret with a "reasonable degree of precision and specificity . . . such that a reasonable jury could find that plaintiff established each statutory element of a trade secret.").

Here, Ganart has failed to provide any specificity to how its "Self-Service Registration at Kiosk" qualifies as a trade secret under the TUTSA.  There is no description with specificity, but only a general interrogatory response or a reference to a 23 page patent application publication. DSOF ¶¶ 28, 30.  Such is insufficient as a matter of law to qualify as a trade secret.  *See IDX Systems*, 285 F.3d at 581.[3]

---

[3] Numerous companies use a self-service user registration process with their kiosks.  In 2010,

Even if Ganart did identify its "Self-Service Registration at Kiosk" with some level of specificity, because Ganart has disclosed the alleged trade secret in a patent publication, as a matter of law, the "Self-Service Registration at Kiosk" is no longer considered a trade secret. *Bondpro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 707 (7th Cir. 2006) ("Published patent applications are in fact studied by inventors in the relevant field, and so a secret disclosed in them will ordinarily (we need not decide whether invariably) lose its status as a trade secret."); *See also On-Line Techs. Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004) ("After a patent has issued, the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret."); *Vital State Can., Ltd. v. Dreampak, LLC*, 303 F.Supp.2d 516, 525 (D. N.J. 2003) (quoting *Milgrim on Trade Secrets* § 1.06) ("To the extent that the patent application/patent issuance process actually results in disclosure of a trade secret, that will, in most instances; result in prospectively terminating the trade secret."). There is no dispute that Ganart disclosed in "Self-Service Registration at Kiosk" process when its patent application publication was released. DSOF ¶ 30. Thus, as a matter of law, the "Self-Service Registration at Kiosk" cannot qualify as a "trade secret."

### 2. *Ganart Has Failed to Show That TurnKey has Misappropriated the Alleged Trade Secrets.*

A person misappropriates a trade secret under the following circumstances:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:
> (i) Used improper means to acquire knowledge of the trade secret.
> (ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had

---

Fujitsu began selling and marketing a self-service registration kiosks for the health care industry, which allows patients to fill out forms and create their own unique user profiles at a kiosk using Fujitsu's palm vein scanner technology. DSOF ¶ 31. This process used by Fujitsu is arguably the same type of process used by Ganart, which provides additional proof that Ganart's self-service registration process is not truly a "trade secret."

---

utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*See* Tex. Civ. Prac. & Rem. Code § 134A.002(3). Further, "improper means" involve acts of "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." *See* Tex. Civ. Prac. & Rem. Code § 134A.002(2).

Here, the undisputed facts show that TurnKey did not misappropriate any alleged trade secrets of Ganart, and certainly did not share any proprietary information with RoboCoin. Further, RoboCoin independently developed its own proprietary user registration and identification software that is currently used on the RoboCoin kiosks.

### a. *There was No Misappropriation of the Palm Vein Scanner Assembly*

Ganart argues that TurnKey misappropriated the palm vein scanner assembly and installed the palm vein scanner assembly in RoboCoin's current model kiosks. However, this is incorrect. First, TurnKey has avowed that it is not using any of Ganart's proprietary information in its business relationship with RoboCoin kiosks. DSOF ¶¶ 84, 85. Second, prior to even reaching out to TurnKey to do business, RoboCoin already had identified the essential components that it were needed in its custom built kiosks. DSOF ¶ 58. Further, in developing its unique and proprietary user identification software, RoboCoin had already determined that it would use some form of biometric capture, such as a fingerprint, as part of its identification process. DSOF ¶ 66. Turnkey also regularly uses biometric scanning devices, such as the palm vein scanner sold by Fujitsu, in its custom built kiosks. DSOF ¶ 67.

Ganart also argues that TurnKey admitted to using the palm vein scanners in the second generation RoboCoin kiosk. DSOF ¶ 80. However, this is also incorrect. The second prototype

kiosk that was developed for RoboCoin and depicted in the October 2013 Wired Magazine article uses palm vein scanner technology that was developed by Fujitsu. DSOF ¶¶ 77, 79. TurnKey also used the housing and dome components that TurnKey had independently created to house the Fujitsu PalmSecure® cube scanner in the kiosk. DSOF ¶¶ 21, 77. The only "component" that TurnKey used that was supplied by Ganart was the finger/hand guide, only because TurnKey did not have sufficient time to fabricate a new hand guide for the RoboCoin kiosk. DSOF ¶ 78.

After TurnKey became aware of Ganart's concerns with the RoboCoin kiosk and the use of the hand guides, TurnKey removed the entire TurnKey palm vein housing, the dome and the finger guides that TurnKey installed in the RoboCoin prototype kiosk. DSOF ¶ 82-84. Turnkey replaced the metal housing, dome and finger guides in the second prototype unit installed in Vancouver, Canada with an "off the shelf" hand guide from Fujitsu made specifically to work with the Fujitsu PalmSecure® cube. DSOF ¶ 83.

The palm vein scanner assembly components have not been used in any other TurnKey kiosks, including those manufactured for RoboCoin. DSOF ¶ 85. All of the RoboCoin kiosks that have been developed and distributed now use the "off the shelf" Fujitsu PalmSecure® cube along with the Fujitsu hand guide and have no Ganart components or any palm vein scanner components that were designed by TurnKey. DSOF ¶ 86. Moreover, RoboCoin has worked directly with Fujitsu to refine the Fujitsu palm vein scanner with RoboCoin's own proprietary user registration software. DSOF ¶ 87. Thus, even if there was a mistaken use of the hand-guide from the palm vein scanner assembly, Ganart has sustained no damages as the palm vein scanners were never sold or put into the stream of commerce with any of the palm vein scanner assembly components. DSOF ¶¶ 84-86.

### b.    There Was No Misappropriation of the Self-Service Registration at Kiosk Software.

Ganart has also failed to explain how its alleged "Self-Service Registration at Kiosk" has been misappropriated or even incorporated into the RoboCoin kiosks.  The undisputed facts show that there has been no misappropriation of the "Self-Service Registration at Kiosk."

First, there is no explanation at all how such an event was possible or even occurred. In discovery responses, Ganart provides a vague explanation that TurnKey shared the Ganart registration process with RoboCoin, but fails to provide any factual support for its assertion. DSOF ¶ 88.

Second, Ganart argues that TurnKey gave an unauthorized demonstration of the demonstration kiosk to RoboCoin on September 5, 2013.  Ganart was fully aware that TurnKey was marketing the Ganart/TurnKey kiosk system for sale to multiple third-parties, all of which were done in furtherance of the parties' business relationship. DSOF ¶¶ 45-51.  While TurnKey provided a general demonstration of the Ganart software operating on the TurnKey kiosk to Jordan Kelley and John Russell of TurnKey in September 2013, the purpose of such was to show the types of kiosks manufactured TurnKey and to promote the sale of the demonstration to the casino that Mr. Kelley's father worked for.  DSOF ¶¶ 70-73, 75.  Mr. Kelley has averred that there was nothing from that demonstration that RoboCoin integrated or uses as a model for its own proprietary user identification and registration software.  DSOF ¶ 74.

Third, TurnKey had no way to share any the Ganart user registration software with any third-party, including RoboCoin.  TurnKey was never given any Ganart source code, passwords or any other access to any Ganart software, which would be necessary for TurnKey to even share the software with RoboCoin.  DSOF ¶¶ 89, 98.  TurnKey would have been unable to share Ganart's software with RoboCoin because the Ganart software is compiled, and cannot be deconstructed.  DSOF ¶ 97.  Further, Ganart did all of the configurations for the software that was on the demonstration kiosk that was kept at TurnKey's offices online via remote access.

DSOF ¶ 99.  Like the Ganart software, TurnKey did not have access to RoboCoin's software, and RoboCoin independently loaded its software on its kiosks.  DSOF ¶ 90, 100.

Fourth, RoboCoin has averred that it has never received Ganart's confidential or proprietary information from TurnKey, and did not receive or have access to any computer code from Ganart or TurnKey.  DSOF ¶¶ 92, 93.

Fifth, Ganart implies that TurnKey regularly removed parts from the demonstration kiosk that was kept at TurnKey's business in Phoenix. However, such was entirely appropriate because the demonstration kiosk was owned by TurnKey and had components that had been purchased by TurnKey.  DSOF ¶¶ 52-55.  Moreover, TurnKey has returned all of Ganart's proprietary information, which Gary Strachan has repeatedly confirmed in writing to Ganart and now under oath in this litigation.  DSOF ¶¶ 101-106

> ### c. RoboCoin Independently Developed its Own Proprietary Software and Process for Registration and Identification of Kiosk Users.

Most importantly, Ganart cannot show any misappropriation by RoboCoin or TurnKey as RoboCoin independently developed its own proprietary software and process for registration and identification of users of its kiosks.  First, RoboCoin has repeatedly maintained in both affidavit and deposition testimony that it independently developed its own user registration and identification software for use on its kiosks.  DSOF ¶ 91.  Prior to even contacting TurnKey, RoboCoin had already developed its own proprietary for user-registration software.  DSOF ¶ 61.  Second, RoboCoin worked to refine the hardware requirements for the development of current production model kiosks, but has never asked TurnKey to assist in developing any part of RoboCoin's registration software or process.  DSOF ¶¶ 63, 65.  In fact, TurnKey has had absolutely no role in the development of RoboCoin's registration software.  DSOF ¶ 65.  Third, RoboCoin independently installs its own proprietary software on the all production model kiosks manufactured by TurnKey.  DSOF ¶ 90.

To the extent Ganart argues that TurnKey suggested that RoboCoin incorporate a palm vein scanner into the registration process, TurnKey has regularly used biometric scanning devices in kiosks that it manufactures for customers, and incorporates Fujitsu palm vein scanners into its production kiosks.  DSOF ¶¶ 68, 83.

Finally, the RoboCoin user registration and identification software is completely and fundamentally different from Ganart's software and user identification process. DSOF ¶ 94. RoboCoin's software runs on a Windows-based operating system, while Ganart's software runs on a Linux-based operating system.  DSOF ¶ 95.  Because the two systems use different operating systems, they are not cross-compatible.  DSOF ¶ 96.

For these reasons, there is absolutely no support for Ganart's claims that any proprietary information was misappropriated by TurnKey.

## B.    Ganart Cannot Prove the Prima Facie Elements of Its Breach of Contract Claim.

In Count II of its Second Amended Complaint, Ganart asserts a breach of contract claim against TurnKey based upon an alleged breach of the terms of the parties' NDA.  The NDA provides that Texas law will govern the terms of the agreement.  DSOF ¶ 8.  Under Texas law, the elements for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach.  *Wright v. Christian & Smith*, 950 S.W.2d 411, 412 (Tex. App. 1997); *See also Roundville Partners, L.L.C. v. Jones*, 118 S.W.3d, 73, 82 (Tex. App. 2003)

Ganart generally alleges that TurnKey breached the NDA when it allegedly misappropriated and disclosed Ganart's trade secrets to RoboCoin.  *See* Plaintiff's Second Amend. Compl. ¶ 43, Docket 22.  "Whether a party's conduct constitutes a breach of contract is a question of law."  *Hovorka v. Community Health Systems*, 262 S.W. 3d 503, 509 (Tex. App. 2008).  Section II(A) sets out in detail why Ganart's proprietary information is not confidential

or even a trade secret and TurnKey did not share any alleged proprietary information with RoboCoin.

With respect to any allegations related to a breach of the NDA based upon the palm vein scanner assembly issues, the undisputed facts show that there was no breach of the NDA:

- Ganart never identified the palm vein scanner assembly as "confidential" as required by the terms of the NDA.  DSOF ¶¶ 8, 20.

- The palm vein scanner assembly is not a trade secret as the assembly is made up of components that are readily available and ascertainable to the general public. DSOF ¶¶ 16-19,

- TurnKey independently developed its own sheet metal housing and dome components that would work on TurnKey kiosks, which Ganart was aware of and approved.  DSOF ¶¶ 21-26.

- While TurnKey did use the hand guide from the Ganart palm vein scanner assembly in the second prototype kiosk that was displayed in Vancouver, TurnKey removed the entire fabricated assembly and replaced it with an "off the shelf" hand guide from Fujitsu made specifically to work with the Fujitsu PalmSecure® cube.  DSOF ¶¶ 81-83.

- All of the production RoboCoin kiosks use the Fujitsu palm vein scanner and associated Fujitsu components, thus, Ganart has not sustained any damages for an alleged breach of the NDA. DSOF ¶¶ 84-86.

- TurnKey has returned all of Ganart's proprietary hardware, including the palm vein scanner assemblies.  DSOF ¶¶ 101-106.

Similarly, there was no breach of the NDA with respect to any issues with the "Self-Service Registration at kiosk" process, which is confirmed by the following undisputed facts:

- Ganart disclosed the "Self-Service Registration at Kiosk" process when its patent application publication was released, which means that such information is no

longer confidential under the NDA.  DSOF ¶¶ 8, 30.

- TurnKey and RoboCoin have averred under oath that the "Self-Service Registration at kiosk" was not shared by TurnKey with RoboCoin.  DSOF ¶¶ 70-74, 92, 93.

- TurnKey had no way to share any of the Ganart user registration software with any third-party, including RoboCoin because TurnKey was never given any Ganart source code, passwords or any other access to any Ganart software, and the software was compiled and cannot be deconstructed. DSOF ¶¶ 89, 97, 98.

- TurnKey did not have access to RoboCoin's software, and RoboCoin independently loaded its software on its kiosks.  DSOF ¶¶ 90, 100.

- RoboCoin independently developed its own proprietary software and process for registration and identification of users of its kiosks. DSOF ¶¶ 61, 63, 65, 90, 91.

- The RoboCoin user registration and identification software is completely and fundamentally different from Ganart's software and user identification process because the two systems use different operating systems and are not cross-compatible.  DSOF ¶¶ 94-96.

Thus, because the undisputed facts show that there was no breach of the NDA or any damages sustained by Ganart, TurnKey is entitled to summary judgment on the breach of contract claim.

### C.   Ganart's Civil Conspiracy and Aiding and Abetting Claims also Fail as a Matter of Law.

In Counts 3 and 4 of the Second Amended Complaint, Ganart has asserted claims for civil conspiracy and aiding and abetting against TurnKey and RoboCoin.  On October 29, 2014, Ganart dismissed its claims against RoboCoin.  *See* Notice of Dismissal of RoboCoin, Docket 32.

Elements of an actionable civil conspiracy include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more

unlawful, overt acts; and (5) damages as a proximate result. *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 554 (Tex. 2005). Further, the elements of aiding and abetting impose liability on a defendant for the conduct of another which causes harm if the defendant: (1) does a tortious act in concert with the other or pursuant to a common design with him; (2) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or (3) (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. *See Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex. 1996) (citing the *Restatement (Second) of Torts* § 876 (1977))[4]

The undisputed facts show that Ganart cannot establish its aiding and abetting and civil conspiracy claims against TurnKey, especially since RoboCoin has been dismissed from this action. First, like the breach of contract claim, the civil conspiracy and aiding and abetting claims turn on whether there was a misappropriation of Ganart's alleged trade secrets. As set forth in the earlier discussion in Section II(A), there was no misappropriation of Ganart's trade secret, and thus, the conspiracy and aiding and abetting claims fail as a matter of law.

Second, there was no meeting of the minds between TurnKey and RoboCoin to misappropriate information. Ganart has disclosed no evidence to support such an assertion. Both RoboCoin and TurnKey have averred that there was no sharing of Ganart's information, and all information that forms the basis of the RoboCoin kiosks were developed by RoboCoin. DSOF ¶¶ 70-74, 92, 93. Third, there was no substantial assistance or encouragement by

---

[4] It should be noted that Texas has not recognized a claim for aiding and abetting liability, and therefore, as a threshold matter, TurnKey is entitled to summary judgment on the aiding and abetting claim. *Juhl*, 936 S.W.2d at 643 (stating that "whether [aiding and abetting] is recognized in Texas is an open question."); *See also Baxter v. Gardere Wynne Sewell*, 182 S.W.3d 460, 465 (Tex. App. 2006) ("[A]iding and abetting fraud . . has not been recognized as an independent claim [45] by the Texas Supreme Court"); *Shinn v. Allen*, 984 S.W.2d 308, 310 (Tex. App. 1998) (observing that the viability of "aiding and abetting" claims in Texas are unsettled). Even if such a claim were recognized, Ganart still cannot establish the prima facie elements.

TurnKey to RoboCoin to misappropriate any alleged trade secrets of Ganart. DSOF ¶¶ 70-74, 92, 93.

## IV.   CONCLUSION

For the reasons set forth above, Ganart cannot set forth the prima facie elements of any of its claims against TurnKey.  Therefore, TurnKey requests entry of summary judgment in its favor on all of Ganart's claims.

DAVIS MILES MCGUIRE GARDNER, PLLC

By:  /s/ David W. Williams
      David W. Williams, admitted Pro Hac Vice
      Joshua W. Carden
      Texas Bar No. 24050379
      545 E. John Carpenter Freeway, Suite 300
      Irving, Texas 75062
      P. 972.674.3885
      F. 972.674.2935
      jcarden@davismiles.com
      Attorney for Defendant, TurnKey Kiosks, LLC

## CERTIFICATE OF SERVICE

On January 19, 2015, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the CM/ECF system, which will send a notice of electronic filing to all counsel of record. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ David W. Williams
David W. Williams