# EXHIBIT 1

00001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GANART TECHNOLOGIES, INC.<br>Plaintiffs, | § | 3:14-cv-616 |
| | § | |
| | § | |
| | § | |
| | § | |
| V. | § | |
| | § | |
| TURNKEY KIOSKS, LLC<br>Defendant. | § | |
| | § | |
| | § | |

## DECLARATION OF GARY STRACHAN

I, Gary Strachan, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief:

1.    I am over the age of 18 years of age and am personally familiar with contents of this declaration set forth below.

2.    I am the Director of Operations of TurnKey, LLC.

### TURNKEY'S BUSINESS MODEL

3.    TurnKey is a family owned business and a manufacturer and supplier of custom kiosks, including financial services kiosks, automatic teller machines, outdoor service kiosks, ticketing kiosks, print-on-demand kiosks, and other custom ordered kiosks, to customers across various industries.

4.    TurnKey is a creator of custom kiosk solutions.    They consult with their customers to understand what the business problem to be solved is and then set about to build the solution.    Generally, TurnKey builds a custom kiosk enclosure, installs Original Equipment Manufacturer ("OEM") components and if the customer does not have software to operate the solution, TurnKey will recommend one of its software partners to develop a software solution to run on the custom kiosk.

5.     TurnKey works with its customer to design the specific custom kiosk needed by the customer in their specific field of interest.  Generally, a customer will supply information to TurnKey for what the customer needs for its custom kiosk, and TurnKey will design and assemble the kiosk, which includes various OEM off the shelf hardware components.

6.     Many times TurnKey will supply its customer with off the shelf hardware components and OEM software tools to aid in the use of these components. The software tools include device drivers, software development kits ("SDK's") and application program interfaces ("API's") which are provided by the OEM hardware manufacturers to allow the customer to integrate the OEM hardware component into their software program which allows them personalized control of the hardware components in the kiosk  to the customer's specific needs.

7.     On or about December 6, 2011, TurnKey and Ganart Technologies, Inc. entered into a "Confidentiality and Non-Disclosure Agreement" ("the NDA"), which provided that TurnKey and Ganart could share confidential and propriety information with each other for the purpose of development of products and services and other joint business opportunities so long as such information was not disclosed to other third parties.

### GANART'S BUSINESS RELATIONSHIP WITH TURNKEY

8.     Ganart and TurnKey were interested in developing a kiosk solution whereby TurnKey supplied the custom made kiosk enclosure and OEM hardware components, and Ganart supplied software for the kiosks.  Ganart had previously attempted to design their own kiosks that utilized their software program that allowed the end consumer of the kiosk to do the Ganart proprietary transaction Money Earned® (a software that allowed an employee to obtain a payroll advance before they were paid) and conduct other financial transactions such as ATM withdrawals, bill payment and wire transfers.

9.     It is my understanding that Ganart had difficulty manufacturing its own kiosks, and thus, it was fortuitous when TurnKey contacted Ganart as a potential business partner.  As part of the business venture with Ganart, TurnKey supplied Ganart access to three demonstration

---

DECLARATION OF GARY STRACHAN                                                    PAGE 2

kiosks that had been built by TurnKey with various OEM hardware components, and were standard models of their TK-8200 Financial Series kiosks used by TurnKey in its business.

10.     The kiosks were modified to utilize Ganart's software program that was used to allow an employee to take cash from their paycheck before pay day.  TurnKey supplied the hardware for the kiosks.

11.     The only "hardware" supplied by Ganart for the three demonstration kiosks was three   sheet metal housings, three finger guides, at least three domes, and   one Fujitsu PalmSecure® cube.

12.     The major components of the palm vein scanner assembly are (1) the Fujitsu PalmSecure® cube; (2) the metal housing; (3) a rounded dome; and (4) finger guides.

13.     The "Fujitsu PalmSecure® cube" is a highly reliable biometric authentication system based on palm vein pattern recognition technology which is used   to capture a biometric scan of a consumer/user's palm and the unique palm vein patterns in the user's hand, which is used to identify the user.

14.     The Fujitsu PalmSecure® cube is an OEM component available to anyone including manufacturers such as TurnKey. The companion to the Fujitsu PalmSecure® cube is the Fujitsu PalmSecure® hand guide.

15.     The Fujitsu PalmSecure® cube scanner is mounted within the sheet metal housing.  In order to use the scanner, the user places their hand within the housing on the finger/hand guide.  The hand guide is necessary to prevent the users hand from moving so that the scanner can capture the biometric image of the user's hand.

16.     On November 19, 2012, Mr. McHugh provided the Ganart technical drawings for the metal housing, the dome and the finger/hand guide and gave permission to Casey Strachan to "morph it into a TurnKey kiosk."  TurnKey independently developed its own sheet metal housing and dome components for a palm vein scanner component that would work on all TurnKey's kiosks.  In November 2012, TurnKey requested Ganart's permission to create its own components that could be used in future kiosks.

17.     TurnKey contracted with its own CAD designer to create a version for the metal housing, the dome and the finger/hand guide component that would be compatible within all TurnKey's kiosks.

18.     TurnKey also contracted with its own plastic molding company to create a dome for the TurnKey kiosks that would allow a Fujitsu PalmSecure® cube to work on a TurnKey kiosk.

19.     The housing and dome components created by TurnKey are completely different than Ganart's housing and dome components for its palm vein scanner assemblies.

20.     For instance, the dome that was manufactured for TurnKey by its plastic molding company was made out of a clear acrylic plastic, while the Ganart dome component is a different tint and plastic material.

21.     I am aware that Casey Strachan, one of the members of TurnKey, made Mr. McHugh aware that TurnKey was developing the dome and housing components and at no time, did Mr. McHugh or anyone else from Ganart object to TurnKey developing its own independent dome and housing components.  Such was confirmed in emails exchanged between Mr. McHugh and Casey Strachan on June 19, 2013.

22.     Ganart's user identification software and Ganart's palm vein scanners assemblies were installed on the three demonstration kiosks.  Two of the kiosks were shipped to Ganart's headquarters in Texas.  The third kiosk was kept at TurnKey's place of business in Phoenix, Arizona.

23.     Ganart's representatives had indicated to me on various occasions that Ganart would attempt to find a potential buyer for the two demonstration kiosks that were at its Texas facility.  However, over the course of the business relationship between Ganart and TurnKey, Ganart failed to sell any of the TurnKey kiosks to any third-party customers.

24.     One of the kiosks kept by Ganart was used by Ganart for the benefit of demonstrating the kiosk services to potential customers and for its employees to use the payroll

advance and the other functions of the kiosk. The kiosk was kept in its lunch room to be used by Ganart employees.

25.     It is my understanding that Ganart actually earned income and generated revenue from the kiosk that it used for its employees. Ganart never shared any of the income generated from this kiosk with TurnKey.

26.     Ganart did not pay Turnkey anything for the three development kiosks, for any parts for the kiosks, or development at any time. Ganart did buy some parts from TurnKey for another project during the relationship. TurnKey offered to sell Ganart the kiosk used by their employees in the Ganart lunchroom, but Ganart refused to purchase it.

27.     TurnKey also worked to promote the kiosk solution to other potential customers, and regularly demonstrated the third kiosk that was kept at TurnKey's business headquarters to potential purchasers. Ganart was well aware of TurnKey's attempt to promote the sale of the kiosks as I and my two sons, Casey Strachan and Kelly Strachan, had repeated conversations with Ganart's employees about promoting the sale of the kiosks to other third-parties.

28.     Wayne McHugh also visited the TurnKey facility in April of 2013. On or about April 11, Wayne McHugh gave a seminar to our Sales Staff on the Work Place Solution.

29.     On or about April 12 Wayne McHugh and I visited a potential customer, Planet Payroll to present the solution, but this sales visit resulted in no business.

30.     On or about July 17, 2013, Jim Kidd from PayCenter 1, a customer of TurnKey visited the TurnKey facility. PayCenter1 was not happy with their current software solution from PayEase.

31.     TurnKey made arrangements with Ganart to demonstrate the demonstration kiosk that had the "Work Place Solution" software supplied by Ganart to Mr. Kidd at the TurnKey facility. Mr. Kidd reviewed the demonstration. After the demonstration, Mr. Kidd made arrangements to travel to Ganart's headquarters in Texas with his partner, Ken Upcraft for the purpose of transferring his existing kiosks to the Ganart "Work Place Solution" software.

---

32.    On or about July 23 and 24, 2013, Mr. Kidd and Mr. Upcraft arrived at Ganart's business to further review the software and enter into a business relationship with Ganart.

33.    TurnKey was only allowed into the introduction part of the meetings and was not privy to any of the business meetings that took place. It is our understanding that an agreement was reached.

34.    It is our understanding that PayCenter1 and Ganart entered into a business relationship and it was TurnKey's introduction of PayCenter1's Mr. Kidd to Ganart that facilitated this relationship.

35.    On or about July 24, 2013, TurnKey was directed by PayCenter1 to ship a PayCenter1 kiosk to Ganart with the existing components so they can modify the software.

36.    I understand that Ganart alleges that TurnKey has made unauthorized demonstrations of the TurnKey/Ganart kiosk.  Contrary to the allegation, TurnKey was demonstrating the features of the prototype kiosk in order to sell the TurnKey/Ganart kiosk as Ganart had failed to promote or sell the any TurnKey/Ganart Workplace Solution kiosks up to this point.

37.    In mid-September 2013, TurnKey also requested that Ganart return of one of the two demonstration kiosks that were at Ganart's headquarters.  TurnKey had identified three potential kiosk placements into two customer locations and were working on finalizing the details when  Ganart ended its business relationship with TurnKey in late October 2013, TurnKey was unable to complete the sale of three  demonstration kiosks because Ganart ended the relationship and remotely erased its software from the TurnKey lobby demonstration kiosk.

38.    TurnKey had to back out of the potential business deals that were pending causing major embarrassment to TurnKey.

39.    Ganart has also alleged that in August 2013, TurnKey removed several components from the third demonstration kiosk that was at TurnKey's headquarters in Phoenix, Arizona.  TurnKey regularly removed components from the demonstration kiosk to meet customer demand for use in other kiosks, and would replace those components with new

components.   Each time TurnKey removed hardware components from the demonstration kiosk, Ganart receive a remote alert from the kiosk as we believe that is a normal function of the Ganart software.

40.     The hardware components removed from demonstration kiosk were components that were purchased and owned by TurnKey and had been installed in the kiosk prior to the time Ganart and TurnKey ever did business.

### TurnKey's Business Relationship with RoboCoin Technologies, LLC

41.     In May 2013, TurnKey was contacted by a prospective customer, RoboCoin.

42.     RoboCoin is in the business of developing products directed at persons involving in the transfer and exchange of "Bitcoin."   Bitcoin is an open source, peer-to-peer electronic money and payment network that is used in online and internet transactions.

43.     RoboCoin contacted TurnKey to develop a prototype kiosk for RoboCoin that was to be displayed at a trade show in San Jose, California on May 17, 2013.   RoboCoin was interested in developing a kiosk that would allow an end consumer to sell, transfer and purchase "Bitcoin" through the RoboCoin kiosks.

44.     TurnKey developed a first generation prototype kiosk for RoboCoin that was displayed at the San Jose trade show.   The prototype kiosk was to be used as a basic proof of concept to demonstrate RoboCoin's services in the Bitcoin market.

45.     After RoboCoin received positive feedback about its kiosk prototype, RoboCoin refined its requirements for a next generation prototype kiosk, and worked with TurnKey to identify the hardware components for the next generation kiosk.   Such requirements included hardware components that would comply with federally mandated regulations in the United States, including but not limited to "Know Your Customer" and "Anti-Money Laundering" regulations.

46.     Based on RoboCoin's research, RoboCoin asked TurnKey to identify biometric scanners available in the marketplace.   TurnKey regularly uses biometric scanning devices in its

---

kiosks and RoboCoin expressed interest in using the palm vein scanner technology in its new generation kiosk.

47. On September 5, 2013, Jordan Kelley and John Russell from RoboCoin met with TurnKey's representatives, Margaret Strachan, Casey Strachan, Kelly Strachan and I, to discuss greater collaboration for the development of additional kiosks.

48. During our meeting, Jordan Kelley indicated that his father was affiliated with a Las Vegas Casino. I believed that the Las Vegas casino chain that would be a good fit for purchasing and using the TurnKey kiosk with the Ganart Workplace Solution. *Id.*, ¶ 41.

49. During the September 5, 2013 meeting, TurnKey showed Mr. Kelley and Mr. Russell how the kiosk operated with the idea that the Las Vegas Casino may be interested in purchasing the Ganart Solution running on a TurnKey kiosk, and also to show the types of kiosks that TurnKey manufactures.

50. In early September 2013, RoboCoin ordered a second prototype kiosk from TurnKey. When it provided its hardware requirements to TurnKey for the second prototype kiosk, RoboCoin wanted to use a palm vein scanner as a means of identification for users of the prototype kiosk.

51. TurnKey used a Fujitsu PalmSecure® cube scanner as the means of identifying users of the prototype kiosk. TurnKey also used the housing and dome components that TurnKey had independently created to house the Fujitsu PalmSecure® cube scanner in the kiosk.

52. Because TurnKey did not have sufficient time to fabricate a "finger guide" for the Fujitsu PalmSecure® cube scanner that was used on the second prototype kiosk, TurnKey used the "finger guide" that had been supplied by Ganart.

53. Upon completion of construction by TurnKey, the second prototype kiosk was sent to RoboCoin's customer in Vancouver, Canada. A photograph of the second prototype kiosk was taken and displayed in an issue of Wired Magazine in October 2013.

54. In October 2013, Mr. McHugh contacted me and an inquired about the RoboCoin second generation kiosk that had been photographed in Wired Magazine. I indicated to Mr.

McHugh that TurnKey had used the finger guides from one of the Ganart palm vein scanner assemblies in the second generation kiosk due to fact that TurnKey did not have sufficient time to fabricate its own finger guides for the palm vein scanner assembly that was in the RoboCoin kiosk.

55.     When TurnKey became aware of Ganart's concerns about the photograph of the second prototype kiosk in Wired Magazine, Kelly Strachan traveled to RoboCoin's customer in Vancouver, Canada, and removed the entire TurnKey palm vein housing, the dome and the finger guides that TurnKey installed in the prototype kiosk.

56.     Turnkey replaced the metal housing, dome and finger guides in the second prototype unit installed in Vancouver, Canada with an "off the shelf" hand guide from Fujitsu made specifically to work with the Fujitsu PalmSecure® cube.

57.     To the extent there was an alleged violation of the NDA agreement with respect to the RoboCoin prototype kiosk; TurnKey has remedied any such alleged violation by removing the finger/hand guides from the second prototype kiosk.   Further, the housing and dome components that were independently created by TurnKey were also removed from the prototype kiosk and have not been used in any other TurnKey kiosks.

58.     RoboCoin has ordered additional kiosks from TurnKey modeled after the second generation prototype kiosk.   However, all of those kiosks now use the "off the shelf" Fujitsu PalmSecure® cube along with the Fujitsu hand guide and have no Ganart components or any palm vein scanner components that were designed by TurnKey.

59.     I am also aware that Ganart has alleged that TurnKey shared Ganart's "Self-Service Registration at Kiosk" software with RoboCoin. TurnKey denies providing Ganart's software to RoboCoin or any other persons. TurnKey was never given any Ganart source code, passwords or any other access to any Ganart software.

60.     RoboCoin installed its own proprietary software on the second prototype kiosk, which is used in the current production model RoboCoin kiosks.   It is my understanding that

RoboCoin independently developed its own complete software package which TurnKey has no knowledge of.

61.     It is my understanding that the RoboCoin user identification software is completely and fundamentally different from Ganart's software and user identification process. I understand that RoboCoin's software runs on a Windows-based operating system, while Ganart's software runs on a Linux-based operating system.

62.     TurnKey would have been unable to share Ganart's software with RoboCoin because the Ganart software is compiled, and cannot be deconstructed.

63.     Moreover, TurnKey had no way to access the Linux root user protocols of the Ganart software because Ganart never provided the passwords needed to access such protocols.

64.     Ganart did all of the configurations for the software that was on the demonstration kiosk that was kept at TurnKey's offices online via remote access.

### TURNKEY HAS RETURNED ALL OF GANART'S PROPRIETARY INFORMATION

65.     On October 29, 2013, Ganart requested that TurnKey return all of Ganart's proprietary information.

66.     Ganart alleges that TurnKey has not returned all of the palm vein scanner assemblies to Ganart. This allegation is false. On November 8, 2013, I personally sent correspondence to Ganart confirming that all of Ganart's physical property had been returned, and all electronic confidential information had been destroyed.

67.     TurnKey no longer has any of the Ganart palm vein scanner assemblies and or parts.

68.     The first Ganart palm vein scanner assembly was installed in the first demonstration kiosk that was sent to Ganart and used in the first demonstration kiosk located in the Ganart lab environment. This assembly was removed by Ganart before the kiosk was returned to TurnKey. Ganart still has possession of that palm vein scanner assembly.

---

69.     The second palm vein scanner assembly was sent to Ganart's office in Texas on January 27, 2013, and installed in the second demonstration kiosk, located in the Ganart lunchroom at Ganart's headquarters.

70.     On or about September 25, 2013, Ganart returned the second demonstration kiosk to TurnKey's office, and prior to returning the kiosk to TurnKey, Ganart removed the second palm vein scanner assembly. Ganart still has possession of that palm vein scanner assembly.

71.     The third palm vein scanner assembly was used in the demonstration kiosk at TurnKey's Phoenix office, and was returned to Ganart pursuant to the request for return of all of Ganart's property.  Ganart still has possession of that palm vein scanner assembly.


FURTHER AFFIDANT SAYETH NAUGHT.

1-16-15
Date

Gary Strachan

# <u>EXHIBIT 2</u>

000013



## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Confidentiality and Non-Disclosure Agreement ("**Agreement**"), effective as of the ____ day of ____, 2011 ("Effective Date") by and between Ganart Technologies, Inc. having its office at 1700 Columbian Club Drive, Carrollton, Texas 75006, USA (hereinafter referred to as "**Ganart**"), and _Turnkey Kiosks LLC 14205 N33rd Ave #105_ _____, having its office at _14205 N33rd Ave #105, Peoria, AZ 85382_ _____ (hereinafter referred to as "**Individual**"), is intended to preserve the confidentiality and proprietary status of information to be disclosed or exchanged between Ganart and Individual; each a "**Party**" and collectively "**Parties**".

WHEREAS, each Party may, from time to time, for Purposes defined hereunder, disclose to the other Party certain technical and/or business information that Disclosing Party considers confidential and proprietary.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  Definition of Confidential Information. As used herein, "**Confidential Information**" of a Party disclosing such information ("**Disclosing Party**") to the other Party ("**Receiving Party**") shall mean any and all information or data of Disclosing Party, and any information or data related to third parties that Disclosing Party has an obligation to treat as confidential, including without limitation, trade secrets, proprietary technical & business data, technical & business expertise, idea, design, features, software functions, hardware materials, manufacturing processes, software and firmware computer programs, algorithm, architecture, source code, patterns, devices, invention, trademarks, copyright, compilations of information, records and specifications, business methods and techniques, customer list, and product information, whether provided by Disclosing Party in written or verbal form, or as data recorded in machine-readable form, or printed facsimile form. Such Confidential Information is either designated as confidential by Disclosing Party at the time such disclosure is made, or is disclosed in circumstances of confidence, or would otherwise be understood by Receiving party, exercising reasonable judgment, to be confidential.

    "Customer/Consumer Information" means all information relating to any customer, consumer or prospective or former customer or consumer of Ganart or of any of Ganart's affiliates, and including without limitation: (a) any and all non-public personal information of consumers or customers (within the meaning of Title V of the Gramm-Leach-Bliley Act and its implementing regulations), and (b) any information from which a customer or consumer's identity can be ascertained, either from the information itself or by combining the information with information from other sources. Customer/Consumer Information is Confidential Information.

2.  Purposes. Each Party agrees to use Confidential Information received from the other Party only for the purpose(s) of discussing a potential business opportunity in connection with development of products or services for Ganart by Individual, or modifications to the products or services of Individual enabling such products or services to interface with Ganart's products or services, and/or determining whether to enter into a mutual business relationship concerning the same or similar products or services ("**Purposes**").

3.  Obligations of Confidentiality. The Parties agree, with respect to any Confidential Information to which either is a Receiving Party, to the following:

    3.1 Receiving Party shall protect and keep confidential and secure all Confidential Information of the Disclosing Party with the same degree of precautions and safeguards it uses to protect and keep its own Confidential Information of a similar nature, but in no case with less than reasonable care.

    3.2 Receiving Party will not copy and distribute, furnish or otherwise disclose any Confidential Information of Disclosing Party to any third party, without the specific written permission of Disclosing Party. As a condition of granting such permission, Disclosing Party may require Receiving Party to execute an agreement with the third party in substantially the same form as this Agreement.

000014

3.3 Receiving Party agrees to disclose Confidential Information received from Disclosing Party only to representatives, officers, employee(s), or agents of Receiving Party who have a "need to know" such Confidential Information, only for Purposes set forth in this Agreement, and who have agreed in writing to be bound by confidentiality terms no less restrictive than the terms of this Agreement.

3.4 Receiving Party shall not decompile, disassemble, decode, reproduce, redesign, reverse engineer, reverse design, duplicate in whole or part, replicate, develop derivatives of or copy the design of any software, algorithm, source code, schematics, diagrams, technical documentation, or related products provided by Disclosing Party or to which Receiving Party has access to.

4. <u>Exceptions to Confidentiality</u>. Notwithstanding any other provisions of this Agreement, the term "Confidential Information" does not include information which; (a) has been published by Disclosing Party, or is otherwise in the public domain without breach of this Agreement by Receiving Party; (b) is properly within the legitimate possession of Receiving Party prior to its disclosure hereunder, and without obligation of confidentiality; (c) after disclosure, is received by Receiving Party from a third party which, to Receiving Party's knowledge, had rights in such Confidential Information and was not restricted from disclosing the information to Receiving Party hereunder; (d) is independently developed by Receiving Party without using the Confidential Information, or; (e) is approved for disclosure by Disclosing Party, in writing, prior to its disclosure.

Notwithstanding anything to the contrary in this Agreement, Receiving Party may disclose Confidential Information to a Court or other government body having applicable jurisdiction upon request; in which case, Receiving Party shall disclose only that portion of the Confidential Information that it is legally required to disclose, <u>provided however</u>, that Receiving Party shall first give prompt notice to Disclosing Party upon receipt of such request so that Disclosing Party may seek a protective order or other appropriate relief as Disclosing Party, in its sole discretion, may elect, and Receiving Party shall reasonably cooperate, at Disclosing Party's expense, with Disclosing Party in Disclosing Party's effort to obtain such order or relief.

5. <u>No License</u>. All Confidential Information furnished by Disclosing Party pursuant to this Agreement shall remain the sole property of Disclosing Party. Receiving Party recognizes and agrees that nothing in this Agreement shall be construed as granting any right or license to Receiving Party, express or implied, to any Confidential Information of Disclosing Party disclosed pursuant to this agreement, or to any patent, copyright, trademark, trade secret, or other intellectual property of Disclosing Party that has issued or that may issue based upon the Confidential Information.

6. <u>Disclaimer</u>. No representation or warranty of any kind is given by Disclosing Party, either expressly or by implication, including without limitation any representation or warranty of merchantability, fitness for any particular purpose, non-infringement, accuracy, or completeness, with respect to the Confidential Information disclosed to Receiving Party pursuant to this Agreement.

7. <u>No Obligation</u>. Nothing in this Agreement shall obligate either Party to disclose any information to the other Party or obligate either Party to enter into any other agreement or business transaction. Subject to the obligations hereof, neither Party shall be precluded from independently developing or acquiring products, services or technology, or pursuing business opportunities similar to or competitive with those covered by this Agreement.

8. <u>Return or Destruction of Information</u>. Upon termination of this Agreement, or upon written request by Disclosing Party made at any time, Receiving Party shall within ten (10) business days return all Confidential Information (original, copies, or extracts), or Receiving Party shall, upon Disclosing Party's option, destroy all Confidential Information, and provide a written certification by an officer of Receiving Party to Disclosing Party of such return or destruction. Notwithstanding the foregoing, either Party may retain one copy of the Confidential Information of the other Party for its records if it is necessary solely for compliance with legal or regulatory obligations, subject to the continuing confidentiality obligations set forth in this Agreement.

000015

Turnkey-Ganart 000002

9.  Termination. Either Party may terminate this Agreement on thirty (30) days written notice to the other Party at the address set forth in this Agreement or at such other address that a Party may hereafter give to the other Party in writing. Notwithstanding the termination of this Agreement by either Party, all provisions of this Agreement relating to the rights and obligations concerning Confidential Information disclosed prior to the effective date of termination of this Agreement shall continue for a period of five (5) years after the date of such termination; provided, however, that with respect to (a) Confidential Information which consists of technical information (including without limitation, software, schematics, diagrams, algorithm, source code, and other technical documentation), and (b) trade secrets, the obligations of the Receiving Party contained in this Agreement shall continue indefinitely, and with respect to Customer/Consumer Information the obligations of Individual under this Agreement shall continue indefinitely.

10. Severability. In the event that any portion of this Agreement shall be ruled invalid by a court of competent jurisdiction, the remaining portions shall be deemed valid and in effect, and interpreted as if the invalid portion had never been part hereof.

11. Modification; Assignment. This Agreement cannot be amended, nor its provisions modified, except in writing by authorized representatives of Ganart and Individual. Neither Party may transfer or otherwise assign its rights, duties, and obligations under this Agreement, in whole or in part, without the prior written consent of the other Party.

12. Waiver. No waiver of a Party's rights, remedies, powers, or privileges under this Agreement shall be effective unless expressed in writing. The failure or delay or neglect by Disclosing Party to enforce at any time any of the provisions of this Agreement shall not be construed or deemed to be a waiver of Disclosing Party's rights, remedy, power, or privileges hereunder, nor prejudice Disclosing party's rights to take subsequent action.

13. Remedies. Because monetary damages are difficult to ascertain and may be inadequate as a remedy for a Party in the event that the other Party were to violate the terms of this Agreement, Ganart and Individual agree that each Party may seek to obtain an injunction to prevent unauthorized use or disclosure of its Confidential Information by the other Party. Should an action be brought, the prevailing Party (as determined by the court) shall be entitled to a reasonable sum for attorney's fees and costs in addition to any other relief that may be awarded.

14. Compliance with Laws: Both Parties agree to comply with all applicable laws and regulations relating to its performance of this Agreement.

15. Governing Law; Arbitration. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, USA, without regard to the conflict of laws principles thereof. Ganart and Individual will make all commercially reasonable efforts to resolve all disputes and disagreements through good faith negotiations conducted by informal means, such as by written correspondence, teleconference, and/or meetings. The venue of any arbitration shall be Dallas, Texas, USA.

16. Headings. Captions and titles of sections and subsections of this Agreement are for convenience only and will not be considered or referred to in resolving questions of interpretation or construction.

17. Entire Agreement. This Agreement constitutes the entire agreement between the Parties with respect to the Purposes set forth herein, and supersedes any prior understandings, agreements, or representations, expressed or implied, between the Parties regarding the subject matter of this Agreement.

18. Counterparts. This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered to the other Party by facsimile, email, postal service, courier or commercial delivery service shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

1700 Columbus Club Drive, Carrollton, Texas USA
(O): 1-972-416-4104    Email: info@ganart.net    Web: www.ganart.com

Turnkey-Ganart 000003

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date listed above.

GANART:

_____
Signature

Anthony M. Cachem
Printed Name

President / COO
Title

INDIVIDUAL:

_____
Signature

Gary Strachan
Printed Name

Director of Operations
Title

000017

Turnkey-Ganart 000004

# EXHIBIT 3

000018

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **GANART TECHNOLOGIES, INC.** | § | |
| | § | **CIVIL ACTION NO.** |
| **VS.** | § | **3:14-CV-00616-BF** |
| | § | |
| **TURNKEY KIOSKS, LLC** | § | |

### PLAINTIFF'S OBJECTIONS AND ANSWERS TO
### DEFENDANT'S SECOND SET OF INTERROGATORIES

**TO:    Defendant, TurnKey Kiosks, LLC, by and through its attorney of record, David W. Williams and Joshua W. Carden, Davis Miles McGuire Gardner, The Summit at law Colinas, 545 E. John Carpenter Freeway, Suite 300, Irving, Texas 75062**

      **COMES NOW,** Ganart Technologies, Inc., Plaintiff in the above-entitled and numbered

cause and pursuant to the Federal Rules of Civil Procedure, files this its Objections and Answers

to Defendant's Second Set of Interrogatories.

                     **Respectfully submitted,**

                     **COBB MARTINEZ WOODWARD PLLC**
                     1700 Pacific Avenue, Suite 3100
                     Dallas, Texas  75201
                     (214) 220-5204
                     (214) 220-5254 (Fax)

                     By: */s/ Jonathan C. LaMendola*_____
                     **JONATHAN C. LaMENDOLA**
                     Texas Bar No. 00792637
                     email: jlamendola@cobbmartinez.com
                     **DAVID R. WOODWARD**
                     Texas Bar No. 21975650
                     email: dwoodward@cobbmartinez.com

                     **ATTORNEYS FOR PLAINTIFF GANART TECHNOLOGIES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to the following counsel of record either by hand-delivery, telefax, certified mail, return receipt requested, e-mail and/or regular U.S. mail on this 15th day of August, 2014.

David W. Williams
Joshua W. Carden
Davis Miles McGuire Gardner
The Summit at law Colinas
545 E. John Carpenter Freeway, Suite 300
Irving, TX 75062

*/s/ Jonathan C. LaMendola*
**JONATHAN C. LaMENDOLA**

## INTERROGATORIES

**INTERROGATORY NO. 1:**      Please state with particularity the complete factual basis for the allegations in Paragraph 10 of Ganart's Second Amended Complaint that "the Self-Service Registration at Kiosk process and software and the Assembly were the result of over two years of research and development by Ganart to perfect the capture of biometric images in support of Ganart's Know-Your-Customer (KYC) and Anti-Money Laundering complaint Self-Service Registration at Kiosk and biometric user authentication at kiosk which has been in commercial use since August 2011."

**ANSWER:** Ganart was in development of the Self-Service Registration at Kiosk process and software, and the Assembly, in 2010.   During that time until Self-Service Registration at Kiosk was initially deployed in August 2011 for commercial use, Ganart spent hundreds of thousands of man hours, and expended significant resources, researching, developing and creating the Self-Service Registration at Kiosk process, the Self-Service Registration at Kiosk software and the Assembly itself.

Ganart spent significant resources researching, developing, manufacturing, and fine tuning the Assembly, so that the housing, finger guide, dome, and palm secure cube were fully integrated into a robust, reliable, secure, industrial grade, biometric reader.  Unlike the Fujitsu consumer grade, plastic, off the shelf scanner, Ganart's Assembly integrates features (e.g. the acrylic dome covering the cube) which differentiate it from other biometric identification devices in the market.  Self-Service Registration at Kiosk is a service that allows fully compliant (Anti-money Laundering Act) registration of an individual at a self-service device, such as a kiosk, without teller assistance, for access to variety of services, such as regulated financial transactions like money transfer. This service allows a complete Anti Money Laundering Act (AML)

compliant identification and registration of an individual at a self-service kiosk using Ganart's proprietary technology and processes. It includes unique combination of biometric signature (including palm vein), capture and validation of a government issued identification card, and digital photographs of the registrant.

**INTERROGATORY NO. 2:**        Please state with particularity the complete factual basis for the allegations in Paragraph 26 of Ganart's Second Amended Complaint that "prior to the demonstration(s), Robocoin's process for customer registration of bitcoin transfer used cell phones and QR codes.

**ANSWER:**  On May 13, 2013, Robocoin posted a video on YouTube showing the Bitcoin exchange process.  That video may be seen at:

https://www.youtube.com/watch?v=0SidcjCLrQM

The video shows an individual buying and selling bitcoins using a cell phone and QR Code.  There is no palm vein reader or scanner.

Robocoin has since admitted through counsel, as has TurnKey, that TurnKey demonstrated the process to Robocoin's representatives.

When Robocoin deployed its first kiosk manufactured by TurnKey in Vancouver. Canada in October, 2013, the process had changed.  The kiosk, which appears to be the same one manufactured for Ganart, had Ganart supplied and manufactured parts (the Assembly) and the customer registration process now incorporated biometric identification using Ganart's Assembly, the scanning of an approved identification card, such as government issued photo id cards, and a captured photograph of the user. The unique combination of these three processes are identical to the Self-Service Registration at Kiosk process developed by Ganart. This was different than the Robocoin process demonstrated previously.  Video of the process confirms Robocoin's "new" process incorporated identical features from Ganart's Know Your Customer

(KYC) and Anti-Money Laundering Compliant Self-Service Registration at Kiosk process.

There are multiple videos of this process which can be found on the internet now.  *See e.g.*:

http://www.bing.com/videos/search?q=robocoin&qs=n&form=QBVR&pq=robocoin&sc=8-5&sp=-1&sk=

**INTERROGATORY NO. 3:**        Please state with particularity the complete factual basis for the allegations in Paragraph 26 of Ganart's Second amended Complaint that the Robocoin process for customer registration "did not incorporate any biometric identification" and "the authentication process was substantially different from Ganart's authentication process."

**ANSWER:**  On May 13, 2013, Robocoin posted a video on YouTube showing the Bitcoin exchange process.  That video may be seen at:

https://www.youtube.com/watch?v=0SidcjCLrQM

The video shows an individual buying and selling bitcoins using a cell phone and QR Code.  There is no palm vein reader or scanner.

Robocoin has since admitted through counsel, as has TurnKey, that TurnKey demonstrated the process to Robocoin's representatives.

When Robocoin deployed its first kiosk manufactured by TurnKey in Vancouver, Canada in October, 2013, the process had changed.  The kiosk, which appears to be the same one manufactured for Ganart, had Ganart supplied and manufactured parts (the Assembly) and the customer registration process now incorporated biometric identification using Ganart's Assembly, the scanning of an approved identification card, such as government issued photo id cards, and a captured photograph of the user. The unique combination of these three processes are identical to the Self-Service Registration at Kiosk process developed by Ganart. .  This was different than the Robocoin process demonstrated previously.  Video of the process confirms

Robocoin's "new" process incorporated identical features from Ganart's Know Your Customer (KYC) and Anti-Money Laundering Compliant Self Service Registration at Kiosk process.

There are multiple videos of this process which can be found on the internet now. *See e.g.*:

http://www.bing.com/videos/search?q=robocoin&qs=n&form=QBVR&pq=robocoin&sc=8-5&sp=-1&sk=

**INTERROGATORY NO. 4:**      Please state with particularity the complete factual basis for the allegations in Paragraph 26 of Ganart's Second Amended Complaint that the Robocoin process for customer registration "on or about October 28, 2013, [Robocoin's] process had substantially changed and was identical in features and process steps in Ganart's process."

**ANSWER:** On May 13, 2013, Robocoin posted a video on YouTube showing the Bitcoin exchange process. That video may be seen at:

https://www.youtube.com/watch?v=0SidcjCLrQM

The video shows an individual buying and selling bitcoins using a cell phone and QR Code. There is no palm vein reader or scanner.

Robocoin has since admitted through counsel, as has TurnKey, thatTurnKey demonstrated the process to Robocoin's representatives.

When Robocoin deployed its first kiosk manufactured by TurnKey in Vancouver, Canada in October, 2013, the process had changed. The kiosk, which appears to be the same one manufactured for Ganart, had Ganart supplied and manufactured parts (the Assembly) and the customer registration process now incorporated biometric identification using Ganart's Assembly, the scanning of an approved identification card, such as government issued photo id cards, and a captured photograph of the user. The unique combination of these three processes are identical to the Self-Service Registration at Kiosk process developed by Ganart. .  This was

different than the Robocoin process demonstrated previously.  Video of the process confirms Robocoin's "new" process incorporated identical features from Ganart's Know Your Customer (KYC) and Anti-Money Laundering Compliant Self Service Registration at Kiosk process.

There are multiple videos of this process which can be found on the internet now.  *See e.g.*:

http://www.bing.com/videos/search?q=robocoin&qs=n&form=QBVR&pq=robocoin&sc=8-5&sp=-1&sk=

Robocoin's process for registering customers and/or transactions now followed Ganart's process.  It involved the use of a palm scanner to identify the user.  The process flow was the same.  Ganart contends TurnKey provided Robocoin with Ganart's proprietary process and/or software as well as Ganart's proprietary Assembly.

**INTERROGATORY NO. 5:**        Please state with particularity the complete factual basis for the allegations in Paragraph 26 of Ganart's Second Amended Complaint that "TurnKey also provided Robocoin with Ganart's software-based customer registration and authentication process."

**ANSWER:** Ganart provided TurnKey with a hard drive loaded with Ganart's proprietary software which TurnKey installed into a kiosk kept at Turnkey's corporate offices.

TurnKey represented it had a "wealth of experience in IT" and had "software development being done in house."   TurnKey also represented it could "design and implement needed software."  After this lawsuit was filed, TurnKey removed these representation from its website.

Ganart contends TurnKey accessed, copied and/or reversed engineered Ganart's proprietary software and either provided or made it available to Robocoin.

**INTERROGATORY NO. 6:**        Please state with particularity the complete factual basis for the allegations in Paragraph 29 of Ganart's Second Amended Complaint that "the software-based customer registration process used on Robocoin kiosk appears to be a replicate of Ganart's Self-Service Registration at Kiosk."

        **ANSWER:**   The process demonstrated in the Robocoin kiosk deployed in Vancouver, Canada has the unique combination of the three processes in Ganart's Self-Service Registration at Kiosk process: biometric identification, scanning of an approved identification card, such as government issued photo id cards, and photograph capture of the user, which are identical to Ganart's proprietary KYC and AML Self-Service Registration at Kiosk.

**INTERROGATORY NO. 7:**        Please state with particularity the complete factual basis for the allegation in Paragraph 30 of Ganart's Second Amended Complaint that "TurnKey has … violated the terms of the NDA with Ganart by providing Robocoin Technologies the Assembly."

        **ANSWER:**   Ganart and TurnKey executed a Non-Disclosure and Confidentiality Agreement ("NDA") on December 6, 2011 to explore potential business opportunities. A true and correct copy of the NDA is attached hereto as Exhibit A.  Pursuant to the NDA, Ganart subsequently shared confidential information with TurnKey, including Ganart's proprietary Self-Service Registration at Kiosk software and process flow on a hard drive supplied by Ganart to TurnKey, Ganart's proprietary palm vein scanner assembly ("the Assembly") and CAD design files, financial analysis and data, pricing, and device designs.

        The confidential information and material provided to TurnKey was in connection with the development of a kiosk model for Ganart's Workplace Solution using Ganart's proprietary software platform (TaaS®), Ganart's Know-Your-Customer (KYC) and Anti-Money Laundering (AML) compliant Self-Service Registration at Kiosk ("Self-Service Registration at Kiosk")

process and software, and proprietary hardware designs. Ganart provided TurnKey a hard drive with Ganart's kiosk software platform and process flow, including Self-Service Registration at Kiosk software, and a list of approved devices and proprietary hardware designs needed for the kiosk. Ganart also provided TurnKey a palm secure cube by Fujitsu, along with the Assembly. The Self-Service Registration at Kiosk process and software and the Assembly were the result of over two years of research and development by Ganart to perfect the capture of biometric images in support of Ganart's Know-Your-Customer (KYC) and Anti-Money Laundering (AML) compliant Self-Service Registration at Kiosk and biometric user authentication at kiosk which has been in commercial use since August 2011.

TurnKey sent their test kiosk to Ganart on November 3, 2012 to be put in Ganart lab for testing and device certification purposes ("Lab Kiosk"). The Lab Kiosk as shipped by TurnKey did not include the Assembly. Ganart successfully tested the Lab Kiosk to run on Ganart software.

The parties mutually agreed that TurnKey would send a production-ready kiosk to Ganart fitted with all devices, including the Assembly, for real production environment ("YourATM Kiosk"). Ganart shipped a unit of the Assembly to TurnKey in November 14, 2012 ("Assembly 1") to be installed in the YourATM Kiosk.

TurnKey executives (Gary Strachan, Kelly Strachan, Margaret Strachan, and Casey Strachan) visited the corporate office of Ganart on December 7, 2012 to discuss the parties' business relationship.

On January 7, 2013 Casey Strachan made a request for two units of the Assembly stating that TurnKey had two palm vein scanner devices with them available that they would like to fit into two Assembly units. TurnKey requested a kiosk with Ganart-approved devices and the

Assembly, running on Ganart software platform to be installed in their corporate office in Peoria, Arizona as a demo unit for prospective customers for Ganart's Workplace Solution ("Demo Kiosk"). The parties agreed that Ganart would send two units of the Assembly to TurnKey with the mutual understanding that one unit of the Assembly would be installed in the Demo Kiosk ("Assembly 2") to be deployed in TurnKey's corporate office, and the other one would be held by TurnKey pending request by Ganart for another kiosk ("Assembly 3"). Ganart sent two units of the Assembly to TurnKey that day.

TurnKey completed the YourATM Kiosk fitted with the Assembly 1 and shipped it to Ganart on January 24, 2013 which was deployed by Ganart in the Humanetics factory location in Carrollton, Texas.

TurnKey visited Ganart's office in Texas on Jan 29, 2014 to (i) retrofit the YourATM Kiosk with a second cash dispenser cassette, and (ii) retrofit the Demo Kiosk with a new front access door. During this visit, Ganart provided TurnKey with another unit of Assembly ("Lab Assembly") which was installed in the Lab Kiosk by TurnKey. The Lab Assembly was in addition to the three Assembly units previously shipped to TurnKey in Arizona.

Ganart sent a hard drive to TurnKey loaded with Ganart's proprietary software, which was received by TurnKey on March 8, 2013. TurnKey used the hard drive and Assembly 2 for the Demo Kiosk that was placed in their corporate office. The Demo Kiosk was operational on April 1, 2013.

On August 20, 2013 Ganart received several alerts from TurnKey's demo unit. Upon inquiry, Ganart was informed that TurnKey removed and/or disconnected several devices from the Demo Kiosk, which triggered the alerts.

000028

On September 4, 2013 Casey Strachan requested to make some changes to the software module (from two cassette dispenser to one cassette version) as TurnKey had a customer visiting their shop on September 5, 2013 and TurnKey wanted to do a demo of Ganart services on the Demo Kiosk.

On September 5, 2013, Ganart received emergency call from TurnKey that their Demo Kiosk was not responding. TurnKey also made an emergency request to enable Self-Service Registration at Kiosk service on the Demo Kiosk for a customer demo. Ganart responded to the requests. TurnKey sent a confirmation email to Ganart that the Demo Kiosk was working and the Self-Service Registration at Kiosk service worked very well. TurnKey also requested Ganart to restore the previous services on the Demo Kiosk. On September 6, 2013 TurnKey sent another email that Self-Service Registration at Kiosk service worked great during customer demo.

On September 12, 2013 Gary Strachan made a request to ship the Lab Kiosk in Ganart lab back to TurnKey with the explanation that they had an opportunity to sell it to a customer. Ganart erased its software from the hard drive and removed its own devices, including Lab Assembly, from the Lab Kiosk prior to shipment.

On September 20, 2013 TurnKey made an emergency request to enable Self-Service Registration at Kiosk service again on their Demo Kiosk for a customer demo later that day. Ganart responded to the request by enabling the Self-Service Registration at Kiosk service for that customer demo.

Assembly 1 was removed by Ganart prior to shipping the YourATM Kiosk to TurnKey the week of November 23, 2013. Assembly 2 was returned by TurnKey to Ganart in November 2013 in a disassembled state which is a violation of the NDA. TurnKey is currently in possession of Assembly 3.

Based on information and belief, TurnKey gave one or more demonstrations of Ganart's proprietary Know Your Customer and Anti-Money Laundering compliant Self Service Registration at Kiosk to Robocoin in September, 2013, in violation of the NDA.

In October, 2013 TurnKey provided Robocoin with a Kiosk that incorporated Ganart's proprietary Assembly.

Prior to the demonstration(s), Robocoin's process for customer registration and bitcoin transfer used cell phones and QR Codes. It did not incorporate any biometric identification. Furthermore, the authentication process was substantially different from Ganart's authentication process.  Following the demonstration(s), as evidenced by video of the TurnKey-supplied Robocoin kiosk, deployed in Vancouver, Canada, on or about October 28, 2013, the process had substantially changed and was identical in features and process steps to Ganart's process. Upon information and belief, TurnKey also provided Robocoin with Ganart's software-based customer registration and authentication process.

During the week of September 23, 2013 TurnKey had the Ganart Lab Kiosk picked up from Ganart premises by UPS.

On October 23, 2013 TurnKey sent an email that the Snapshell (ID scanner) device on their Demo Kiosk was not working.  Upon information and belief, TurnKey unplugged the Snapshell device from the Demo Kiosk, plugged in another device, and then when they re-plugged the Snapshell device, it stopped working.

On or about October 28, 2013 Ganart learned from media reports that Robocoin installed a kiosk (supplied by TurnKey) in Vancouver, Canada.  The kiosk installed by Robocoin is the same model manufactured by TurnKey for Ganart.  Photographs of the kiosk accompanying the news reports reveal that the palm vein scanner assembly installed on the Robocoin kiosk is the

same as the Assembly designed by Ganart. Also, the software-based customer registration process used on Robocoin kiosk appears to be a replica of Ganart's Self-Service Registration at Kiosk. When confronted with this information, TurnKey admitted that the palm vein scanner Assembly installed on the Robocoin kiosk had the same components provided by Ganart and same design of the Assembly provided to TurnKey by Ganart, which is a violation of the NDA.

**INTERROGATORY NO. 8:**        Please state with particularity the complete factual basis for the allegations in Paragraph 30 of Ganart's Second Amended Complaint that "TurnKey has … violated the terms of the NDA with Ganart by demonstrating Ganart's proprietary Self-Service Registration at Kiosk process to Robocoin."

        **ANSWER:** *See* Answer to Interrogatory No. 7. *See also*, Ganart's Answers to Defendant's First Set of Interrogatories.

**INTERROGATORY NO. 9:**        Please state with particularity the complete factual basis for the allegations in Paragraph 30 of Ganart's Second Amended Complaint that "TurnKey has … infringed upon the intellectual property of Ganart by providing Robocoin Technologies the entire Self-Service Registration at Kiosk process."

        **ANSWER:** *See* Answer to Interrogatory No. 7. *See also*, Ganart's Answers to Defendant's First Set of Interrogatories.

**INTERROGATORY NO. 10:**        Please state with particularity the complete factual basis for the allegations in Paragraph 34 of Ganart's Second Amended Complaint that "Defendants have misappropriated Ganart's trade secrets through improper means."

        **ANSWER:** *See* Answer to Interrogatory No. 7. *See also*, Ganart's Answers to Defendant's First Set of Interrogatories.

**INTERROGATORY NO. 11:**      Please state with particularity the complete factual basis for your contention that the "palm vein scanner assembly" constitutes a "trade secret" as defined by Tex. Civ. Prac. & Rem. Code § 134A.002(6).

  **ANSWER:** Ganart spent significant resources researching and developing the Assembly, so that the housing, finger guide, dome, and palm secure cube were fully integrated into a robust, reliable, secure, industrial grade, biometric reader.  Unlike the Fujitsu consumer grade, plastic, off the shelf scanner, Ganart's Assembly integrates features (e.g. the acrylic dome covering the cube) which differentiate it from other biometric identification devices in the market.

  TurnKey's allegedly "independently developed" palm vein scanner assembly is nothing more than a slight modification of Ganart's design — it uses the same materials, has the same profile, and the same angles developed by Ganart.  The base geometry for TurnKey's version is identical to Ganart's proprietary Assembly.

**INTERROGATORY NO. 12:**      Please state with particularity the complete factual basis for your contention that the "Self-Service Registration" constitutes a "trade secret" as defined by Tex. Civ. Prac. & Rem. Code § 134A.002(6).

  **ANSWER:** Self-Service Registration at Kiosk is a service that allows fully compliant (Anti-money Laundering Act) registration of an individual at a self-service device, such as a kiosk, without teller assistance, for access to variety of services, such as regulated financial transactions like money transfer. This service allows a complete Anti Money Laundering Act (AML) compliant identification and registration of an individual at a self-service kiosk using Ganart's proprietary technology and processes. It includes unique combination of biometric

signature (including palm vein), capture and validation of a government issued identification card, and digital photographs of the registrant.

Ganart's Self-Service Registration at kiosk is the result of over two years of research and development by Ganart and the expenditure of approximately one million dollars. Ganart licenses this process to third parties for a fee. This process derives independent economic value because it is not generally known to, and not readily ascertainable by proper means, by other persons who could obtain economic value from its disclosure or use.

This software-based process is kept confidential by Ganart and is not shared with third parties absent a Non-Disclosure Agreement. As part of the NDA, Ganart requires any subsequent disclosure by the party receiving such confidential information to obtain Ganart's specific written permission before doing so.

**INTERROGATORY NO. 13:**        If your responses to Plaintiff's First Set of Requests for Admission are anything, but an unqualified admission:

    A.     State the factual basis for your denial;

    B.     Identify all persons who have knowledge of the facts stated in support of subparagraphs (A) above; and

    (C)    Identify all documents supporting your denial.

**ANSWER:**  Plaintiff objects to this Interrogatory because Defendant has exceeded the permissible number of Interrogatories.  Plaintiff objects to this Interrogatory because it is overbroad.  Subject to these objections, Plaintiff directs Defendant to its Disclosures and its responses to Defendant's discovery.

<u>**VERIFICATION**</u>

| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

    **BEFORE ME,** the undersigned Notary Public, on this day personally appeared WAYNE McHUGH, who, being by me duly sworn on his oath, deposed and said that he is duly qualified and authorized in all respects to make this affidavit; that he is a duly authorized representative of Defendant Ganart Technologies, Inc.; and he has read the above and foregoing Objections and Answers to Plaintiff's Second Set of Interrogatories, and that on behalf of Ganart Technologies, Inc., attests that based on the information known or reasonably available to Ganart Technologies, Inc., the factual statements contained herein are true and correct.

 

_____

WAYNE McHUGH, Authorized Representative of Ganart Technologies, Inc.

 

    **SUBSCRIBED AND SWORN TO BEFORE ME** on this 13 day of August , 2014, which witness my hand and official seal.


JANIE WHITE
Notary Public, State of Texas
My Commission Expires
March 13, 2017

_____
Notary Public, State of Texas

Printed Name: Janie White

My Commission Expires: March 13, 2017